Alan D. Halperin, Esq.
Robert D. Raicht, Esq.
Jocelyn Keynes, Esq.
**HALPERIN BATTAGLIA RAICHT, LLP**
555 Madison Avenue, 9th Floor
New York, New York 10022
Phone:  (212) 765-9100; Fax: (212) 765-0964
ahalperin@halperinlaw.net; rraicht@halperinlaw.net
jkeynes@halperinlaw.net

*Proposed Counsel to the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:

**BRUNSCHWIG & FILS, INC.,**

Debtor.
--------------------------------------------------------x

Chapter 11

Case No. 11-22036 (RDD)

**MOTION FOR AN ORDER (I) AUTHORIZING DEBTOR
(A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361,
362, 364(c)(1), 364(c)(2), 364(d)(1), AND 364(e) AND (B) TO UTILIZE CASH
COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE
PROTECTION TO PREPETITION SECURED PARTY PURSUANT TO
11 U.S.C. §§ 361, 362, 363, AND 364, AND (III) SCHEDULING FINAL HEARING
PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Brunschwig & Fils, Inc., the debtor and debtor-in-possession herein

("Brunschwig" or the "Debtor"), respectfully represents:

**PRELIMINARY STATEMENT**

1.     By this motion (the "Motion"), the Debtor seeks two forms of relief:

(a) use of cash collateral and (b) approval of a $4.0 million secured debtor-in-possession

financing facility from Kravet Inc. as administrative agent (the "DIP Agent") for itself and other

entities who may become lenders under the facility from time to time (each a "DIP Lender" and,

collectively, the "DIP Lenders").  Simultaneously herewith, the Debtor has filed a motion with this Court pursuant to which Brunschwig proposes to sell substantially all of its assets, free and clear of liens, claims and encumbrances, subject to higher or better offers (the "Asset Sale"). Kravet is also the proposed "stalking horse" bidder in connection with the Asset Sale.[1]

2.      As discussed, herein, the Debtor requires financing under the debtor-in-possession facility pending an Asset Sale.  The DIP Lenders have agreed to make loans and advances to the Debtor in an amount up to $4.0 million, on a senior secured priming basis, subject to the terms of the Budget (as defined herein), to fund the Debtor's operations pending the Asset Sale.  In addition, the Prepetition Lender (as defined herein) has also agreed to permit the Debtor to use cash collateral, and to incur the priming liens and obligations under the DIP Facility (as defined below) pending the Asset Sale on the terms and conditions set forth in the Interim Order and in the DIP Loan Documents (as defined below).

3.      Absent the immediate entry of the proposed Interim Order, the Debtor will be unable to conduct its business pending the Asset Sale.  Without immediate advances from the DIP Lenders and use of cash collateral, the Debtor will not be able to meet payroll, fulfill obligations under its existing customer orders, or operate on a day-to-day basis.  For all of the foregoing reasons and for those that follow, the Debtor respectfully requests that the Motion be granted on an interim and final basis.

---

[1] Contemporaneously herewith, the Debtor has filed that certain Motion for Orders (I) Scheduling Hearing to Consider (A) Sale of Substantially All of the Debtor's Assets, Free and Clear of All Liens, Claims and Encumbrances, Subject to Higher and Better Offers; and (B) Assumption and Assignment of Executory Contracts; (II) Scheduling Hearing to Consider Approval of (A) Break-Up Fee and Expense Reimbursement and (B) Bidding Procedures for the Conduct of an Auction and Entering Order Thereon; (III) Fixing a Cure Claims Bar Date With Respect to the Assumption and Assignment of Executory Contracts; and (IV) Fixing Manner and Notice of Sale Hearing; (V) Authorizing the Debtor to Sell Assets, Free and Clear of All Liens, Claims and Encumbrances, Subject to Higher and Better Offers; and (VI) Authorizing Assumption and Assignment of Executory Contracts.

# INTRODUCTION

4. The Debtor makes this Motion for orders, pursuant to sections 105(a), 361, 363 and 364(c) and (d) of Title 11 of the United States Code, as amended (the "Bankruptcy Code") and Fed. R. Bankr. P. 2002, 4001 and 9014 and General Order No. M-274 of this Court (the "Guidelines"), on an interim and final basis:

(a) to obtain senior secured priming postpetition financing on a superpriority basis (the "DIP Facility") pursuant to the terms and conditions of that certain Revolving Loan Promissory Note (as amended, supplemented, restated or otherwise modified from time to time, the "DIP Demand Note," a copy of which is annexed hereto as **Exhibit A**), by and among Brunschwig (in its capacity as borrower), the DIP Agent, and the DIP Lenders on the terms of the DIP Demand Note;

(b) authorizing the Debtor to execute the DIP Demand Note and any other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith (as amended from time to time, collectively, the "DIP Loan Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(c) subject to the Carve-Out (as defined herein), granting the DIP Agent and the DIP Lenders first priority security interests in and liens on all of the DIP Collateral (defined herein) on account of the DIP Facility and all obligations owing thereunder and under the DIP Loan Documents (collectively, and including all "Obligations" as described in the DIP Demand Note, the "DIP Obligations");

(d)  subject to the Carve Out, granting allowed superpriority expense claims to the DIP Agent and the DIP Lenders;

(e)  authorizing the use of the Prepetition Lender's (defined herein) Cash Collateral (defined herein);

(f)  providing adequate protection for any diminution in value of the Prepetition Collateral (defined herein) to the Prepetition Lender;

(g)  scheduling interim and final hearings, pursuant to Bankruptcy Rule 4001 on this Motion; and

(h)  granting the Debtor such other and further relief as the Court may deem just and proper.

## **BACKGROUND**

5.      On January 12, 2011 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and has continued in the management and operation of its business and property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6.      No creditors' committee or trustee has been appointed in this case.

7.      Brunschwig is a family-owned company organized and existing under the laws of the State of New York with headquarters in North White Plains, New York.  The issued and outstanding shares of the Debtor are held 75.5% percent by T. Olivier Peardon, 21.9% percent by Thomas P. Peardon, Jr., and 2.6% percent by a Peardon family trust.  The Debtor maintains showroom premises in seventeen locations across the United States, including New York, Boston, Philadelphia, Chicago, Dallas, Houston, Los Angeles and San Francisco, among

others.  In addition, Brunschwig has a showroom in London and operations, through certain non-debtor affiliates, in Paris and Melbourne.

8.     Brunschwig provides its products and services primarily to design professionals, giving them access, and the ability to buy, "to-the-trade-only" luxury home furnishings for their clients.  In addition to its own extensive product lines, Brunschwig represents approximately thirty-four other furnishing companies, including Gaston y Daniela, Houles and Hinson.

History and Description of Business.

9.     Brunschwig has been in business for 110 years.  It designs and manufactures contemporary and historically-inspired decorative fabrics, wall coverings, trimmings, upholstered furniture, lamps, tables, mirrors and accessories for both residential and contract applications.  Throughout its storied history of operations, Brunschwig has maintained a remarkable legacy of design, service, timelessness, quality, attention to detail and superb craftsmanship.  These are the hallmarks of the Debtor's products, celebrated world-wide, which began in 1900 when Achille Brunschwig established Brunschwig & Fils as a tapestry-weaving mill in Aubusson and Bohain, France.

10.     The 1900s were known as a new age for many; an innovative start, a new beginning.  Certainly, that was true for Mr. Brunschwig and his tapestry-weaving mill.  Early in the twentieth century, the firm expanded its collection to include printed and woven silks and cottons from the finest European mills.  Brunschwig soon established and enjoyed a distinguished, international reputation for quality.  By 1925, under the direction of Captain Roger E. Brunschwig, the founder's son, the company opened showrooms in New York and other cities in the United States.

11.     In 1941, Captain Brunschwig joined General de Gaulle's Free French Forces in London, leaving Zelina, his American wife, to direct the business. Mrs. Brunschwig – affectionately called Mrs. B – who had been a successful interior designer, joined the firm as a stylist, and found herself without French imports and, being forced to be innovative, she substituted parachute cloth for silk, unbleached muslin for linen, and found American mills to weave and print her designs, all to great acclaim.

12.     Following World War II, Roger Brunschwig, now a Colonel, returned to head the firm, which was again able to import fabrics from France and England to complement its American collection. Under Mrs. B's leadership as design director, the company broadened its product base to include wallpapers and trimmings, many of which coordinated with existing printed cotton and linen designs. Mrs. B. also continued to enrich the company's archives of antique textiles, wallpapers and trims – originally established by Achille Brunschwig – as well as collaborating with museums and historic restorations to create further fabrics based upon historical pieces.

13.     In the 1980's, cousins to the founding Brunschwig family acquired the business. Today, Brunschwig continues as a family-owned company under the direction of T. Olivier Peardon, the Debtor's President and Chief Executive Officer.

14.     The firm offers more than 17,000 fabrics and 1,200 wall coverings, ranging from fine documentary reproductions to striking contemporary designs. It has relationships with more than 200 mills from around the world. Every year the design studio creates new fabric collections consisting of as many as thirty designs per collection, each design available in a variety of colors. At least one annual collection is inspired by a museum or

historic place. The studio also annually introduces a new wallpaper book and adds to its extensive collection of passementerie – tassels, braids, fringes, ropes and cords.

15. In 1986, the company launched its first collection of upholstered furniture. As it has with other products, Brunschwig produces timeless designs of exceptional quality that are suited to both residential and commercial use. Brunschwig launched lighting and table collections in the spring of 1992. In 2003, Brunschwig began the worldwide distribution for Jagtar Thai Silks. In 2004, Brunschwig acquired worldwide distribution rights for the Kirk Brummel Collection, which is now a division of Brunschwig.

16. In 1990, the Debtor opened a showroom in London. Thereafter, Brunschwig, through non-debtor affiliates, opened showrooms in Paris and Melbourne.

Debtor's Financial Difficulties.

17. Brunschwig's financial difficulties stem from a confluence of events and challenges in recent years, which taken together, have had a negative impact on its overall performance. Like many industries, the textile industry has been hard hit by the significant decrease in consumer spending and severely affected by the global economic downturn. As a result, Brunschwig has experienced declining sales and profitability over the last several years.

18. In 2007, the company undertook a comprehensive restructuring of its business operation. As part of that restructuring, the Debtor entered into a sale-leaseback transaction with respect to its premises in North White Plains, New York in order to resolve obligations to its secured bank lender. Upon the closing of the sale-leaseback transaction in or about June 2010, the Debtor was able to pay off its credit facility leaving the company with a greatly reduced level of secured debt. The Debtor also implemented significant cost-cutting measures reducing its costs by approximately $18 million since the beginning of 2008. Through

attrition and painful reductions in its workforce, the Debtor terminated approximately 100 employees reducing its payroll costs by over $5.3 million since the beginning of 2008. The Debtor currently has approximately 135 employees in its various locations in the United States. The restructuring left Brunschwig in the enviable position of being not only cash positive on its then current numbers, but even in the event sales further decreased by up to 21%. Unfortunately, given the duration and depth of the recession, the efforts of management to sustain Brunschwig at its current reduced level of operations have been unavailing. Due to a fundamental reduction of market size in the home furnishings market, sales plummeted industry wide, and Brunschwig was not spared. The Debtor's sales fell by 35% in 2009 and 30% in 2010 (estimated). The company found itself again in financial trouble.

19.     Brunschwig has continued to explore modifications to its business model, including closing underperforming and unprofitable locations, downsizing and scaling back its operations, and eliminating unduly burdensome contracts and unexpired leases. Nonetheless, the Debtor has determined that it cannot effectuate such modifications to its business model on its own given the precipitous drop in revenue, its current cash crisis and large legacy obligations. These and other challenges caused Brunschwig to seek protection under Chapter 11.

Chapter 11 Goals.

20.     Faced with a significant drop in revenue and related challenges, Brunschwig requires the breathing spell afforded by the automatic stay to protect and preserve assets for the benefit of its creditors. Prior to the commencement of this case, the Debtor explored various alternatives to resolve its financial issues, including a going concern sale of its business. The Debtor has determined that a going concern sale is necessary to preserve its business, and is in the best interest of its estate and creditors. By this Motion, the Debtor is

seeking approval of a debtor-in-possession financing facility. Such financing sources will enable the Debtor to ensure continuity of service to its valuable customer base, thus maximizing asset values for the benefit of its creditors and estate.

21. By seeking bankruptcy protection, Brunschwig will be able to protect, preserve and maximize the value of its assets and businesses for the benefit of the estate, its creditors and employees. This proceeding will enable Brunschwig to transition its business to a financially sound status, maximize the value of Brunschwig's long-term reputation and goodwill in the textile industry, provide continued employment to many of its valued employees, and sustain a significant and trusted partner for its agents and distributors around the globe.

22. Additional information regarding Brunschwig's business, capital structure and the circumstances leading to this chapter 11 case is contained in the Affidavit of T. Olivier Peardon Pursuant to Local Bankruptcy Rule 1007-2 (the "Peardon Affidavit") filed contemporaneously herewith.

**Debtor's Prepetition Loan Agreement**

23. For a number of years preceding the Petition Date, the Debtor obtained loans and other financial accommodations from J.P. Morgan Chase Bank, N.A. ("Chase") evidenced by, among other things, a certain loan agreement, notes, security agreement, and guarantees of certain non-debtor affiliates (collectively, the "Chase Agreement"). Chase was owed approximately $4.35 million, exclusive of interest and other costs and expenses, under the Chase Agreement (the "First Chase Claim"). Repayment under the Chase Agreement was secured by substantially all of the assets of the Debtor, including a mortgage on certain real property (then) owned by the Debtor located at 75 Virginia Road, North White Plains, New York (the "Real Property"). In addition to the First

Chase Claim, Chase loaned additional monies and held a $2.5 million second mortgage on the Real Property to secure this loan (the "Second Chase Claim").

24.     In connection with an earlier negotiation to reduce Chase's aggregate loans to the Debtor, Thomas P. Peardon, Jr. ("T. Peardon" or the "Prepetition Lender")[2] acquired the Second Chase Claim by buying the loan from Chase at par. Thereafter, T. Peardon made additional loans and advances from time to time to the Debtor aggregating approximately $500,000, for a total claim of $3 million, exclusive of interest and other costs and expenses (the "Prepetition Lender's Claim"). Repayment of the Prepetition Lender's Claim was secured by the Real Property.

25.     As discussed above, as part of its 2007 restructuring, the Debtor determined to enter into a sale-leaseback transaction for the Real Property that would generate approximately $7 million. After negotiation with its secured creditors, it was agreed that: (a) the Real Property would be sold pursuant to the sale-leaseback transaction, (b) Chase would be repaid on the First Chase Claim from the proceeds of sale, (c) T. Peardon would consent to the disposition of the Real Property and release his mortgage on the Real Property and forebear from exercising his rights under the second mortgage, (d) the funds remaining after repayment of the First Chase Claim (in excess of $1,000,000) that would be due to T. Peardon on account of the Second Chase Claim would be re-loaned to the Debtor, and (e) T. Peardon would receive liens on the other assets that had been subject to Chase's liens, *i.e.* the Prepetition Collateral. The sale leaseback was negotiated and consummated in June 2010 in a manner consistent with the aforementioned terms. The Prepetition Lender's Claim is evidenced by, among other things, a note and continuing general security agreement (the "Prepetition Loan Agreement") pursuant to which T. Peardon holds perfected liens and security interests on all of the assets of the Debtor (the "Prepetition Collateral").

---

[2] T. Peardon is a holder of 21.9% percent of the issued and outstanding shares of the Debtor.

26. As a result, all cash in the Debtor's possession or in which the Debtor has an interest on and after the Petition Date, together with all proceeds thereof, constitutes Cash Collateral in which the Prepetition Lender has an interest within the meaning of section 363(a) of the Bankruptcy Code.

27. Based upon the Debtor's review of the various loan documents and filings, the Debtor believes that the Prepetition Lender has valid, enforceable and perfected security interest in the Debtor's assets (including without limitation, Cash Collateral).

## THE DEBTOR REQUIRES USE OF CASH COLLATERAL
## AND DEBTOR-IN-POSSESSION FINANCING
## TO CONTINUE OPERATION OF ITS BUSINESS

28. The Debtor has no unencumbered funds or credit available to fund its business operations. Without use of Cash Collateral and funding under the DIP Facility, as proposed herein, the Debtor's operations will cease and the value of its assets will be lost. Therefore, it is imperative that the Debtor be authorized to use Cash Collateral and obtain debtor-in-possession financing in order to preserve its operations and asset values pending the Asset Sale.[3]

29. Annexed as **<u>Exhibit B</u>** hereto is the Budget, which is a week-by-week budget for a 13 week period. The Budget provides a detailed list of the various categories of expenses that the Debtor seeks authorization to pay with cash on hand as of the Petition Date, the proceeds of Cash Collateral and advances under the DIP Demand Note. The Debtor requests authorization to obtain financing and to use Cash Collateral to pay those actual, necessary ordinary course operating expenses ("<u>Permitted Expenditures</u>") set forth in the Budget. The DIP

---

[3] Prior to the Petition Date, the Debtor's cash balance was at a critically low level. In order to provide the Debtor with some modicum of liquidity to, among other things, pay retainers to the Debtor's professionals and fund certain other pre-filing Chapter 11 administrative expenses, the Debtor and Kravet entered into a certain bill of sale, dated January 12, 2011 (the "<u>Bill of Sale</u>"), pursuant to which the Debtor sold, subject to a repurchase option (the "<u>Repurchase Option</u>"), an historical archive of its fabrics. In consideration for the transaction, the Debtor received $250,000.

Agent and the Prepetition Lender have consented to the terms of the Budget and the proposed use of Cash Collateral and the advances under the DIP Demand Note, as provided herein.

*Use of Cash Collateral.*

30.     In consideration of the use of Cash Collateral, the Debtor proposes to grant adequate protection to the Prepetition Lender of the Prepetition Collateral in the form of (a) replacement liens on any and all postpetition assets of the Debtor (the "Replacement Liens"), and (b) an allowed administrative claim under sections 503(b)(1), 507(a), and 507(b) of the Bankruptcy Code (the "Adequate Protection Superpriority Claim"), provided, however, that the Replacement Liens and the Adequate Protection Superpriority Claim shall (i) be subject and subordinate to (x) the Postpetition Liens and Superpriority Claim (each as defined herein) to be granted under the DIP Demand Note and (y) the Carve-Out, and the Supplemental Carve-Out (as defined herein), and (ii) not to extend to Avoidance Actions or the proceeds thereof..  The Debtor respectfully submits that, under the circumstances, the combination of the Replacement Liens and the Adequate Protection Superpriority Claim adequately protects the Prepetition Lender for the use of Cash Collateral pursuant to section 361 of the Bankruptcy Code.

*Approval of DIP Facility and Use of Funds.*

31.     In order to complement the use of Cash Collateral, and to ensure continued operations of its business pending the Asset Sale, the Debtor has negotiated the terms of a secured $4.0 million DIP Facility from Kravet and the DIP Lenders.  Subject to the terms and conditions of the DIP Demand Note and the other DIP Loan Documents, and Court approval thereof, the DIP Lenders have agreed to advance funds, on a revolving basis, to the Debtor.  The Debtor seeks authority to borrow up to $3,050,000 on an interim basis to fund its operations, in accordance with the Budget, pending a final hearing on the Motion.  Upon final approval by this

Court, the DIP Lenders shall make loans and advances to the Debtor up to an amount not to exceed $4.0 million, subject to the terms and conditions of the DIP Demand Note and the other DIP Loan Documents.

32.     Advances under the DIP Demand Note shall be used solely for working capital purposes and to fund the administration of the Chapter 11 case, including professional fees, all in accordance with the Budget.  In addition, the Debtor proposes to use a portion of the advances under the DIP Demand Note to exercise the Repurchase Option under the Bill of Sale. Pursuant to the Bill of Sale, the Debtor retains possession and use of the archive during the Chapter 11 case and must exercise the repurchase option on or before March 1, 2011.  By this Motion, the Debtor seek authority to obtain advances under the DIP Demand Note to exercise the Repurchase Option and regain title to the archive.

33.     Interest on advances under the DIP Demand Note will accrue at the rate of 12% per annum, with a default interest rate of 2% above the then applicable non-default rate of interest.  Absent the occurrence of an Event of Default, interest is payable in kind until the Maturity Date. The DIP Demand Note also provides for payment of a 2% commitment fee, and reimbursement of the reasonable fees and expenses of the DIP Agent's professional fees, all of which are payable upon the Maturity Date (as defined in the DIP Demand Note).  The Maturity Date shall occur as set forth in the DIP Demand Note, which provides, among other things, that the Maturity Date shall mean the earlier to occur of (a) 30 days from entry of the Interim Order (subject to extension at the Final Hearing), (b) two (2) business days following the entry of an order approving sale of the Debtor's assets to an entity other than Kravet, (c) the occurrence of an Termination Event (as set forth in the Interim Order), and (d) such other events as set forth in the DIP Demand Note.

34.     The Debtor proposes to grant the DIP Lenders, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "Superpriority Claim") having priority over any and all administrative expenses.  Postpetition financing that the Debtor obtains under the DIP Facility will also be secured (a) under section 364(c)(2), by all unencumbered prepetition and postpetition property of the Debtor, and (b) under section 364(d), by perfected priming liens on all of the Debtor's assets that were subject to valid, properly perfected liens as of the commencement of the Chapter 11 case (collectively, the "Postpetition Liens").  The Superpriority Claim and the Postpetition Liens will be subject and subordinate solely to the Carve-Out and shall not include Avoidance Actions.

35.     The DIP Agent, the DIP Lenders and the Prepetition Lender have agreed to a carve-out (the "Carve-Out") from the liens and claims granted to them hereunder, which liens and claims shall be subject and subordinate only to payment of the following:

(a) the statutory fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6);

(b) fees payable to the Clerk of this Court;

(c) subject to the terms and conditions of this Interim Order and the Budget, the unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date and prior to the occurrence of an Event of Default under the DIP Loan Documents or other Termination or Maturity Date under this Interim Order, the Final Order or the DIP Loan Documents (including the DIP Demand Note), to the extent allowed and payable under sections 326, 328, 330 and 331 of the Bankruptcy Code (but excluding success, completion or other transaction fees) by attorneys,

accountants and other professionals retained by the Debtor and any

creditors' committee under sections 327 or 1103(a) of the Bankruptcy

Code (the "Professionals");

(d) the unpaid and outstanding reasonable fees and expenses of the

Professionals actually incurred from or after the occurrence of an Event of

Default or other Termination or Maturity Date under this Interim Order or

the DIP Loan Documents (including the DIP Demand Note), to the extent

allowed and payable under sections 326, 328, 330, and 331 of the

Bankruptcy Code (but excluding success, completion or other transaction

fees) in an aggregate amount not to exceed $50,000; and

(e) reasonable fees and expenses of any Chapter 7 trustee, allowable pursuant

to section 726(b) of the Bankruptcy Code in an amount not to exceed

$10,000.

In addition to the Carve-Out, with respect to the Prepetition Lender only, the Prepetition

Collateral, the Adequate Protection Liens or the Adequate Protection Superpriority Claim, shall

be further subject and subordinate to (i) the unpaid and outstanding reasonable fees and expenses

of the Debtor's professionals in an amount not to exceed $150,000; and (ii ) the unpaid and

outstanding reasonable fees and expenses of the Creditors' Committee, if any, in an amount not

to exceed $50,000 (the "Supplemental Carve-Out").

36.     The Postpetition Liens, the Superpriority Claim, the Replacement Liens

and the Adequate Protection Superpriority Claim shall not be subject or subordinate to any

expenses or fees of any party incurred in connection with the prosecution of claim against the

DIP Agent, the DIP Lenders and/or the Prepetition Lenders.

37.     Finally, the DIP Demand Note shall terminate upon occurrence of an

Event of Default.[4]  The remedies upon the occurrence of an Event of Default are set forth in

paragraph 18 of the Interim Order.  The Interim Order also sets forth deadlines by which the

Committee and parties in interest must assert challenges to the Prepetition Liens.[5]

**Grounds for (A) Use of Cash Collateral and (B) Approval of the DIP Facility**

38.     The Debtor's business plan contemplates a sale of its assets in the context

of this Chapter 11 case.  As noted above, the Debtor has negotiated a "stalking horse" asset

purchase agreement with Kravet, and by contemporaneous motion has sought approval of such

sale, subject to higher and better offers, pursuant to sale procedures to be approved by this Court.

In order to continue the operation of the Debtor and maximize the value of its assets pending the

Asset Sale, the Debtor requires advances under the DIP Demand Note and other DIP Loan

Documents and use of Cash Collateral.  It is essential to the continued operation of the Debtor

that it has authority to obtain financing and use Cash Collateral to fund payroll, fulfill existing

---

[4] Events of Default under the DIP Demand Note include, but are not limited to, the following: (i) the Debtor's failure to make any payment of principal of, or interest on, or fees owing in respect of, the revolving loans or any of the other obligations when due and payable; (ii) the Debtor's failure to pay or reimburse any DIP Lender for any reimbursable expense within three (3) business days following a DIP Lender's demands for such reimbursement or payment; (iii) the Debtor brings a motion to obtain financing from any person other than the DIP Agent and the DIP Lenders (other than with respect to a financing used, in whole or in part, to repay the obligations and terminate the DIP Demand Note);  (iv) entry of an order confirming a plan of reorganization that does not contain a provision for the termination of the commitment of the DIP Lenders to make revolving loans and the repayment in full of all the obligations under the DIP Demand Note on or before the effective date of such plan ; (v) dismissal of the Chapter 11 case or conversion of the Chapter 11 case to one under Chapter 7; etc.  This summary of the relevant Events of Default are qualified in their entirety by the provisions of the DIP Demand Note.

[5] The Interim Order provides that any complaint or motion asserting challenging the validity, enforceability, perfection or priority of the liens securing the claims of the Prepetition Lender or any other cause of action against and/or with respect to the claim of the Prepetition Lender, the Prepetition Liens or the Prepetition Lender (individually or collectively, a "Challenge Claim") must be filed within the later of sixty (60) days after the date of an order approving the appointment of counsel for the Committee  (or such longer period as the Committee may obtain for cause shown before the expiration of such period) , or, in the event no Committee is appointed, no later than seventy-five (75) days (or a longer period for cause shown before the expiration of such period) from the entry of the final Order approving the Motion, or any subsequent date that may be agreed to in writing by the Prepetition Lender.  If no complaint is filed within such time period, then any Challenge Claim shall be deemed to have been forever relinquished, released and waived as to the Committee and other person or entity.

customer orders and other operating needs, including the costs of administration of this Chapter 11 case.

39. The Debtor submits that it should be authorized to use Cash Collateral in accordance with the terms of the Interim Order. Section 363 of the Bankruptcy Code governs a debtor's ability to use, sell or lease property of the estate. Section 363(c)(2) of the Bankruptcy Code restricts a debtor's ability to use Cash Collateral. That section provides, in pertinent part:

> The trustee [or debtor in possession] may not use, sell or lease cash collateral under paragraph (1) of this subsection unless –
>
> > (A) Each entity has an interest in such cash collateral consents; or
> >
> > (B) The court, after notice and a hearing, authorized such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

40. Section 363(a) of the Bankruptcy Code defines "cash collateral" as including cash and cash equivalents "whenever acquired," in which the estate and any entity other than the estate have an interest, and the "proceeds, products, offspring, rents or profits of property subject to a security interest as provided in section 552(b) of this title whether existing before or after the commencement of a case under this title" 11 U.S.C. § 363(a).

41. Bankruptcy Code section 363(e) provides that, upon request of an entity that has an interest in property to be used by a debtor, the Court shall "prohibit or condition such use… as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). What constitutes adequate protection is determined on a case-by-case basis. *See, In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3rd Cir. 1994); *In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987). Adequate protection can be provided in a number of ways under section 361 of the Bankruptcy Code, with the focus being to protect a secured creditor from any

diminution in the value of its interest in the collateral during the period during of its use postpetition. *See Swedeland*, 16 F.2d at 564-565; *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995). *See also, In re Cann & Saul Steel Co.*, 76 B.R. 479 (Bankr. E. D. Pa. 1987); *In re Dunes Casino Hotel*, 69 B.R. 784, 793 (Bankr. D.N.J. 1986) ("Adequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy."). Regardless of the form of adequate protection given, "the entitlement to and measure of adequate protection is always determined by the extent of the anticipated or actual decrease in the value of the secured creditor's collateral during the bankruptcy case." *Swedeland*, 16 F.2d at 564. "Adequate protection" is not defined in the Bankruptcy Code, although section 361 of the Bankruptcy Code sets forth three non-exclusive methods of how an interest in property may be adequately protected. *Id.*; *In re Shriver*, 33 B.R. 176, 181 (Bankr. N.D. Ohio 1983).

42. Pursuant to section 361 of the Bankruptcy Code, a debtor may provide adequate protection by making a cash or periodic payment to the creditor or providing it with the replacement lien. The creditor is only entitled to protection to the value of its collateral supporting its secured claim; it is not entitled to adequate protection for lost opportunity costs. *In re Gallegos Research Group, Corp.*, 193 B.R. at 584-85 (citing *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988)); *Cann & Saul Steel*, 76 B.R. at 483.

43. As set forth herein, the Debtor proposes to provide the Prepetition Lender with adequate protection in the form of the Replacement Liens and the Adequate Protection Superpriority Claim to protect the Prepetition Lender from diminution in the value of its collateral resulting from the use of Cash Collateral and the granting of the priming liens in favor

of the DIP Agent and DIP Lenders under the DIP Facility.  The preservation of the Debtor's

operations on a going-concern basis will maintain the value of any equity cushion associated

with the Prepetition Collateral while avoiding disruption of the Debtor's operations. *See In re*

*Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in

determination of whether the protection to a creditor's secured interest is adequate, is whether

that interest, whatever it is, is being unjustifiably jeopardized.").  The Debtor respectfully

submits that the protections set forth herein are appropriate to adequately protect the Prepetition

Lender's security interests.  Accordingly, the Court should authorize the Debtor's use of Cash

Collateral in accordance with the Budget.

44.    Finally, financial and other reporting like that required by the Interim

Order is often a component of the adequate protection provided to secured creditors. *See, e.g., In*

*re 5877 Poplar, L.P.*, 268 B.R. 140, 150 (Bankr. W.D. Tenn. 2001) (finding adequate protection

for use of cash collateral where, among other things, the debtors agreed to provide operating

reports to the lender and permit inspection of the premises upon lender's reasonable request).

The Prepetition Lender has consented to the forms of adequate protection proposed hereunder.

For the foregoing reasons, the Court should approve the adequate protection proposed herein.

45.    In addition, the Debtor seeks approval of the DIP Demand Note and

overall DIP Facility.  It is submitted that approval of the DIP Facility is in the best interest of the

estate and its creditors and should be approved.  Obtaining credit by the Debtor is governed by

section 364 of the Bankruptcy Code, which provides in relevant part:

> (c) If the trustee is unable to obtain unsecured credit allowable under section
> 503(b)(1) of this title as an administrative expense, the court, after notice and a
> hearing, may authorize the obtaining of credit or the incurring of debt –
>
> > (1) with a priority over any or all administrative expenses of the
> > kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate is subject to a lien.

(d)    (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate this is subject to a lien only if –

       (A) the trustee is unable to obtain such credit otherwise; and

       (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

       (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

(e) The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of the grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

46.    It is respectfully submitted that the Debtor meets the statutory criteria to obtain the relief requested.  Because of its precarious financial situation, the Debtor is unable to obtain funding other than on a senior secured, first priority priming basis.  Here, the DIP Agent is the proposed "stalking horse" bidder for the Asset Sale.  It is providing financing to enable the Debtor to undertake a sale process consistent with the provisions of section 363 of the Bankruptcy Code.  As part of its effort to identify a "stalking horse" bidder, the Debtor's management made clear to all parties that a debtor-in-possession financing facility was an essential component to any offer given the Debtor's current financial condition.  The DIP Lender was the only party willing to put forth a comprehensive offer that provided the financing necessary to fund a §363 sale process within the time constraints under which the Debtor was

operating.  Consequently, the requirements of sections 364(c)(1) and (d)(1)(A) are met and a superpriority and a priming lien may be granted in connection with any approval of the DIP Facility.  With regard to the terms and conditions of the financing facility itself, it is respectfully submitted that the terms and conditions are typical of debtor-in-possession loans.

47.     The Debtor has shown ample cause for approval of the DIP Facility.  The DIP Demand Note was negotiated at arms' length in good faith.  The terms and conditions of the DIP Facility have been the subject of negotiations between the parties and are reasonable under the circumstances, particularly given the Debtor's financial condition.  Moreover, the Motion provides appropriate notice to creditors and other parties in interest and an opportunity for such parties to object to the relief requested herein.  Accordingly, it is submitted that the DIP Agent and DIP Lenders are entitled to the protections set forth in section 364(e) of the Bankruptcy Code.

### The Debtor Requires Interim Financing

48.     Pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure, the final hearing on this Motion may be commenced no earlier than fifteen (15) days after service thereof.  As previously noted, there is a critical need for financing on an emergency basis.  Currently, the Debtor has no available cash or assets except that which is subject to the Prepetition Lender's liens and security interests.  The Debtor seeks authority to obtained advances and use Cash Collateral on an emergency basis in an amount not to exceed $3,050,000.[6]  Authorization to obtain financing and utilize Cash Collateral will provide the Debtor with the liquidity necessary to operate its business and to pay the wages, salaries, rent, utilities, and other expenses associated with running the Debtor's business.  Without such

---

[6] The amount sought on an emergency basis may need to be modified at the emergency hearing depending on the timing of the date(s) scheduled for any interim or final hearing on the Motion.

authorization, the Debtor's business operations will be terminated because the Debtor will be unable to obtain the services or employ the personnel necessary to operate its business and serve its clients, or to pay its utilities, rent and other operating expenses. Specifically, as set forth in the Budget, the Debtor needs to make immediate payments aggregating approximately $900,000 to vendors for the Debtor to acquire inventory to satisfy all pre-paid customer orders already in progress. To continue to service its clients, the Debtor must be able to provide assurance to its customers and vendors that it will be able to pay in the ordinary course for all postpetition purposes. Thus, access to financing under the DIP Facility and use of Cash Collateral is crucial to the Debtor's ability to avoid immediate and irreparable harm to its estate, creditors, and ongoing business.

49. The Debtor submits that creditors will not be prejudiced by emergency and interim relief because such relief is necessary to protect and preserve the assets for the benefit of the estate and its creditors and prevent irreparable harm to the going concern value of the business. The Debtor hereby requests that the Court schedule an interim hearing on this Motion.

### Request for a Final Hearing

50. Pursuant to Bankruptcy Rule 4001(b)(2), the Debtor respectfully requests that the Court set a date for the Final Hearing and approve the provisions for notice of the proposed Interim Order and the objection procedures that are set forth in the proposed Interim Order

### Notice

51. Pursuant to Bankruptcy Rule 4001, the Debtor respectfully requests that it be authorized to provide notice of the Interim Hearing and Final Hearing by serving a copy of

the Motion, by facsimile transmission, hand delivery or overnight mail or courier service upon: (a) the Prepetition Lender, (b) the DIP Agent, by its counsel, (c) the Committee (or its counsel), if one is appointed, if not, the twenty (20) largest unsecured creditors of the Debtor; (d) all known creditors who have or assert liens against the Debtor's assets; (e) the Internal Revenue Service; (f) the United States Attorney's Office for the Southern District of New York; (g) the New York State Department of Taxation & Finance; (h) the Office of the United States Trustee; and (i) all parties filing a notice of appearance in this case (collectively, the "<u>Notice Parties</u>").  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice need be given.

(Remainder of Page Intentionally Blank)

**WHEREFORE**, the Debtor respectfully requests entry of orders (a) scheduling interim and final hearings on this Motion; (b) granting the Debtor authority to use Cash Collateral and borrow from the DIP Lender on an interim basis in accordance with the proposed Interim Order, in the form annexed as **<u>Exhibit C</u>** hereto, (c) approving the terms of the DIP Facility pending the final hearing; (d) at the final hearing, granting final approval of use of Cash Collateral and financing in accordance with the DIP Facility, and (e) granting such other and further relief as is just and proper.

Dated: New York, New York
      January12, 2011

**BRUNSCHWIG & FILS, INC.**
Debtor and Debtor-in-Possession

By:     * /s/  T. Olivier Peardon      *
        T. Olivier Peardon,
        President and Chief Executive Officer

Filed by:

**HALPERIN BATTAGLIA RAICHT, LLP**

By: * /s/ Robert D. Raicht     *
    Alan D. Halperin, Esq.
    Robert D. Raicht, Esq.
    Jocelyn Keynes, Esq.
    555 Madison Avenue, 9th Floor
    New York, New York 10022
    Phone:  (212) 765-9100; Fax: (212) 765-0964
    ahalperin@halperinlaw.net; rraicht@halperinlaw.net
    jkeynes@halperinlaw.net

*Proposed Counsel to the Debtor and Debtor- in-Possession*