**<u>Exhibit A</u>**

## BRUNSCHWIG & FILS, INC.

## REVOLVING LOAN PROMISSORY NOTE

$3,050,000                                                           New York, New York
                                                                          January __, 2011

On January 12, 2011 (the "Petition Date"), Brunschwig & Fils, Inc, a New York corporation (the "Borrower"), commenced Chapter 11 Case No. 11-[_____](RDD) (the "Chapter 11 Case") by filing a voluntary petition for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Borrower continues to operate its business and manage its properties as a debtor and a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Borrower has requested that Kravet Inc., a Delaware corporation, ("Kravet") and the lenders from time to time party hereto together with Kravet (each as a "Lender" and collectively as the "Lenders"), make advances from time to time evidenced by this Revolving Loan Promissory Note (as amended, modified, or supplemented from time to time, this "Note") in accordance with the terms hereof and the Interim Order. The Borrower intends to utilize such advances in accordance with Section 1(d) of this Note. Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 17 of this Note.

1.       Revolving Advances.

(a)       Subject to the terms and conditions hereof, each Lender shall make available to Borrower from time to time until the Maturity Date advances (each, a "Revolving Advance" or a "Revolving Loan"). The aggregate principal amount of Revolving Loans outstanding shall not exceed at any time Three Million Fifty Thousand and 00/100 Dollars ($3,050,000) (the "Maximum Amount") minus such Reserves that are then in effect. Subject to Section 18(h) of this Note, the aggregate amount of Revolving Loans made by each Lender under this Note shall not exceed the amount for each such Lender set forth on Schedule I. The obligation of each Lender to make Revolving Loans under this Note shall be several and not joint and several. Until the Maturity Date, Borrower may from time to time borrow, repay and reborrow under this Section 1. Each Revolving Loan shall be made on notice by Borrower to Agent and each Lender identified in Section 18(a) at the address specified therein or such other person or persons designated by each such Lender in writing to Borrower. Any such notice must be given no later than 1:00 p.m. (New York time) two (2) Business Days prior to the proposed Revolving Loan; provided, that, the initial Revolving Loan may be made simultaneously with the execution of this Note by each of Lenders. Each such notice (a "Notice of Revolving Advance") shall be given in writing (by telecopy or overnight courier) (i) specifying the amount of such Revolving Loan, (ii) specifying the proposed date of such Revolving Loan, which must be a Business Day, (iii) representing that the Borrower has less than $50,000 of cash and cash equivalents on hand and available to the Borrower, (iv) representing that the amount of the Revolving Loan requested plus cash and cash equivalents on hand and available to the Borrower does not exceed the amount necessary to pay when due expenditures contemplated by the Budget for the immediately succeeding week for which such request is made in contemplation of, and (v) providing such other information as may be reasonably required by the Agent (including,

without limitation, evidence that the Borrower is in compliance with clause (iii) above and Section 13(e) hereof).  Upon receipt of a Notice of Revolving Advance, subject to the satisfaction of the conditions set forth in this Note, each Lender shall make the proceeds of such Revolving Loan made by it available to Borrower on the applicable date of funding of such Revolving Loan by transferring immediately available funds equal to such proceeds to Borrower's Designated Account.  Each Revolving Loan shall be made by each Lender in accordance with its Pro Rata Share.  The entire unpaid balance of the Revolving Loans and all other Obligations shall be immediately due and payable in full in immediately available funds on the Maturity Date.

(b)     Notwithstanding the foregoing limitations set forth in Section 1(a) hereof, the Borrower shall be permitted to obtain Revolving Loans in amounts in excess of the Maximum Amount minus the Reserves then in effect, provided, that the amount of such excess Revolving Loans are immediately used to satisfy the obligations for which the Archive Assets Reserve, Carve-Out Reserve or Vendor Payment Reserve are established in contemplation thereof.  The immediate payment of such obligations will result in a dollar-for-dollar reduction in the applicable reserve.

(c)     Each Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Revolving Advance or similar notice believed by such Lender to be genuine.  Each Lender may assume that each person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon for such Lender has actual knowledge to the contrary.

(d)     Borrower shall utilize the proceeds of Revolving Loans (i) to pay fees and expenses associated with the Note, (ii) in amounts necessary to repurchase the Archive Assets, and (iii) for working capital and other corporate purposes of the Borrower, including administrative expenses of the Chapter 11 Case, in each case solely in accordance with the Budget (including, without limitation, the payment of any of the costs and expenses that are payable by the Borrower to vendors to acquire inventory sufficient to satisfy all pre-paid customer orders in accordance with Section 13(e) hereof).

2.     Certain Conditions to Each Revolving Loan.  No Lender shall be obligated to fund any Revolving Loan, if, as of the date thereof:

(a)     (i) the Bankruptcy Court shall not have entered the Interim Order; or (ii) the Interim Order shall have been stayed, vacated, reversed, modified amended or otherwise determined not to be a binding or valid obligation of the Borrower, in each case, without Agent and the Required Lenders' prior written consent;

(b)     except as occasioned by the commencement of the Chapter 11 Case and the actions, proceedings, investigations and other matters related thereto, any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof and the Agent or Required Lenders shall have determined not to make any Revolving Loan so long as such Material Adverse Effect is continuing;

(c)　(i) any Event of Default shall have occurred and be continuing or would result after giving effect to any Revolving Loan; or (ii) any Default shall have occurred and be continuing or would result after giving effect to any Revolving Loan, and the Agent or Required Lenders shall have determined not to make any Revolving Loan so long as such Default is continuing;

(d)　the Borrower shall have not delivered to the Agent a Budget that is in form and substance satisfactory in the Agent's sole and absolute discretion;

(e)　after giving effect to any Revolving Loan, the outstanding principal amount of all Revolving Loans would exceed the lesser of (i) the Maximum Amount, (ii) the amount then authorized by the Interim Order, or (iii) the amount permitted to be borrowed for such period as set forth in the Budget, subject to Permitted Variances which will not result in a Material Adverse Deviation; or

(f)　any representation or warranty by the Borrower contained herein shall be untrue or incorrect as of such date, except to the extent that such representation or warranty expressly relates to an earlier date.

The request and acceptance by Borrower of the proceeds of any Revolving Loan shall be deemed to constitute, as of the date of such request, acceptance or incurrence, (i) a representation and warranty by Borrower that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by Borrower of the granting and continuance of the Lien granted in favor of the Agent for the benefit of the Lenders.

3.　<u>Payment of Principal</u>.  FOR VALUE RECEIVED, Borrower promises to pay to each Lender, in the manner and at the place hereinafter provided, the unpaid principal amount of all Revolving Loans made by such Lender to Borrower, on the Maturity Date.

4.　<u>Payment of Interest</u>.

(a)　Borrower shall pay interest on the unpaid principal amount hereof from the date hereof until the date all Obligations are paid in full, in arrears on each applicable Interest Payment Date, at the rate per annum equal to 12.00%, <u>provided</u>, that, in the absence of a continuing Event of Default, interest shall be paid-in-kind by being added to the outstanding principal amount of the Obligations, <u>provided</u>, <u>further</u>, that, the Borrower may, on or prior to the date that is five (5) Business Days prior to each applicable Interest Payment Date, elect to pay in cash all or any portion of the interest that has been or may be paid-in-kind pursuant to this proviso.  Borrower hereby authorizes the Agent to, and the Agent may, from time to time upon two (2) Business Days notice to the Borrower, charge the Loan Account pursuant to Section 5 with the amount of any interest payment due hereunder.  For the avoidance of doubt, if any Event of Default shall occur and be continuing, interest (including interest pursuant to clause (d) of this Section 4) shall be payable in cash.

(b)　If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)     All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on Borrower (absent manifest error).

(d)     So long as an Event of Default shall have occurred and be continuing, and at the election of the Agent or the Required Lenders, the interest rate applicable to the Obligations shall be increased by two percentage points (2.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default (or, if applicable, the date of notice referred to above) until such Event of Default is cured or waived and shall be payable upon demand.

(e)     Notwithstanding anything to the contrary set forth in this Section 4, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Lenders is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the closing date as otherwise provided in this Note.  Thereafter, interest hereunder shall be paid at the rate(s) of interest and in the manner provided in Sections 4(a) through (d), unless and until the rate of interest again exceeds the Maximum Lawful Rate, and at that time this paragraph shall again apply.  In no event shall the total interest received by Lenders pursuant to the terms hereof exceed the amount that Lenders could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. If the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made.  If, notwithstanding the provisions of this Section 4(e), a court of competent jurisdiction shall finally determine that Lenders have received interest hereunder in excess of the Maximum Lawful Rate, Lenders shall, to the extent permitted by applicable law, promptly apply such excess to the payment of other outstanding Obligations and thereafter shall refund any excess to Borrower or as a court of competent jurisdiction may otherwise order.

5.     Payments.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent for the account of the Lenders at the following account:

Bank Name:  JPMorgan Chase Bank, N.A.
ABA Number:  021000021
Account Name:  Kravet Inc.
Account Number:  777-742861
Reference:  Brunschwig & Fils, Inc. - DIP Note

or to such other account as shall be designated in a written notice delivered by the Agent to Borrower. Except as provided in Section 7(e) of this Note, each payment made hereunder shall be paid to the Agent for the ratable benefit of each Lender in accordance with their Pro Rata Share, credited <u>first</u> to interest, fees and expenses then due and <u>second</u>, to the principal balance of the Revolving Loans.

Borrower hereby authorizes the Agent to, and the Agent may, from time to time upon two (2) Business Days notice to the Borrower, charge the Loan Account of Borrower with any amount due and payable by Borrower. Borrower and each Lender agree that the Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing. Any amount charged to the Loan Account of Borrower shall be deemed a Revolving Loan hereunder made by the Agent to Borrower. Borrower and each Lender confirms that any charges which the Agent may so make to the Loan Account of Borrower as herein provided will be made as an accommodation to Borrower and solely at the Agent's discretion.

6.      <u>Optional Prepayments</u>. Borrower shall have the right at any time and from time to time to prepay the principal of this Note in whole or in part (without premium or penalty) upon two (2) Business Days' notice to Lenders; <u>provided</u>, that each such prepayment shall be in a minimum amount of $100,000 and in integral multiples of $50,000 in excess of that amount.

7.      <u>Mandatory Prepayments</u>.

(a)      If at any time the aggregate outstanding principal amount of the Revolving Loans exceeds (i) the amount permissible pursuant to an order of the Bankruptcy Court, (ii) the Maximum Amount minus the Reserves then in effect (unless such over-advance is permitted by Section 1(b) hereof), or (iii) the amount set forth in the Budget for such period by an amount which will result in a Material Adverse Deviation, Borrower shall immediately repay the aggregate outstanding Revolving Loans to the extent required to eliminate such excess.

(b)      Immediately upon receipt by the Borrower or any of its subsidiaries of cash proceeds of any asset disposition, unless Agent and the Required Lenders agree otherwise, such subsidiary shall contribute such proceeds to Borrower and Borrower shall prepay the Revolving Loans in an amount equal to all such proceeds, net of (A) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by Borrower or such subsidiary in connection therewith, (B) transfer or sales taxes, and (C) an appropriate reserve for income taxes in accordance with GAAP in connection therewith. Any such prepayment shall be applied in accordance with Section 7(e). Notwithstanding anything in this Note to the contrary, the proceeds of sales of inventory in the ordinary course of business shall not be subject to mandatory prepayment under this clause (b).

(c)      Upon the receipt by the Borrower or any of its subsidiaries of any casualty or condemnation proceeds, such subsidiary shall contribute such proceeds to Borrower and Borrower shall prepay the Revolving Loans in an amount equal to all such proceeds, net of any reasonable expenses incurred in collecting such proceeds. Any such prepayment shall be applied in accordance with Section 7(e).

(d)    On the last Business Day of each week, Borrower shall prepay the Revolving Loans to the extent the Borrower has, after the payment of all expenses and other obligations (including any mandatory prepayments under this Section 7) paid on such Business Day, and after taking into account all expenses and other obligations to be paid during the immediately succeeding week pursuant to the Budget, cash or cash equivalents on hand in excess of $350,000; such prepayment shall be in an amount equal to such amount.    Any such prepayment shall be applied in accordance with Section 7(e).

(e)    <u>Application of Certain Mandatory Prepayments</u>.  Any prepayments made by Borrower pursuant to Sections 7(b) through (d) above shall be applied as follows: <u>first</u>, to the principal balance of the Revolving Loans until the same has been paid in full; and <u>second</u>, to all other Obligations.

(f)    <u>No Implied Consent</u>.  Nothing in this Section 7 shall be construed to constitute any Lender's consent to any transaction that is not permitted by other provisions of this Note.

8.    <u>Closing Fee</u>.  Borrower shall pay the following fee to the Agent, for the benefit of the Agent, a non-refundable closing fee (the "<u>Closing Fee</u>") equal to $80,000, which fee shall be earned in full on the date the Interim Order is entered and shall be immediately added to the outstanding principal amount of the Obligations and payable on the Maturity Date.

9.    <u>Indemnity</u>.

(a)    The Borrower shall indemnify and hold harmless the Agent and each Lender and each of their respective affiliates, members, officers, directors, employees, attorneys, agents and representatives (each, an "<u>Indemnified Person</u>"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to this Note (collectively, "<u>Indemnified Liabilities</u>"); <u>provided</u>, that the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.  **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER THIS NOTE OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

10.    Priority of Obligations and Lender's Liens.

(a)    The priority of the Agent's Liens on the Collateral shall be set forth in the Interim Order.  The security interests and Liens granted to the Agent for the benefit of Lenders hereunder pursuant to Sections 364(c)(2) and 364(d)(1) shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of the Borrower's estate under Section 551 of the Bankruptcy Code, or (ii) subordinated to or made pari passu with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)    The Obligations shall have superpriority administrative priority equivalent to a claim under Section 364(c) of the Bankruptcy Code.  Subject only to the Carve-Out to the extent provided in the Interim Order, such superpriority administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1114 or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of the Borrower, the Borrowers' estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code.

(c)    The Agent's Liens on the Collateral and the superpriority administrative claim under Section 364(c) of the Bankruptcy Code afforded the Obligations shall, following the occurrence and during the continuation of an Event of Default, be subject solely to the Carve Out to the extent provided in the Interim Order.

11.    Further Assurances.  The Borrower agrees that it shall, at its sole cost and expense and upon request of the Agent, duly execute and deliver or cause to be duly executed and delivered, to the Agent such further instruments and do and cause to be done such further acts as may be necessary or proper in the opinion of the Agent to carry out more effectively the provisions and purposes of this Note, including, upon the written request of the Agent and in form and substance satisfactory to the Agent, deliver and execute any mortgages, security agreements, UCC-l financing statements and other documents granting to the Agent for the benefit of Lenders first priority Liens in the Collateral to secure the Obligations.

12.    Reports and Notices.

(a)    Pursuant to Section 26 of the Interim Order, the Borrower hereby agrees to deliver to the Agent and each Lender as soon as available the financial reporting and an updated Budget on a weekly basis, in each case, as set forth in Section 26 of the Interim Order.

(b)    The Borrower hereby agrees to deliver, or cause to be delivered to the Agent and each Lender, each of the following, which shall be in form and detail acceptable to the Agent:

(1)    immediately after any officer of the Borrower obtains knowledge of the occurrence of any Default or Event of Default, notice of such occurrence, together with a detailed statement by a responsible officer of the Borrower of the steps being taken by the Borrower to cure the effect of such Default or Event of Default;

(2)     immediately upon any officer of the Borrower obtaining knowledge thereof, notice of any material loss of or material damage to any Collateral or of any substantial adverse change in any Collateral or the prospect of payment of this Note, or of the occurrence or existence of any other event or circumstance which has had or could reasonably be expected to have a Material Adverse Effect;

(3)     promptly upon receipt, or if filed by the Borrower, promptly upon filing, all motions, notices, reports, applications, objections, responses or other papers filed or served in the Chapter 11 Case;

(4)     a daily report as to the amount of available cash and cash equivalents held by the Borrower as of the end of the immediately preceding Business Day; and

(5)     promptly upon request, such other information concerning the condition or operations, financial or otherwise, of the Borrower as Agent may reasonably request.

13.     <u>Affirmative Covenants</u>.

The Borrower agrees that, without the prior written consent of the Agent and the Required Lenders:

(a)     The Borrower and each of its subsidiaries will (i) comply in all material respects with all requirements of law and (ii) obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted.

(b)     The Borrower and its subsidiaries will pay or discharge, when due (except for any pre-petition taxes which shall only be payable in conjunction with the confirmation of a plan), (i) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrower and its subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, (ii) all federal, state and local taxes required to be withheld by the Borrower, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of the Borrower and its subsidiaries.

(c)     The Borrower and each of its subsidiaries will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as may from time to time be reasonably required by the Agent, but in all events in such amounts and against such risks as is usually carried by companies engaged in a similar business and owning similar properties in the same general areas in which the Borrower and each of its subsidiaries operate.  Without limiting the generality of the foregoing, the Borrower will at all times keep all tangible Collateral insured against risks of fire (including so-called extended coverage), theft and such other risks and in such amounts as Agent may reasonably request, with any loss payable to the Agent for the benefit of Lenders to the extent of its interest, and all policies of such insurance shall contain a loss payable endorsement in favor of Agent for the

benefit of Lenders, in form and substance acceptable to the Agent. All policies of liability insurance required hereunder shall name the Agent for the benefit of Lenders as an additional insured.

(d)      The Borrower and each of its subsidiaries shall maintain their cash management systems in accordance with the Cash Management Order.

(e)      The Borrower and each of its subsidiaries shall promptly pay all vendors amounts necessary to acquire inventory sufficient to satisfy all pre-paid customer orders in accordance with the Budget.

(f)      The Borrower shall obtain entry of an order from the Bankruptcy Court, in form and substance reasonably acceptable to the Agent, approving procedures for the sale of all or substantially all of the Borrowers' assets and approving bid protections for Kravet (or its designee) as a stalking horse purchase by no later than twenty (20) days after the date the Petition Date.

(g)      Upon request of the Agent or any Lender, the Borrower will permit any officer, employee, attorney or accountant or agent of the Agent or any Lender to audit, review, make extracts from or copy, at Borrower's expense, any and all corporate and financial and other books and records of the Borrower and its subsidiaries at all times during ordinary business hours and to discuss the Borrowers' affairs with any of their directors, officers, employees, attorneys (except for documents subject to attorney-client privilege), or accountants subject to the terms of the non-disclosure agreement between the parties. Borrower will permit the Agent and any Lender, or any of its respective officers, employees, accountants, attorneys or agent, to examine and inspect any Collateral or any other property of the Borrower or its subsidiaries at any time during ordinary business hours.

(h)      The Borrower and each of its subsidiaries shall continue to be engaged in the wholesale distribution and sale of decorative fabric, wallpaper, trimming, upholstery, lamps, tables and mirrors and operate its business in the ordinary course of business consistent with past practice and taking into account the Borrowers' status as a debtor and debtor in possession.

14.      <u>Negative Covenants</u>.

The Borrower agrees that, without the prior written consent of the Agent and the Required Lenders:

(a)      No Borrower nor any of its subsidiaries shall create, incur, assume or permit to exist any indebtedness, other than indebtedness permitted by this Note and indebtedness existing as of the Petition Date.

(b)      No Borrower nor any of its subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, Prepetition Indebtedness (including, without limitation, any payments then due and owing to the Prepetition Secured Lender).

(c)     No Borrower nor any of its subsidiaries shall create, incur, assume or permit to exist any Lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Liens arising under the Prepetition Loan Agreement for the benefit of the Prepetition Secured Lender.

(d)     No Borrower nor any of its subsidiaries will assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other person, except the endorsement of negotiable instruments by Borrower for the deposit or collection or similar transactions in the ordinary course of business.

(e)     No Borrower nor any of its subsidiaries will convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired other than the sale of inventory in the ordinary course of business.

(f)     No Borrower nor any of its subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to the Interim Order.

(g)     During each week, the Borrower shall not permit the outstanding Revolving Loans to exceed, for such period, the amount set forth for such line item in the Budget such that it would result in a Material Adverse Deviation.

(h)     No Borrower nor any of its subsidiaries shall make or commit to make any capital expenditures.

(i)     No Borrower nor any subsidiary shall (i) close any showroom location, (ii) terminate any existing lease obligations or (ii) change or move the locations of any Collateral (other than Collateral consisting of inventory sold in the ordinary course of business), in each case, without the prior written consent of the Agent.

15.     Events of Default; Rights and Remedies.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

A.     Borrower (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Revolving Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse any Lender for any expense reimbursable hereunder or under any other Loan Document within three (3) Business Days following a Lender's demands for such reimbursement or payment.

B.     The Borrower shall fail or neglect to perform, keep or observe any of the provisions of (i) Section 13(f) or 14 of this Note and (ii) Sections 12 and 13 (other than Section 13(f)) of this Note and such failure under Sections 12 and 13 (other than Section 13(f) of this Note shall remain uncured for a period of two (2) Business Days.

C.     Except for defaults occasioned by the filing of the Chapter 11 Case and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits the

Borrower from complying or permits the Borrower not to comply, a default or breach shall occur under any other agreement, document or instrument to which the Borrower is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any indebtedness (other than the Obligations) of the Borrower in excess of $25,000 in the aggregate, or (ii) causes, or permits any holder of such indebtedness or a trustee to cause, indebtedness or a portion thereof in excess of $25,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

D.      The Borrower shall bring a motion in the Chapter 11 Case:  (i) to obtain financing from any person other than the Agent and the Lenders under Section 364(c) or 364(d) of the Bankruptcy Code (other than with respect to a financing used, in whole or in part, to repay in full in cash the Obligations and terminate this Note);  (ii) to grant any Lien upon or affecting any Collateral; (iii) to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code; or (iv) to authorize any other action or actions adverse to the Agent or Lenders, in such capacity, or their rights and remedies hereunder or their interests in the Collateral.

E.      The entry of an order in the Chapter 11 Case confirming a plan of reorganization that does not contain a provision for the termination of the commitment of the Lenders to make Revolving Loans and the repayment in full in cash of all the Obligations under this Note on or before the effective date of such plan.

F.      The allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

G.      The sale without the Agent and Required Lenders' consent, of all or substantially all of the Borrowers' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise, that does not provide for payment in full in cash of the Obligations and termination of the commitment of Lenders to make Revolving Loans.

H.      The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, business, or reorganization of the Borrower.

I.      The Chapter 11 Case shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

J.      The entry of an order in any Chapter 11 Case granting any other superpriority administrative claim or Lien equal to or superior to that granted to the Agent and the Lenders, unless (i) consented to by the Agent and the Required Lenders or (ii) the Obligations are paid in full in cash and the commitment of Lenders to make Revolving Loans is terminated.

K.     The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (i) to allow any creditor (other than Agent) to execute upon or enforce a Lien on any Collateral, or (ii) with respect to any Lien of, or the granting of any Lien on any Collateral to, any state or local environmental or regulatory agency or authority that could reasonably be expected to have a Material Adverse Effect.

L.     (i) The Interim Order shall be stayed, amended, modified, reversed or revoked in any respect without the Agents' and the Required Lenders' prior written consent or (ii) the Borrower shall fail to comply in any material respect with any term or condition of the Interim Order.

M.     There shall commence any suit or action against the Agent or Lenders by or on behalf of (i) the Borrower, (ii) any governmental authority, or (iii) any official committee in the Chapter 11 Case, in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Agent and the Lenders and, if such suit or action is commenced by any person other than the Borrower or any subsidiary, officer, or employee of the Borrower, such suit or action shall not have been dismissed or stayed within 15 days after service thereof on the Agent and the Lenders, as applicable, and, if stayed, such stay shall have been lifted.

N.     Any provision of this Note shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or the Borrower shall challenge the enforceability of this Note or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of this Note has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under the Interim Order shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or therein) in any of the Collateral purported to be covered thereby.

O.     A Material Adverse Deviation occurs.

If any Event of Default shall have occurred and be continuing the Agent may, and shall at the request of the Lenders whose Pro Rata Shares aggregate at least 50.1% (the "Required Lenders"), upon written notice to Borrower and subject to the terms of the Interim Order: (i) terminate the Revolving Loan facility with respect to further Revolving Loans, (ii) declare all or any portion of the Obligations, including all or any portion of any Revolving Loan, to be forthwith due and payable, (iii) revoke Borrower's rights to use Cash Collateral in which the Agent and the Lenders have an interest; and (iv) exercise any rights and remedies under the Interim Order, this Note or at law or in equity.  Subject to the Interim Order and Agent and Lenders' compliance with the provisions thereof, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit the Agent and Lenders to exercise its remedies under this Note, without further application or motion to, or order from, the Bankruptcy Court.  Subject to the Interim Order, upon the occurrence of an Event of Default and the exercise by the Agent and the Lenders of their rights and remedies under this Note pursuant to clause (iv) above, the Borrower and each of its subsidiaries shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as may be determined by Agent in its sole discretion.

Except as otherwise provided for in this Note or by applicable law, the Borrower hereby waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent or any Lender on which Borrower may in any way be liable, and hereby ratifies and confirms whatever the Agent or any Lender may do in this regard; (b) except as provided in the Interim Order, all rights to notice and a hearing prior to the Agent or Lenders taking possession or control of, or Agent's or Lenders' replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent or Lenders to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

16.     <u>Reference Agreements</u>.  This Note evidences the Revolving Loans that may be made to Borrower from time to time in the aggregate principal amount outstanding of up to $3,050,000 and is issued pursuant to and entitled to the benefits of the Interim Order, to which reference is hereby made for a more complete statement of the terms and conditions under which the Revolving Loans evidenced by this Note are made and are to be repaid.

17.     <u>Definitions</u>.  In addition to the terms otherwise defined in this Note, the following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"<u>Agent</u>" means Kravet, in its capacity as agent for the Lenders under this Note.

"<u>Archive Assets</u>" means the assets specified in that certain Bill of Sale, dated as of January 11, 2011, between Kravet and the Borrower.

"<u>Archive Assets Reserve</u>" means, as of any date of determination, the amount necessary to exercise the repurchase option for the Archive Assets as set forth in the Budget.

"<u>Budget</u>" shall have the meaning given to such term in the Interim Order as in effect on the date hereof.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"<u>Carve Out</u>" shall have the meaning given to such term in the Interim Order

"<u>Carve-Out Reserve</u>" means, as of any date of determination, an amount equal to the Carve-Out.

"<u>Cash Collateral</u>" shall mean "cash collateral" as that phrase is defined in Section 363(a) of the Bankruptcy Code.

"<u>Cash Management Order</u>" means the cash management order entered by the Bankruptcy Court on the date hereof.

"Collateral" shall mean the DIP Collateral as such term is defined in the Interim Order.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Designated Account" shall mean account number 000301170845368, account name: Brunschwig & Fils, Inc, routing number 021000021 maintained by Borrower with JPMorgan Chase Bank, N.A. or such other deposit account of Borrower (located in the United States) that has been designated as such in writing by Borrower to the Agent.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to the Agent and the Required Lenders, together with all extensions, modifications and amendments thereto, authorizing the Borrower to obtain credit, incur indebtedness, and grant Liens all as set forth in such order.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Interest Payment Date" shall mean the first Business Day of each month to occur while any Revolving Loan is outstanding; provided that, in addition to the foregoing, each of (x) the date upon which all of the Revolving Loans have been paid in full and (y) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder.

"Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Agent and the Required Lenders, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Note.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Loan Account" means an account maintained hereunder by the Agent on its books of account at the Payment Office, and with respect to Borrower, in which the Borrower will be charged with all Revolving Loans made to, and all other Obligations incurred by, Borrower.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business, assets, properties or condition (financial or otherwise) of the Borrower and its subsidiaries taken as a whole, (ii) the ability of the Borrower and its subsidiaries, taken as a whole, to perform any of their obligations under any this Note and the Interim Order, (iii) the legality, validity or enforceability of this Note and the Interim Order, (iv) the rights and remedies of the Agent and/or Lenders under this Note and the Interim Order, or (v) the validity, perfection or priority of a Lien in favor of the Agent and/or Lenders on any of the Collateral.

"Material Adverse Deviation" shall mean a line item deviation from the Budget in excess of such line item's Permitted Variance.

"Maturity Date" means the earliest of (i) February 11, 2011, (ii) the date upon which the Interim Order expires; (iii) a "Termination Event" as defined in the Interim Order occurs, (iv) the date of entry of the Final Order; (v) the effective date any confirmed plan of reorganization in the Chapter 11 Case, (vi) two (2) Business Days after the entry of any Bankruptcy Court order authorizing and approving the sale of all or substantially all of the assets of the Borrower to any other person other than Kravet Inc. (or its designee), (vii) the consummation of a sale or other disposition of all or substantially all of the assets of the Borrower whether done by one or a series of transactions, in which case the date the last of such transactions is consummated, (viii) the date on which the Borrowers' Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code, (ix) the date on which the Borrower voluntarily repays the Revolving Loans and the commitments of the Lenders are terminated, (x) the date of the acceleration of the Revolving Loans and the commitments of the Lenders are terminated, or (xi) the date on which the Revolving Loans are accelerated pursuant to Section 15.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to the Agent or any Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under the Note. This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under the Note.

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to the Borrower.

"Permitted Variances" shall have the meaning given to such term in the Interim Order as in effect on the date hereof.

"Prepetition Indebtedness" shall mean all indebtedness of Borrower incurred or assumed prior to the Petition Date.

"Prepetition Loan Agreement" means that certain Note, dated as of June 14, 2010, between the Borrower, as maker and Thomas, P. Peardon, Jr., as the payee, in the aggregate principal amount of $3,000,000.

"Prepetition Secured Lender" shall mean the lender party to the Prepetition Loan Agreement that is the holder of the loans under the Prepetition Loan Agreement.

"Pro Rata Share" shall mean, with respect to a Lender's rights and obligations under this Note, the percentage obtained by dividing (x) such Lender's commitment to provide Revolving Loans by (y) the total commitment to provide Revolving Loans, provided, that, if the total commitment to provide Revolving Loans has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's Revolving Loans and the denominator shall be the aggregate unpaid principal amount of all Revolving Loans.

"Reserves" means, as of any date of determination, the (i) Archive Assets Reserve, (ii) Carve-Out Reserve, (iii) Vendor Payment Reserve and (iv) such other amounts as the Agent may from time to time establish in the good faith exercise of its business judgment (a) to reflect events, conditions, contingencies or risks which adversely affect (x) any Collateral or the Agent's access thereto, or (y) the priority, perfection or enforceability of any of the security interest of the Agent in the Collateral, or (b) in respect of any state of facts which the Agent reasonably determines to constitute a Default or an Event of Default. For the avoidance of doubt, any Reserve established by the Agent under clause (iv) hereof shall have a reasonable relationship to the event, condition or other matter which is the basis for such Reserve as reasonably determined by the Agent. The Agent shall provide notice to the Borrower of such new Reserve established under clause (iv) hereof and will be available to consult with the Borrower in connection with the basis for such new Reserve.

"Vendor Payment Reserve" means, as of any date of determination, the lesser of (i) $1,400,000 and (ii) an amount equal to the payments required to be paid to vendors to acquire inventory sufficient to satisfy all pre-paid customer orders as set forth in Budget.

18.     Miscellaneous.

(a)     All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, telegraphed, telexed, telecopied, cabled or delivered as follows: if to Borrower, at 75 Virginia Road, N. White Plains, New York 10603, Attention: Olivier Peardon, President and Chief Executive Officer, Facsimile: (914) 684-6140, Email: opeardon@brunschwig.com; with a copy to: Halperin Battaglia Raicht, LLP, 555 Madison Avenue, 9th Floor, New York, New York 10022, Attention: Alan D. Halperin, Esq., Facsimile: (212) 765-0964, Email: ahalperin@halperinlaw.net; if to the Agent, at 225 Central Avenue South, Bethpage, New York 11714, Attention: Mr. Cary Kravet, President & Chief Executive Officer, Facsimile: (516) 293-8675, Email: cary.kravet@kravet.com; with a copy to: Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022; Attention: Adam C. Harris, Esq., Facsimile: (212) 593-5955, Email: adam.harris@srz.com; or in each case at such other address as shall be designated by the Agent or Borrower. All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by facsimile be effective when confirmation is received.

(b)     The Borrower shall reimburse the Agent and the Lenders for all reasonable out-of-pocket expenses incurred in connection with the negotiation and preparation of

this Note, and any proceedings seeking approval hereof by the Bankruptcy Court (including the reasonable fees and expenses of counsel for the Agent, all of its special local counsel, advisors, consultants and auditors retained in connection with this Note and advice in connection therewith). The Borrower shall reimburse the Agent for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with: (i) any amendment, modification or waiver of, consent with respect to, or termination or enforcement of or advice in connection with the administration of the Revolving Loans made pursuant hereto or its rights hereunder or thereunder; (ii) the review of pleadings and documents related to the Chapter 11 Case and any subsequent Chapter 7 case, attendance at meetings or hearings related to the Chapter 11 Case and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Case and any subsequent Chapter 7 case; (iii) any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, a Lender, the Borrower or any other person, and whether as a party, witness or otherwise) in any way relating to the Collateral or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against the Borrower or any other person that may be obligated to a Lender by virtue of this Note, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Revolving Loans during the pendency of an Event of Default; (iv) any attempt to enforce any remedies of the Agent or the Lenders against the Borrower or any other person that may be obligated to the Lenders by virtue of this Note, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Revolving Loans during the pendency of an Event of Default; (v) any work-out or restructuring of the Revolving Loans; and (vi) any efforts to (1) monitor the Revolving Loans or any of the other Obligations, (2) evaluate, observe or assess the Borrower or their respective affairs, and (3) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral; including, as to each of clauses (i) through (vi) above, all reasonable attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all reasonable expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 18(b), all of which shall constitute Obligations and, in the absence of a continuing Event of Default, be paid-in-kind by being added to the outstanding principal amount of the Obligations in accordance with Section 4(a) hereof. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services. All expenses incurred by the Agent and/or Lenders shall constitute Obligations for purposes of this Note and the protections afforded pursuant to the Interim Order.

(c)     No failure or delay on the part of the Agent or any Lender or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrower and the Agent or any Lender shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise

thereof or the exercise of any other right, power or privilege. The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent or any Lender would otherwise have. No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Agent or any Lender to any other or further action in any circumstances without notice or demand.

        (d)     If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

        (e)     **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWER, AGENT AND LENDERS HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

        (f)     **BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT AND THE LENDERS AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREES TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT AND THE LENDERS/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED**.

        (g)     (i) By their acceptance of this Note, each Lender hereby appoints Kravet as the Agent for the Lenders with respect to the Collateral and authorizes the Agent to hold (A) the original Note for the benefit of the Lenders and (B) the security interests in and liens upon the Collateral for the benefit of Lenders. Accordingly, each Lender hereby agrees and appoints and authorizes the Agent to take such action as the Agent on its behalf and to exercise such powers and discretion under the Note as are delegated to the Agent by the terms hereof and thereof, together with such powers as are reasonable incidental thereto. Without limiting the foregoing, each Lender hereby expressly authorizes the Agent to exercise all rights, powers, privileges and remedies that the Agent may have hereunder or under the Note, or that may be incidental thereto, including, without limitation, to make such disbursements and advances in an amount not to exceed $[500,000] at any one time outstanding (collectively, the "Protective Advances") which the Agent, in its sole discretion, deems necessary or desirable to preserve, protect, prepare for sale or lease or dispose of the Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by the Borrower of the Obligations or to pay any other amount chargeable to the Borrower pursuant to the terms of this Note, including, without limitation, costs, fees and expenses as described in Section 18(b). The Protective Advances shall be repayable on demand and be secured by the Collateral and shall bear interest at a rate per annum equal to the rate then applicable to the Revolving Loans. The Protective Advances shall constitute Obligations hereunder which may be charged to the Loan Account.

Without limitation to its obligations pursuant to this Section 18(g), each Lender agrees that it shall make available to the Agent, upon the Agent's demand, in Dollars in immediately available funds, the amount equal to such Lender's Pro Rata Share of each such Protective Advance.

(ii) The Agent and their directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction. The Agent may at any time request instructions from the Required Lenders with respect to any actions or approvals which by the terms of this Note, and if such instructions are promptly requested, the Agent shall be absolutely entitled to either (A) take any action or provide any approval as the Agent deems necessary under this Note or (B) refrain from taking any action or to withhold any approval under this Note, in each case, until the Agent shall have received such instructions from the Required Lenders.

(iii) To the extent that the Agent is not reimbursed and indemnified by the Borrower, and whether or not the Agent has made demand on the Borrower for the same, the Lenders will, within five (5) days of written demand by the Agent, reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to the Agent), advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any action taken or omitted by the Agent under this Note, in proportion to each Lender's Pro Rata Share, provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final judicial determination that such liability resulted from the Agent's gross negligence or willful misconduct. The obligations of the Lenders under this Section 18(g) shall survive the payment in full of the Revolving Loans and the termination of this Note.

(h)     The Borrower shall not have the right to assign its obligations or liabilities under this Note without the prior written consent of the Agent and the Lenders. Any Lender, with the written consent of the Agent, may assign to one or more entitles all or any part of the amounts outstanding hereunder, and pursuant to such assignment (unless otherwise stated therein) the assignee shall have the same rights and benefits hereunder as it would have if it were a Lender hereunder. An assigning Lender shall notify Borrower and Agent of any such assignment (other than an assignment to an affiliate of such Lender) which notice shall include a description of the assignment and include customary instructions from such Agent and such assignee with respect to the making of payments and other communications with such Lender and such assignee.

(i)     The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain, or cause to be maintained at its Payment Office, a copy of each assignment notice delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders, if any, that take an assignment from it and the principal amount of the Revolving Loans and stated interest thereon (the "Registered Loans") owing to each such Lender from time to time. The entries in the Register shall be

conclusive and binding for all purposes, absent manifest error, and Borrower and Lenders may treat each person whose name is recorded in the Register as a Lender hereunder for all purposes of this Note. The Register shall be available for inspection by Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(j) Upon receipt by the Agent of an assignment notice, the Agent shall accept such assignment and record the information contained therein in the Register.

(k) A Registered Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register. Any assignment or sale of all or part of such Registered Loan may be effected only by registration of such assignment or sale on the Register. Prior to the registration of assignment or sale of any Registered Loan, the Agent or any Lender shall treat the person in whose name such Registered Loan is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(l) No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by Borrower, the Agent and the Required Lenders.

(m) Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(n) This Note and all Liens created hereby or pursuant to this Note and the Interim Order shall be binding upon the Borrower, the estate of the Borrower, and any trustee or successor in interest of the Borrower in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Note shall be binding upon, and inure to the benefit of, the successors of the Agent and the Lenders and each of their respective assigns, transferees and endorsees. The Liens created by this Note shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Borrower to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Agent or Lenders file financing statements or otherwise perfect its security interests or Liens under applicable law.

(o) THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

19. <u>Representations and Warranties</u>. Borrower represents as follows:

(a) Borrower is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation;

(b)     the execution and delivery of this Note and the performance by Borrower of Borrower's obligations hereunder are within its corporate powers, have been duly authorized by all necessary corporate action of Borrower and its respective shareholders and affiliates, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of Borrower's or any of its respective shareholders or affiliates corporate charter or by-laws or of any agreements binding upon or applicable to Borrower or any of its respective affiliates or any of Borrower's properties;

(c)     the Chapter 11 Case has been duly authorized by all necessary legal and corporate action by or on behalf of the Borrower and has been duly and properly commenced;

(d)     this Note is the legal, valid and binding obligation, enforceable against Borrower in accordance with its terms.

(e)     Borrower has good and marketable title to, or valid leasehold interests in, all of its property and assets; none of the properties and assets of Borrower are subject to any Liens except for Liens arising under the Prepetition Loan Agreement for the benefit of the Prepetition Secured Lender, and there are no facts, circumstances conditions known to Borrower that may result in any Liens except for Liens arising under the Prepetition Loan Agreement for the benefit of the Prepetition Secured Lender;

(f)     no information contained in this Note; any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of Borrower to the Agent and the Lenders pursuant to the terms of this Note or otherwise contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made; the Liens granted to the Agent will at all times be fully perfected first priority Liens in and to the Collateral described therein;

(g)     except for proceedings in the Chapter 11 Case in connection with the entry of the Interim Order, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of Borrower, threatened against Borrower before any governmental authority or before any arbitrator or panel of arbitrators that (a) challenges Borrower's right or power to enter into or perform any of its obligations under the Note, or the validity or enforceability of the Note or any action taken thereunder or (b) has a reasonable risk of being determined adversely to Borrower and that, if so determined, could have a Material Adverse Effect;

(h)     Borrower will be at all times the owner of the Collateral free and clear of any lien, security interest or other charge or encumbrance except for the security interest created by this Note and liens arising under the Prepetition Loan Agreement for the benefit of the Prepetition Secured Lender; no effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording or filing office except such as

may have been filed in favor of Agent relating to this Note and such as may have been filed by the Prepetition Secured Lender;

(i)     the execution, delivery and performance of this Note will not (immediately or with the giving of notice or passage of time, or both) (i) violate the articles of incorporation or bylaws of the Borrower, or violate any law or regulation; or (ii) result in the creation or imposition of any Lien upon any of the property of the Borrower, except in favor of the Agent; and

(j)     except for the Chapter 11 Case, there is no order, notice, claim, litigation, proceeding or investigation pending or threatened against or in any way affecting (i) the Borrower, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (ii) this Note.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

**BRUNSCHWIG & FILS, INC.,** as a Debtor and a Debtor-in-Possession, as Borrower

By: _____
    Name:
    Title

Agreed and accepted on this
___ day of January 2011:

**KRAVET INC.**, as Agent and Lender

By: _____
    Name:
    Title:

## **EXHIBIT A**

Budget

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Opening Cash** | 4,000,000 | 1,281,077 | 1,228,928 | 952,248 | 1,080,656 | 205,896 | 272,221 | 145,081 | 354,976 | 43,378 | 1,870 | 28,017 | 203,305 |
| Regular Receipts | 160,990 | 217,810 | 284,100 | 284,100 | 337,500 | 337,500 | 412,500 | 412,500 | 475,000 | 475,000 | 475,000 | 475,000 | 475,000 |
| Agency Receipts | - | 45,894 | 97,425 | 127,167 | - | 45,894 | 97,425 | 109,646 | - | 50,483 | 99,267 | 107,355 | - |
| **Gross Cash** | 4,160,990 | 1,544,781 | 1,610,453 | 1,363,515 | 1,418,156 | 589,290 | 782,147 | 667,227 | 829,976 | 568,862 | 576,138 | 610,371 | 678,305 |
| Disbursements | | | | | | | | | | | | | |
| Expenses | (1,125,834) | (128,961) | (458,206) | (82,859) | (1,012,260) | (130,176) | (437,066) | (112,250) | (636,598) | (430,099) | (398,121) | (257,066) | (459,101) |
| D&A | - | 13,108 | - | - | - | 13,108 | - | - | - | 13,108 | - | - | - |
| **Total Disbursements** | (1,125,834) | (115,853) | (458,206) | (82,859) | (1,012,260) | (117,068) | (437,066) | (112,250) | (636,598) | (416,991) | (398,121) | (257,066) | (459,101) |
| **Pay Suppliers** | (1,754,079) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (200,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) |
| Cash Flow | (2,718,923) | (52,150) | (276,680) | 128,408 | (874,760) | 66,326 | (127,140) | 209,895 | (311,598) | (41,508) | 26,146 | 175,289 | (134,101) |
| **Cash Ending** | 1,281,077 | 1,228,928 | 952,248 | 1,080,656 | 205,896 | 272,221 | 145,081 | 354,976 | 43,378 | 1,870 | 28,017 | 203,305 | 69,204 |
| **Starting Inventory** | 6,000,000 | 6,060,407 | 6,078,653 | 6,081,089 | 6,072,985 | 6,066,261 | 6,259,536 | 6,452,811 | 6,646,087 | 6,827,058 | 7,008,029 | 7,189,000 | 7,369,971 |
| Inv receipts | 150,000 | 150,000 | 150,001 | 150,002 | 144,975 | 344,975 | 344,975 | 344,975 | 332,672 | 332,672 | 332,672 | 332,672 | 282,672 |
| COGS | (89,593) | (131,754) | (147,565) | (158,105) | (151,700) | (151,700) | (151,700) | (151,700) | (151,701) | (151,701) | (151,701) | (151,701) | (151,701) |
| **Ending Inventory** | 6,060,407 | 6,078,653 | 6,081,089 | 6,072,985 | 6,066,261 | 6,259,536 | 6,452,811 | 6,646,087 | 6,827,058 | 7,008,029 | 7,189,000 | 7,369,971 | 7,500,942 |
| **Opening AR** | 956,063 | 1,025,720 | 1,147,097 | 1,242,886 | 1,365,810 | 1,438,310 | 1,510,810 | 1,508,310 | 1,505,810 | 1,464,240 | 1,422,670 | 1,381,100 | 1,339,530 |
| Receipts | (160,990) | (217,810) | (284,100) | (284,100) | (337,500) | (337,500) | (412,500) | (412,500) | (475,000) | (475,000) | (475,000) | (475,000) | (475,000) |
| Sales | 230,647 | 339,187 | 379,889 | 407,024 | 410,000 | 410,000 | 410,000 | 410,000 | 433,430 | 433,430 | 433,430 | 433,430 | 433,430 |
| **Ending AR** | 1,025,720 | 1,147,097 | 1,242,886 | 1,365,810 | 1,438,310 | 1,510,810 | 1,508,310 | 1,505,810 | 1,464,240 | 1,422,670 | 1,381,100 | 1,339,530 | 1,297,960 |

**Brunschwig & Fils, Inc.**
**B&F Inc. (Consolidated)**
## 13 week P&L and Cash Use

Ordinary Income/Expense

Income

4000 - Sales

| Description | Total | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total - Income | 1,356,746.64 | 230,646.93 | 339,186.66 | 379,889.06 | 407,023.99 | 1,640,000.00 | 410,000.00 | 410,000.00 | 410,000.00 | 410,000.00 | 2,167,150.00 | 433,430.00 | 433,430.00 | 433,430.00 | 433,430.00 | 433,430.00 |
| **Cost Of Sales** | | | | | | | | | | | | | | | | |
| Total - Cost Of Sales | 527,017.77 | 89,593.02 | 131,754.44 | 147,564.97 | 158,105.33 | 606,800.00 | 151,700.00 | 151,700.00 | 151,700.00 | 151,700.00 | 758,502.50 | 151,700.50 | 151,700.50 | 151,700.50 | 151,700.50 | 151,700.50 |
| **Gross Profit** | 829,728.88 | 141,053.91 | 207,432.22 | 232,324.09 | 248,918.66 | 1,033,200.00 | 258,300.00 | 258,300.00 | 258,300.00 | 258,300.00 | 1,408,647.50 | 281,729.50 | 281,729.50 | 281,729.50 | 281,729.50 | 281,729.50 |
| **Expense** | | | | | | | | | | | | | | | | |
| 6020 - Advertising | - | | | | | - | | | | | - | | | | | |
| 6022 - Public Relations | 6,000.00 | 6,000.00 | - | - | - | 6,000.00 | 6,000.00 | - | - | - | 6,000.00 | - | - | 6,000.00 | - | - |
| 6028 - Publicity | - | | | | | - | | | | | - | | | | | |
| 6030 - Depn- Leasehold Improvements | - | | | | | - | | | | | - | | | | | |
| 6031 - Depn- Computer Software | - | | | | | - | | | | | - | | | | | |
| 6050 - Bad Debt Expense | - | | | | | - | | | | | - | | | | | |
| 6059 - French Payroll Tax | 6,355.74 | - | - | - | 6,355.74 | 6,355.74 | - | - | - | 6,355.74 | 6,355.74 | - | - | - | 6,355.74 | - |
| 6061 - Benefits Superannuation | 2,167.61 | - | - | - | 2,167.61 | 2,167.61 | - | - | - | 2,167.61 | 2,167.61 | - | - | - | 2,167.61 | - |
| 6062 - Medical/Dental | 52,571.37 | - | 52,571.37 | - | - | 49,241.15 | - | 49,241.15 | - | - | 49,241.15 | - | 49,241.15 | - | - | - |
| 6063 - Pension (France) | 3,783.12 | - | - | - | 3,783.12 | 3,783.12 | 3,783.12 | - | - | - | 3,783.12 | 3,783.12 | - | - | - | - |
| 6070 - Collection Expense | - | | | | | - | | | | | - | | | | | |
| 6080 - Agency Commission | 57,642.38 | - | - | 57,642.38 | - | 48,996.02 | - | - | 48,996.02 | - | 44,096.42 | - | - | 44,096.42 | - | - |
| 6111 - Depn - Furniture | 8,762.24 | - | 8,762.24 | - | - | 8,762.24 | - | 8,762.24 | - | - | 8,762.24 | - | 8,762.24 | - | - | - |
| 6113 - Depn - Machinery & Equip | 2,583.97 | - | 2,583.97 | - | - | 2,583.97 | - | 2,583.97 | - | - | 2,583.97 | - | 2,583.97 | - | - | - |
| 6114 - Depn - Computer Hardware | 1,761.37 | - | 1,761.37 | - | - | 1,761.37 | - | 1,761.37 | - | - | 1,761.37 | - | 1,761.37 | - | - | - |
| 6120 - Design Costs - General | - | | | | | - | | | | | - | | | | | |
| 6121 - Sales & Marketing Consultants | 4,000.00 | - | - | 4,000.00 | - | 4,000.00 | - | - | 4,000.00 | - | 4,000.00 | - | - | 4,000.00 | - | - |
| 6140 - Displays | - | | | | | - | | | | | - | | | | | |
| 6143 - Trade Shows | 6,000.00 | - | 6,000.00 | - | - | 6,000.00 | - | 6,000.00 | - | - | - | - | - | - | - | - |
| 6144 - Advertising Other | - | | | | | - | | | | | - | | | | | |
| 6149 - Inventory Used in Showroom Displays | - | | | | | - | | | | | - | | | | | |
| 6150 - Dues & Subscriptions | 200.00 | 200.00 | - | - | - | 200.00 | 200.00 | - | - | - | 200.00 | 200.00 | - | - | - | - |
| 6160 - Office Equip. Lease/Rental | 3,500.00 | 3,500.00 | - | - | - | 3,500.00 | 3,500.00 | - | - | - | 3,500.00 | 3,500.00 | - | - | - | - |
| 6170 - Payroll Processing Fees | 3,050.80 | - | 3,050.80 | - | - | 2,900.00 | - | 2,900.00 | - | - | 2,900.00 | - | 2,900.00 | - | - | - |
| 6172 - Temporary Employees | - | | | | | - | | | | | - | | | | | |
| 6173 - Fees Other | 1,860.02 | 316.20 | 465.01 | 520.81 | 558.01 | 2,248.35 | 562.09 | 562.09 | 562.09 | 562.09 | 2,971.04 | 594.21 | 594.21 | 594.21 | 594.21 | 594.21 |
| 6174 - Bank Fees | 4,281.26 | 727.81 | 1,070.32 | 1,198.75 | 1,284.38 | 5,175.08 | 1,293.77 | 1,293.77 | 1,293.77 | 1,293.77 | 6,838.52 | 1,367.70 | 1,367.70 | 1,367.70 | 1,367.70 | 1,367.70 |
| 6176 - Credit Card Fees - Amex | 8,423.19 | 1,431.94 | 2,105.80 | 2,358.49 | 2,526.96 | 10,181.74 | 2,545.43 | 2,545.43 | 2,545.43 | 2,545.43 | 13,454.48 | 2,690.90 | 2,690.90 | 2,690.90 | 2,690.90 | 2,690.90 |
| 6177 - Credit Card Fees - Pivotal | 8,217.45 | 1,396.97 | 2,054.36 | 2,300.89 | 2,465.23 | 9,933.04 | 2,483.26 | 2,483.26 | 2,483.26 | 2,483.26 | 13,125.84 | 2,625.17 | 2,625.17 | 2,625.17 | 2,625.17 | 2,625.17 |
| 6210 - Insurance - Auto | 1,177.63 | - | - | 1,177.63 | - | 1,177.63 | - | - | 1,177.63 | - | 1,177.63 | - | - | 1,177.63 | - | - |
| 6211 - Insurance - Property | 8,542.42 | 8,542.42 | - | - | - | 8,542.42 | 8,542.42 | - | - | - | 8,542.42 | 8,542.42 | - | - | - | - |
| 6212 - Insurance - Miscellaneous | 757.47 | 757.47 | - | - | - | 757.47 | 757.47 | - | - | - | 757.47 | 757.47 | - | - | - | - |
| 6213 - Insurance - Liability | 1,268.59 | 1,268.59 | - | - | - | 1,268.59 | 1,268.59 | - | - | - | 1,268.59 | 1,268.59 | - | - | - | - |
| 6215 - Insurance - Workers Comp | 3,353.38 | 3,353.38 | - | - | - | 2,850.38 | 2,850.38 | - | - | - | 2,565.34 | 2,565.34 | - | - | - | - |
| 6230 - Kitchen/Bath Supplies | 1,398.56 | 349.64 | 349.64 | 349.64 | 349.64 | 1,398.56 | 349.64 | 349.64 | 349.64 | 349.64 | 1,398.56 | 349.64 | 349.64 | 349.64 | 349.64 | - |
| 6240 - Entertainment (reps) | 2,357.45 | 589.36 | 589.36 | 589.36 | 589.36 | 2,849.62 | 712.41 | 712.41 | 712.41 | 712.41 | 2,849.62 | 753.12 | 753.12 | 753.12 | 753.12 | 753.12 |
| 6242 - Meals (reps) | 2,673.16 | 668.29 | 668.29 | 668.29 | 668.29 | 3,231.25 | 807.81 | 807.81 | 807.81 | 807.81 | 4,269.88 | 853.98 | 853.98 | 853.98 | 853.98 | 853.98 |
| 6250 - Miscellaneous | - | | | | | - | | | | | - | | | | | |
| 6260 - Moving Expense | - | | | | | - | | | | | - | | | | | |
| 6280 - Non Capitalized Equipment | 1,000.00 | 250.00 | 250.00 | 250.00 | 250.00 | 1,000.00 | 250.00 | 250.00 | 250.00 | 250.00 | 1,000.00 | 250.00 | 250.00 | 250.00 | 250.00 | - |
| 6300 - Shipping Charges | 47,100.32 | 8,007.05 | 11,775.68 | 13,188.09 | 14,130.09 | 56,933.63 | 14,233.41 | 14,233.41 | 14,233.41 | 14,233.41 | 75,233.98 | 15,046.80 | 15,046.80 | 15,046.80 | 15,046.80 | 15,046.80 |
| 6302 - Postage & Meter Supplies | 7,000.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 7,000.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 10,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| 6320 - Debtor's Professional Fees (carve out) | 300,000.00 | 300,000.00 | - | - | - | - | - | - | - | - | 300,000.00 | - | - | - | 150,000.00 | 150,000.00 |
| 6321 - Committee's Professional Fees (carve out) | 60,000.00 | 25,000.00 | - | - | 35,000.00 | - | - | - | - | - | - | - | - | - | - | - |
| 6324 - Consulting | - | | | | | - | | | | | - | | | | | |
| 6329 - Hinson Allocation Expenses | (12,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | (12,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | (12,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | - |
| 6330 - Rent | 405,280.38 | 405,280.38 | - | - | - | 661,246.93 | 661,246.93 | - | - | - | 661,246.93 | 330,623.47 | 330,623.47 | - | - | - |
| 6331 - CAM | - | | | | | - | | | | | - | | | | | |
| 6332 - Commercial Rent Tax | 4,700.00 | 4,700.00 | - | - | - | 4,700.00 | 4,700.00 | - | - | - | 4,700.00 | - | 4,700.00 | - | - | - |
| 6333 - Office Cleaning | 3,043.75 | 3,043.75 | - | - | - | 3,043.75 | 3,043.75 | - | - | - | 3,043.75 | - | - | - | 3,043.75 | - |
| 6334 - Trash Removal | 784.47 | 784.47 | - | - | - | 784.47 | 784.47 | - | - | - | 784.47 | - | - | - | 784.47 | - |
| 6335 - Utilities | 17,125.10 | 4,281.27 | 4,281.27 | 4,281.27 | 4,281.27 | 17,125.10 | 4,281.27 | 4,281.27 | 4,281.27 | 4,281.27 | 17,125.10 | - | - | - | - | 17,125.10 |
| 6336 - Parking - Showroom | 1,979.00 | 1,979.00 | - | - | - | 1,979.00 | 1,979.00 | - | - | - | 1,979.00 | - | - | 1,979.00 | - | - |
| 6337 - Security | 117.00 | 117.00 | - | - | - | 117.00 | 117.00 | - | - | - | 117.00 | 117.00 | - | - | - | - |
| 6338 - Lighting | 1,960.49 | 490.12 | 490.12 | 490.12 | 490.12 | 1,960.49 | 490.12 | 490.12 | 490.12 | 490.12 | 2,500.00 | 500.00 | - | - | 1,000.00 | 500.00 |
| 6340 - Repairs & Maintenance | 4,894.79 | 1,223.70 | 1,223.70 | 1,223.70 | 1,223.70 | 4,894.79 | 1,223.70 | 1,223.70 | 1,223.70 | 1,223.70 | 5,000.00 | - | - | - | 5,000.00 | - |
| 6342 - Software Maint. | 1,500.00 | 1,500.00 | - | - | - | 1,500.00 | 1,500.00 | - | - | - | 1,500.00 | - | - | - | 1,500.00 | - |
| 6350 - Salaries | 448,267.00 | 205,633.50 | - | 242,633.50 | - | 419,870.76 | 183,117.50 | - | 236,753.26 | - | 602,988.26 | 183,117.50 | - | 236,753.26 | - | 183,117.50 |
| 6351 - Exec. Salaries | 66,787.00 | 33,393.50 | - | 33,393.50 | - | 66,787.00 | 33,393.50 | - | 33,393.50 | - | 100,180.50 | 33,393.50 | - | 33,393.50 | - | 33,393.50 |

**Brunschwig & Fils, Inc.**
**B&F Inc. (Consolidated)**
# 13 week P&L and Cash Use

| | M1 | Wk1 | Wk2 | Wk3 | Wk4 | M2 | Wk5 | Wk6 | Wk7 | Wk8 | M3 | Wk9 | Wk10 | Wk11 | Wk12 | Wk13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6352 - Employee Commissions | 56,373.07 | - | - | 56,373.07 | - | 47,917.11 | - | - | 47,917.11 | - | 52,708.82 | - | - | 52,708.82 | - | - |
| 6354 - Payroll Taxes | 53,971.46 | 25,047.15 | - | 28,924.31 | - | 50,995.88 | 22,687.75 | - | 28,308.13 | - | 73,683.63 | 22,687.75 | - | 28,308.13 | - | 22,687.75 |
| 6358 - Overtime | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 6371 - Sample Fabrics - Distribution | 8,987.00 | 8,987.00 | - | - | - | 8,987.00 | 8,987.00 | - | - | - | - | - | - | - | - | - |
| 6390 - Shipping Supplies | 4,679.86 | 795.58 | 1,169.96 | 1,310.36 | 1,403.96 | 5,656.89 | 1,414.22 | 1,414.22 | 1,414.22 | 1,414.22 | 7,475.20 | 1,495.04 | 1,495.04 | 1,495.04 | 1,495.04 | 1,495.04 |
| 6402 - Stationary Supplies | 2,389.33 | 597.33 | 597.33 | 597.33 | 597.33 | 2,389.33 | 597.33 | 597.33 | 597.33 | 597.33 | 3,000.00 | - | - | - | 2,400.00 | 600.00 |
| 6403 - Flowers, Refreshements, Food | 279.64 | 69.91 | 69.91 | 69.91 | 69.91 | 279.64 | 69.91 | 69.91 | 69.91 | 69.91 | 375.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 |
| 6410 - Storage | 1,000.00 | 250.00 | 250.00 | 250.00 | 250.00 | 1,000.00 | 250.00 | 250.00 | 250.00 | 250.00 | 1,000.00 | 250.00 | 250.00 | 250.00 | 250.00 | - |
| 6420 - Taxes - Other | 228.70 | 228.70 | - | - | - | 228.70 | 228.70 | - | - | - | 228.70 | 228.70 | - | - | - | - |
| 6421 - Propety Tax | 11,265.52 | 11,265.52 | - | - | - | 11,265.52 | 11,265.52 | - | - | - | 11,265.52 | - | - | 11,265.52 | - | - |
| 6422 - Use Tax | 837.79 | 837.79 | - | - | - | 837.79 | 837.79 | - | - | - | 837.79 | 837.79 | - | - | - | - |
| 6423 - Bus License/ Franchise Fee Tax | 1,764.04 | 1,764.04 | - | - | - | 1,764.04 | 1,764.04 | - | - | - | 1,764.04 | 1,764.04 | - | - | - | - |
| 6430 - Messenger Service | 188.55 | 47.14 | 47.14 | 47.14 | 47.14 | 227.91 | 56.98 | 56.98 | 56.98 | 56.98 | 300.00 | 75.00 | 75.00 | - | 75.00 | 75.00 |
| 6439 - Telephone - Mobile/Blackberry | 2,407.86 | - | 2,407.86 | - | - | 2,407.86 | - | 2,407.86 | - | - | 2,600.00 | - | - | 2,600.00 | - | - |
| 6440 - Telephone Expense | 20,000.00 | - | 20,000.00 | - | - | 20,000.00 | - | 20,000.00 | - | - | 20,000.00 | - | - | - | - | 20,000.00 |
| 6441 - Computer Expense | 1,094.84 | 273.71 | 273.71 | 273.71 | 273.71 | 1,094.84 | 273.71 | 273.71 | 273.71 | 273.71 | 1,100.00 | - | - | - | 1,100.00 | - |
| 6448 - Netsuite Expense | 33,606.00 | 33,606.00 | - | - | - | 67,207.00 | - | - | - | 67,207.00 | - | - | - | - | - | - |
| 6449 - Oz Link | 495.00 | 495.00 | - | - | - | 495.00 | 495.00 | - | - | - | 495.00 | 495.00 | - | - | - | - |
| 6451 - Avalara | 1,517.50 | 1,517.50 | - | - | - | 1,517.50 | 1,517.50 | - | - | - | 1,517.50 | 1,517.50 | - | - | - | - |
| 6460 - Travel - Transportation | 13,318.42 | 3,329.60 | 3,329.60 | 3,329.60 | 3,329.60 | 14,500.00 | 3,625.00 | 3,625.00 | 3,625.00 | 3,625.00 | 13,000.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 |
| 6466 - Travel - Lodging | 8,054.78 | 2,013.70 | 2,013.70 | 2,013.70 | 2,013.70 | 9,000.00 | 2,250.00 | 2,250.00 | 2,250.00 | 2,250.00 | 7,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 |
| 6480 - Auto Lease | 1,671.11 | 1,671.11 | - | - | - | 1,671.11 | 1,671.11 | - | - | - | 1,671.11 | 1,671.11 | - | - | - | - |
| 6481 - Auto Reimbursement | 9,501.32 | 9,501.32 | - | - | - | 9,501.32 | 9,501.32 | - | - | - | 9,501.32 | 9,501.32 | - | - | - | - |
| 6500 - Payroll Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 7002 - OPENING BALANCE AR | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total - Expense** | 1,795,826.06 | 1,125,833.92 | 128,961.05 | 458,205.55 | 82,858.08 | 1,691,751.84 | 1,012,259.91 | 130,175.80 | 437,065.72 | 112,250.42 | 2,179,993.63 | 636,598.15 | 430,098.74 | 398,121.00 | 257,065.95 | 459,100.75 |
| **Net Ordinary Income** | (966,131.38) | (984,780.01) | 78,471.17 | (225,881.47) | 166,059.78 | (658,551.84) | (753,959.91) | 128,124.20 | (178,765.72) | 146,049.58 | (771,346.13) | (354,868.65) | (148,369.24) | (116,391.50) | 24,663.55 | (177,371.25) |
| Other Income and Expenses | | | | | | | | | | | | | | | | |
| Other Income | | | | | | | | | | | | | | | | |
| **Total - Other Income** | 328,979.11 | 9,943.78 | 60,517.04 | 113,803.39 | 144,714.89 | 323,669.62 | 17,676.15 | 63,569.99 | 115,101.55 | 127,321.93 | 350,536.33 | 18,686.28 | 69,169.50 | 117,953.38 | 126,040.89 | 18,686.28 |
| Other Expense | | | | | | | | | | | | | | | | |
| **Total - Other Expense** | 2,461.79 | 2,461.79 | - | - | - | 2,461.79 | 2,461.79 | - | - | - | 2,461.79 | 2,461.79 | - | - | - | - |
| **Net Other Income** | 326,517.32 | 7,481.99 | 60,517.04 | 113,803.39 | 144,714.89 | 321,207.83 | 15,214.36 | 63,569.99 | 115,101.55 | 127,321.93 | 348,074.54 | 16,224.49 | 69,169.50 | 117,953.38 | 126,040.89 | 18,686.28 |
| **Net Income** | (639,614.07) | (977,298.02) | 138,988.21 | (112,078.08) | 310,774.68 | (337,344.01) | (738,745.55) | 191,694.19 | (63,664.17) | 273,371.52 | (423,271.59) | (338,644.16) | (79,199.74) | 1,561.88 | 150,704.45 | (158,684.97) |
| | | | | | | | | | | | | | | | | |
| Expenses | | (1,125,833.92) | (128,961.05) | (458,205.55) | (82,858.08) | | (1,012,259.91) | (130,175.80) | (437,065.72) | (112,250.42) | | (636,598.15) | (430,098.74) | (398,121.00) | (257,065.95) | (459,100.75) |
| Receivables | | 160,990.00 | 217,810.00 | 284,100.00 | 284,100.00 | | 337,500.00 | 337,500.00 | 412,500.00 | 412,500.00 | | 475,000.00 | 475,000.00 | 475,000.00 | 475,000.00 | 475,000.00 |
| Agency commissions | | - | 45,893.84 | 97,425.40 | 127,167.05 | | - | 45,893.84 | 97,425.40 | 109,645.79 | | - | 50,483.22 | 99,267.10 | 107,354.62 | - |
| Depreciation | | - | 13,107.58 | - | - | | - | 13,107.58 | - | - | | - | 13,107.58 | - | - | - |
| Prepaid purchases for BO and Stock | | (1,754,078.75) | (200,000.00) | (200,000.00) | (200,000.00) | | (200,000.00) | (200,000.00) | (200,000.00) | (200,000.00) | | (150,000.00) | (150,000.00) | (150,000.00) | (150,000.00) | (150,000.00) |
| | | | | | | | | | | | | | | | | |
| **Cash Consumption** | | (2,718,922.66) | (52,149.63) | (276,680.15) | 128,408.17 | | (874,759.91) | 66,325.63 | (127,140.32) | 209,895.37 | | (311,598.15) | (41,507.94) | 26,146.10 | 175,288.67 | (134,100.75) |
| **Cumulative** | | (2,718,922.66) | (2,771,072.29) | (3,047,752.45) | (2,919,344.28) | | (3,794,104.19) | (3,727,778.56) | (3,921,244.51) | (3,517,883.19) | | (3,829,481.34) | ########## | ########## | ########## | ########## | |
| DIP 3.5MM | | | | | | | | | | | | | | | | |
| Inventory | 6,000,000.00 | 6,000,000.00 | 6,060,406.98 | 6,078,652.54 | 6,081,088.56 | | 6,072,985.23 | 6,066,260.58 | 6,259,535.92 | 6,452,811.26 | | 6,646,086.60 | 6,827,057.69 | 7,008,028.78 | 7,188,999.87 | 7,369,970.96 |
| Inventory receipt | | 150,000.00 | 150,000.00 | 150,000.00 | 150,000.00 | | 144,975.34 | 344,975.34 | 344,975.34 | 344,975.34 | | 332,671.59 | 332,671.59 | 332,671.59 | 332,671.59 | 282,671.59 |
| Inventory consumption | | (89,593.02) | (131,754.44) | (147,564.97) | (158,105.33) | | (151,700.00) | (151,700.00) | (151,700.00) | (151,700.00) | | (151,700.00) | (151,700.00) | (151,700.00) | (151,700.00) | (151,700.00) |
| Ending Inventory | | 6,060,406.98 | 6,078,652.54 | 6,081,088.56 | 6,072,985.23 | | 6,066,260.58 | 6,259,535.92 | 6,452,811.26 | 6,646,086.60 | | 6,827,057.69 | 7,008,028.78 | 7,188,999.87 | 7,369,970.96 | 7,500,942.05 |
| | | | | 72,985.23 | | | | | | 646,086.60 | | | | | | 1,500,942.05 |
| | | | | 1.22% | | | | | | 10.64% | | | | | | 21.99% |

## SCHEDULE I

Lender's Revolving Loan Commitments

| Lender | Revolving Loan Commitments | Pro Rata Share |
|---|---|---|
| Kravet Inc. | $3,050,000 | 100% |
| **Totals** | $3,050,000 | **100%** |