Alan D. Halperin, Esq.
Robert D. Raicht, Esq.
Jocelyn Keynes, Esq.
**HALPERIN BATTAGLIA RAICHT, LLP**
555 Madison Avenue, 9th Floor
New York, New York 10022
Phone: (212) 765-9100; Fax: (212) 765-0964
ahalperin@halperinlaw.net; rraicht@halperinlaw.net
jkeynes@halperinlaw.net

*Proposed Counsel to the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re:

BRUNSCHWIG & FILS, INC.,

                             Debtor.
----------------------------------------------------------x

Chapter 11

Case No. 11-22036 (RDD)

**MOTION FOR ORDERS (I) SCHEDULING HEARING TO
CONSIDER (A) SALE OF SUBSTANTIALLY ALL OF THE
DEBTOR'S ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES, SUBJECT TO HIGHER AND BETTER OFFERS; AND
(B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS;
(II) SCHEDULING HEARING TO CONSIDER APPROVAL OF (A) BREAK-UP
FEE/EXPENSE REIMBURSEMENT AND (B) BIDDING PROCEDURES FOR THE
CONDUCT OF AN AUCTION AND ENTERING ORDER THEREON; (III) FIXING A
CURE CLAIMS BAR DATE WITH RESPECT TO THE ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (IV) FIXING MANNER
AND NOTICE OF SALE HEARING; (V) AUTHORIZING THE DEBTOR TO SELL
ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES,
SUBJECT TO HIGHER AND BETTER OFFERS; AND (VI) AUTHORIZING
<u>ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS</u>**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

        Brunschwig & Fils, Inc., the debtor and debtor-in-possession herein ("<u>Brunschwig</u>" or the

"<u>Debtor</u>"), by its proposed counsel, Halperin Battaglia Raicht, LLP, makes this motion (the "<u>Motion</u>"),

pursuant to sections 105, 363 and 365 of Title 11 of the United States Code, as amended (the "<u>Bankruptcy</u>

<u>Code</u>"), for entry of orders:

1. fixing the date and time of a hearing (the "Sale Hearing") to consider:

   a. approval of a certain asset purchase agreement and all ancillary agreements documents (collectively, the "Sale Agreement" substantially in the form attached hereto as **Exhibit A**) by and between the Debtor, T. Olivier Peardon and Thomas P. Peardon, Jr., as sellers, and Kravet Inc. ("Kravet" or the "Purchaser"), dated as of January 12, 2011, pursuant to which, among other things, the Debtor proposes to sell substantially all of its assets (the "Assets") to Purchaser, free and clear of all liens, claims and encumbrances, subject to higher or better offers, and

   b. approval of the assumption and assignment to the Purchaser, or its designee, of certain executory contracts of the Debtor related to the Assets (the "Assigned Contracts and Leases"). A schedule of all of the Debtor's executory contracts and unexpired leases, together with (among other things) the cure costs associated with each (if any) calculated in accordance with the Debtor's books and records, is attached as Exhibit B to the Bidding Procedures Order (as defined herein). The Purchaser shall have the rights to designate which Executory Contracts and Leases it wishes to have assumed and assigned no later than 15 calendar days prior to the Sale Hearing;

2. fixing the date and time of a hearing (the "Bidding Procedures Hearing") to consider approval of a break-up fee and expense reimbursement (the "Break-Up Fee/Expense Reimbursement"), and bidding procedures (the "Bidding Procedures") to be utilized in connection with the Auction of the Assets to be held prior to the Sale Hearing (the "Auction"), and, in connection therewith, approving the Break-Up Fee/Expense Reimbursement and Bidding Procedures,

3. fixing the last date by which the non-debtor parties to the Assigned Contracts and Leases must file Cure Claims (as defined herein) with respect to the respective Debtor's assumption and assignment to Purchaser, or its designee, of the Assigned Contracts and Leases,

4. fixing the manner and form of notice of the Sale Hearing, and

5. approving the Sale Agreement and authorizing the sale of the Assets pursuant to section 363(b) of Title 11 of the United States Code, as amended (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), free and clear of claims, liens and other encumbrances and, in connection therewith, approving the assumption and assignment of the Assigned Contracts and Leases pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

In support thereof, the Debtor respectfully represents, as follows:

**Introduction**

1.     By this Motion, the Debtor seeks entry of an Order approving the sale of the Assets, free and clear of all liens, claims and encumbrances (the "Asset Sale"), as well orders granting the related relief described above, all of which is in furtherance of the Debtor's efforts to maximize the value of its assets for the benefit of its estate and creditors.

2.     The Debtor has received an offer from the Purchaser to purchase the Assets (the "Offer").  The proposed sale under the Offer shall be subject to higher and better offers that may be made at the Auction to be scheduled prior to the Sale Hearing, provided that a Qualified Bid (as defined herein) is received pursuant to the Bidding Procedures (as described herein).  For the reasons set forth herein, the Debtor requests that the Court approve a Break-Up Fee/Expense Reimbursement and establish Bidding Procedures for the conduct of the Auction.  The proposed sale is the result of substantial, good faith, arms' length negotiation and provides a vehicle for the Debtor to maximize asset values through an auction sale process.  Accordingly, the Debtor respectfully requests that the Court schedule the Sale Hearing and grant the other forms of preliminary relief requested in accordance with the pre-fixed order scheduling hearing.

**Jurisdiction and Venue**

3.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.).  The statutory predicates for the relief sought herein are sections 105(a), 363(b), (f), (m) and (n) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 9014.  Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. §157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §1409.

## Background

4.     On January 12, 2011 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and has continued in the management and operation of its business and property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

5.     No creditors' committee or trustee has been appointed in this case.

6.     Brunschwig is a family-owned company organized and existing under the laws of the State of New York with headquarters in North White Plains, New York.  The issued and outstanding shares of the Debtor are held 75.5% percent by T. Olivier Peardon, 21.9% percent by Thomas P. Peardon, Jr., and 2.6% percent by a Peardon family trust.  The Debtor maintains showroom premises in seventeen locations across the United States, including New York, Boston, Philadelphia, Chicago, Dallas, Houston, Los Angeles and San Francisco, among others.  In addition, Brunschwig has a showroom in London and operations, through certain non-debtor affiliates, in Paris and Melbourne.

7.     Brunschwig provides its products and services primarily to design professionals, giving them access, and the ability to buy, "to-the-trade-only" luxury home furnishings for their clients.  In addition to its own extensive product lines, Brunschwig represents approximately thirty-four other furnishing companies, including Gaston y Daniela, Houles and Hinson.

History and Description of Business.

8.     Brunschwig has been in business for 110 years.  It designs and manufactures contemporary and historically-inspired decorative fabrics, wall coverings, trimmings, upholstered furniture, lamps, tables, mirrors and accessories for both residential and contract applications.  Throughout its storied history of operations, Brunschwig has maintained a remarkable legacy of design, service, timelessness, quality, attention to detail and superb craftsmanship.  These are the hallmarks of the Debtor's products, celebrated world-wide, which began in 1900 when Achille Brunschwig established Brunschwig & Fils as a tapestry-weaving mill in Aubusson and Bohain, France.

9.      The 1900s were known as a new age for many; an innovative start, a new beginning.  Certainly, that was true for Mr. Brunschwig and his tapestry-weaving mill.  Early in the twentieth century, the firm expanded its collection to include printed and woven silks and cottons from the finest European mills.  Brunschwig soon established and enjoyed a distinguished, international reputation for quality.  By 1925, under the direction of Captain Roger E. Brunschwig, the founder's son, the company opened showrooms in New York and other cities in the United States.

10.      In 1941, Captain Brunschwig joined General de Gaulle's Free French Forces in London, leaving Zelina, his American wife, to direct the business.  Mrs. Brunschwig – affectionately called Mrs. B – who had been a successful interior designer, joined the firm as a stylist, and found herself without French imports and, being forced to be innovative, she substituted parachute cloth for silk, unbleached muslin for linen, and found American mills to weave and print her designs, all to great acclaim.

11.      Following World War II, Roger Brunschwig, now a Colonel, returned to head the firm, which was again able to import fabrics from France and England to complement its American collection.  Under Mrs. B's leadership as design director, the company broadened its product base to include wallpapers and trimmings, many of which coordinated with existing printed cotton and linen designs.  Mrs. B. also continued to enrich the company's archives of antique textiles, wallpapers and trims – originally established by Achille Brunschwig – as well as collaborating with museums and historic restorations to create further fabrics based upon historical pieces.

12.      In the 1980's, cousins to the founding Brunschwig family acquired the business.  Today, Brunschwig continues as a family-owned company under the direction of T. Olivier Peardon, the Debtor's President and Chief Executive Officer.

13.      The firm offers more than 17,000 fabrics and 1,200 wall coverings, ranging from fine documentary reproductions to striking contemporary designs.  It has relationships with more than 200 mills from around the world.  Every year the design studio creates new fabric collections consisting of as

many as thirty designs per collection, each design available in a variety of colors. At least one annual

collection is inspired by a museum or historic place. The studio also annually introduces a new wallpaper

book and adds to its extensive collection of passementerie – tassels, braids, fringes, ropes and cords.

14.     In 1986, the company launched its first collection of upholstered furniture. As it

has with other products, Brunschwig produces timeless designs of exceptional quality that are suited to

both residential and commercial use. Brunschwig launched lighting and table collections in the spring of

1992. In 2003, Brunschwig began the worldwide distribution for Jagtar Thai Silks. In 2004, Brunschwig

acquired worldwide distribution rights for the Kirk Brummel Collection, which is now a division of

Brunschwig.

15.     In 1990, the Debtor opened a showroom in London. Thereafter, Brunschwig,

through non-debtor affiliates, opened showrooms in Paris and Melbourne.

Debtor's Financial Difficulties

16.     Brunschwig's financial difficulties stem from a confluence of events and

challenges in recent years, which taken together, have had a negative impact on its overall performance.

Like many industries, the textile industry has been hard hit by the significant decrease in consumer

spending and severely affected by the global economic downturn. As a result, Brunschwig has

experienced declining sales and profitability over the last several years.

17.     In 2007, the company undertook a comprehensive restructuring of its business

operation. As part of that restructuring, the Debtor entered into a sale-leaseback transaction with respect to

its premises in North White Plains, New York in order to resolve obligations to its secured bank lender.

Upon the closing of the sale-leaseback transaction in or about June 2010, the Debtor was able to pay off its

credit facility leaving the company with a greatly reduced level of secured debt. The Debtor also

implemented significant cost-cutting measures reducing its costs by approximately $18 million since the

beginning of 2008. Through attrition and painful reductions in its workforce, the Debtor terminated

approximately 100 employees reducing its payroll costs by over $5.3 million since the beginning of 2008. The Debtor currently has approximately 135 employees in its various locations in the United States. The restructuring left Brunschwig in the enviable position of being not only cash positive on its then current numbers, but even in the event sales further decreased by up to 21%. Unfortunately, given the duration and depth of the recession, the efforts of management to sustain Brunschwig at its current reduced level of operations have been unavailing. Due to a fundamental reduction of market size in the home furnishings market, sales plummeted industry wide, and Brunschwig was not spared. The Debtor's sales fell by 35% in 2009 and 30% in 2010 (estimated). The company found itself again in financial trouble.

18.     Brunschwig has continued to explore modifications to its business model, including closing underperforming and unprofitable locations, downsizing and scaling back its operations, and eliminating unduly burdensome contracts and unexpired leases. Nonetheless, the Debtor has determined that it cannot effectuate such modifications to its business model on its own given the precipitous drop in revenue, its current cash crisis and large legacy obligations. These and other challenges caused Brunschwig to seek protection under Chapter 11.

Chapter 11 Goals.

19.     Faced with a significant drop in revenue and related challenges, Brunschwig requires the breathing spell afforded by the automatic stay to protect and preserve assets for the benefit of its creditors. Prior to the commencement of this case, the Debtor explored various alternatives to resolve its financial issues, including a going concern sale of its business. The Debtor has determined that a going concern sale is necessary to preserve its business, and is in the best interest of its estate and creditors. To fund operations during the Chapter 11 case, the Debtor will be seeking approval of a consensual cash collateral facility with its existing secured creditor. The Debtor also intends to seek approval a debtor-in-possession financing facility. Such financing sources will enable the Debtor to ensure continuity of service to its valuable customer base, thus maximizing asset values for the benefit of its creditors and estate.

20.     By seeking bankruptcy protection, Brunschwig will be able to protect, preserve and maximize the value of its assets and businesses for the benefit of the estate, its creditors and employees.  This proceeding will enable Brunschwig to transition its business to a financially sound status, maximize the value of Brunschwig's long-term reputation and goodwill in the textile industry, provide continued employment to many of its valued employees, and sustain a significant and trusted partner for its agents and distributors around the globe.

21.     Additional information regarding Brunschwig's business, capital structure and the circumstances leading to this chapter 11 case is contained in the Affidavit of T. Olivier Peardon Pursuant to Local Bankruptcy Rule 1007-2 (the "<u>Peardon Affidavit</u>") filed contemporaneously herewith.

<strong><u>Marketing the Assets for Sale</u></strong>

22.     Prior to the Petition Date, the Debtor pursued various avenues to enable the business to continue in operation in an effort to protect, preserve and maximize the value of its assets.  As noted above, the Debtor had hoped to reorganize on a stand-alone basis.  Despite that desire the Debtor determined that the depth and duration of the recession made it impossible for the Debtor to continue in operation absent a sale under Chapter 11.  Since that time, the Debtor has endeavored to identify a strategic or financial investor for the business and/or an acquirer for all or a portion of the assets.  To that end, the Debtor's management team prepared financial and operational materials for dissemination to potential investors and/or acquirers of all or a portion of the Debtor's assets.  The Debtor has solicited expressions of interest from approximate seven (7) candidates, including strategic buyers, private equity firms and offshore strategic buyers and investors.

23.     To date, Purchaser is the only party to make a formal written Offer to acquire certain of the Debtor's assets and business on a going concern basis.  Kravet is an industry leader in to-the-trade home furnishings business, with fort-two (42) locations in the United States and abroad.  The Debtor believes that the Offer is fair and reasonable - - although it intends to submit the Offer to the rigors of the

marketplace. The Offer has been memorialized in the Sale Agreement for which the Debtor now seeks approval.

24. The Debtor, through its chief restructuring officer, Benjamin Capital Advisors, Inc., and its principal, Charles D. Benjamin (the "CRO"), has updated its financial and operational materials and intends to solicit offers for the Assets from parties previously solicited as well as other parties that the CRO believes may have an interest in acquiring the Assets. The Debtor submits that - - with the Offer from the Purchaser and the Debtor's ability to transfer the Assets, free and clear of liens, claims and encumbrances, pursuant to an Order of the Bankruptcy Court -- there is a potential for a competitive bidding process for the Assets.

## The Sale Agreement[1]

25. The Sale Agreement is a comprehensive, purchase and sale agreement setting forth all the rights and obligations contemplated thereunder by and between the Debtor and the Purchaser. The Sale Agreement provides a vehicle for the disposition of certain of the Debtor's operating assets and, at the same time, enables the Debtor to canvass the marketplace for any higher and better offers for the Assets.

26. The following is a general description of the salient terms of the Sale Agreement. Capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Agreement:[2]

> Purchased Assets: The Sale Agreement contemplates the Debtor will sell, convey, assign and transfer to Purchaser all of the Assets (other than the Excluded Assets) on the terms and subject to the conditions set forth in the Sale Agreement, including, but not limited to: (a) rights and benefits under Assigned Contracts and Leases, (b) inventory, (c) accounts receivable, (d) the Debtor's ownership interests in certain non-debtor affiliates, (e) tangible property, (f) goodwill,

---

[1] The Sale Agreement attached hereto is in substantially final form, but without either exhibits or schedules. The final, executed form of the Sale Agreement, together with exhibits and schedules (but redacted to preserve confidentiality) will be filed with the Court no later than 2 business days prior to the Bidding Procedures Hearing.

[2] The following is merely a summary of the Sale Agreement and is qualified in its entirety by the actual, express terms of the Sale Agreement. To the extent there is any discrepancy between this summary and the terms of the Sale Agreement, the terms of the Sale Agreement shall control.

(g) intellectual property, (h) telephone numbers, (i) sales and promotional materials, customer lists and sales related materials, (j) rights under unfulfilled vendor purchaser orders, (k) unfulfilled customer orders in respect of which a purchase deposit has been made by the customer and the related payment has been made to the relevant vendor, (l) cash and cash equivalents, (m) files and operating data, (n) rights and benefits accruing under any permits, (o) claims and causes of action under Chapter 5 of the Bankruptcy Code, (p) pre-paid items, (q) present or future rights to insurance proceeds relating the acquired assets or assumed liabilities, (r) warranties, guarantees and indemnities related to the acquired assets, (s) rights, demands, claims and credits related to the acquired assets and (t) rights under confidentiality agreements,

Purchase Price: The purchase price for the Assets is (a) cash in the amount of $6.5 million, subject to certain adjustments,[3] (b) plus cure costs on any Assigned Contracts and Leases, and (c) minus the sum of all obligations outstanding under the DIP Facility[4] as of the closing (the "Closing") of the Asset Sale (the "Purchase Price").

Assumed Liabilities: Purchase is not assuming any liabilities of the Debtor other than (a) residential warranty claims, (b) customer claims for delivery of goods on open orders that have been prepaid (so long as payment for the goods has been made to the vendor and such claim is specifically set for on a schedule to the Sale Agreement), (c) liabilities arising from and after the Closing under any Assigned Contracts and Leases identified by Purchaser to be assumed and assigned to Purchaser at Closing, and (d) such other liabilities as may be specifically identified in the Sale Agreement.

Assigned Contracts and Leases.  The Sale Agreement contemplates that certain executory contracts will be assumed and assigned to Purchaser at Closing (the "Assigned Contracts and Leases").  Purchaser will provide the Debtor with a schedule of the Assigned Contracts and Leases no later than 15 calendar days prior to the Sale Hearing.   Purchaser shall be responsible for the payment of any Cure Cost[5] associated with any Assigned Contract or Lease, provided, however, that if the Cure Cost for any Assigned Contract or Lease is disputed by the counterparty thereto and is determined by the Court to be higher than the Cure Cost set forth on the Debtor's books and records, Purchaser has reserved the right

---

[3] The Purchase Price will be (a) increased by the amount , if any, by which the Current Accounts Receivable (as defined in the Sale Agreement), as reflected on the Debtor's books and records 2 business days prior to the Closing Date exceed $900,000; and (b) decreased by the amount, if any, by which the Current Accounts Receivable, as reflected on the Debtor's books and records 2 business days prior to the Closing Date are less than $800,000.

[4] Simultaneously with the Petition Date, the Debtor filed a motion seeking, among other things, approval of a $4 million senior secured debtor-in- possession financing facility from Kravet (the "DIP Facility").

[5] As discussed herein, pursuant to the pre-fixed order scheduling hearing, the Debtor requests that the Court fix a bar date for the assertion of any Cure Costs by the counterparty to any Assigned Contracts and Leases.

not to take an assignment of such Assigned Contract or Lease, notwithstanding the timing provisions otherwise provided herein.

Excluded Assets: The Debtor is not selling to the Purchaser, and the Assets do not include, any asset specifically identified by Purchaser as being an Excluded Asset set forth in Section 2.02 of the Sale Agreement or otherwise excluded in writing no later than fifteen (15) days prior to the Closing.

Conditions to Closing: The Sale Agreement provides that the conditions to closing include, among other things, (a) entry of a final non-appealable order by the Bankruptcy Court authorizing the sale of the Assets to Purchaser, in accordance with the terms of the Sale Agreement; (b) a closing occurring no later than March 21, 2011; (c) representations and warranties are true and correct; (d) no breach of the Sale Agreement; and (e) a finished goods inventory, valued at cost, of not less than $5.4 million.

Record Retention: The Purchaser has agreed to provide the Debtor with access to its books and records as may be necessary to conclude the administration of the estate.

Transition Services: The Purchaser and the Seller have agreed to enter into a transition services agreement, pursuant to which, at Purchaser's sole cost and expense, Seller will provide Purchaser with access to premises, and the benefits of any executory contract not being assumed and assigned, for a period of time post-Closing so as to permit Purchaser to conduct an orderly transition with respect to the Acquired Assets.

## Additional Disclosures Regarding Potential Related Transactions

27.     Purchaser and the Debtor's principal, Olivier Peardon, have had discussions concerning Mr. Peardon's potential employment by the Purchaser in the event Purchaser is the successful bidder for the Assets. No agreement has been reached, to date, between the parties.

## The Sale is Supported by Sound Business Judgment and Should be Approved

28.     The Debtor submits that the terms of the Sale Agreement are fair and reasonable, and that ample authority exists for the approval of the sale of the Assets to the Purchaser. Section 363(b) of the Bankruptcy Code provides that a debtor-in-possession, after notice and a hearing, may use, sell, or

lease property of the estate other than in the ordinary course of business. In pertinent part, the section provides:

> (b)(1) The trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

*See* 11 U.S.C. § 363(b)(1).

29.     In order for a court to approve a request for the use of property of the estate outside the ordinary course of business, the court must find that the proposed course of action is supported by sound business reasons. *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2nd Cir. 1983); *see also In re Chateaugay Corp.,* 973 F.2d 141 (2d Cir. 1993); *Bartel v. Bar Harbor Airways, Inc.,* 196 B.R. 268, 273 (S.D.N.Y. 1996); *In re Caldor, Inc.- NY,* 193 B.R. 182, 187 (Bankr. S.D.N.Y. 1996); *In re Thomas McKinnon Securities, Inc.,* 120 B.R. 301 (Bankr. S.D.N.Y. 1990). In reviewing such proposed transactions, courts should give substantial deference to the business judgment of the debtor-in-possession. *See e.g., Esposito v. Title Inc. Co. of Pa. (In re Fernwood Mkts.),* 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987).

30.     The Debtor submits that consideration of these factors militates in favor of this Court's approval of a section 363(b) sale process. Given its precipitous drop in revenue and current cash crisis, the Debtor does not have the operation funds necessary to promulgate a plan of reorganization and does not believe it would be able to reorganize on a stand-alone basis. With the DIP Facility proposed to be provided by Purchaser, the Debtor believes it has sufficient funds to continue to operate pending the Sale Hearing. However, the Debtor is concerned that unless it is permitted to undertake the Asset Sale at this time it will lose the value of its assets, in particular, its name recognition and good will in the industry that has been developed over the past century. Accordingly, the Debtor believes that conducting an auction sale process will maximize the prospect of a sale of the Assets on a going concern basis. Thus,

approval of the Sale Agreement provides the Debtor the ability to maximize the value of its assets through a fair and open auction process.

31. Based upon the foregoing, the Debtor submits that the Sale Agreement and the proposed sale of the Assets is in the best interests of the Debtor, its estate, and its creditors, and is based upon sound, reasoned and informed business judgment warranting this Court's approval. *See In re Lionel Corp.,* 722 F.2d at 1071; *Bar Harbor Airways, Inc.*, 196 B.R. at 273; *In re Caldor, Inc. - NY*, 193 B.R. at 187.

32. The Debtor and the Purchaser seek findings that the transactions contemplated by the Sale Agreement are (a) subject to the protections afforded to "good faith" purchasers under section 363(m) of the Bankruptcy Code and (b) not subject to avoidance under section 363(n) of the Bankruptcy Code. Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under section (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). In addition, section 363(n) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount . . . [including] punitive damages . . . .

11 U.S.C. § 363(n).

33. The negotiations and the resulting transaction contemplated by the Sale Agreement are the result of good faith and arm's length negotiations between the Debtor and the Purchaser and resulted in a Purchase Price that is both fair and reasonable in light of the circumstances. At the Sale

Hearing, the parties will adduce evidence in support of the foregoing and will request that the Court incorporate findings on these matters as part of the Order approving the sale.

**The Sale should be Approved Free and
Clear of All Liens, Claim and Encumbrances**

34. Pursuant to section 363(f) of the Bankruptcy Code, after notice and a hearing, a debtor may sell property of the estate free and clear of all liens and encumbrances. In pertinent part, the section provides:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if-
>
> > (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2) such entity consents;
> >
> > (3) such interest is a lien and the price at which the property is to be sold is greater than the aggregate value of all liens on such property;
> >
> > (4) such interest is in bona fide dispute; or
> >
> > (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Here, the Debtor's pre-petition secured creditor has consented to the sale of the Assets.

**Bidding Procedures**

35. The Debtor and the Purchaser recognize that the sale of the Assets must be subject to higher and better offers pursuant to applicable bankruptcy law. The Purchaser is prepared to consent to subject its offer to higher and better bids provided it receives overbid protection and the Court approves the Break-Up Fee/Expense Reimbursement, and appropriate bidding procedures are put in place. Set forth below are the proposed Bidding Procedures to be employed with respect to the Auction (if any):

> a. <u>Alternative Bid Deadline</u>. All alternative bids must be submitted to the Debtor, c/o Charles D. Benjamin, the Debtor's CRO, 75 Virginia Road, North White Plains, New York 10603-0905, by March 3, 2011 at 4:00 p.m. (ET) (the "<u>Alternative Bid Deadline</u>"), with a copy to Debtor's counsel, Halperin Battaglia Raicht, LLP, 555 Madison Avenue, 9th Floor, New York, New York 10022, Attn: Alan D. Halperin, Esq.

b. <u>Due Diligence</u>. To the extent any proposed bidder wants to undertake any due diligence with respect to the Assets, such proposed bidder must execute a non-disclosure agreement (to the extent such an agreement has not been previously executed and delivered by such proposed bidder) in form and substance acceptable to the Debtor prior to undertaking any such due diligence and all such due diligence must be undertaken and completed prior to the Alternative Bid Deadline.

c. <u>Qualified Bid</u>. Only alternative bids that meet with the following qualifications will be considered a "<u>Qualified Bid</u>":

   i. the bid must be <u>received</u> by the Debtor, , c/o Charles D. Benjamin, the Debtor's chief restructuring officer, with copies as detailed in paragraph (a), above, by the Alternative Bid Deadline;

   ii. The bid must :

      A. Be in writing;

      B. State that it is irrevocable;

      C. Be accompanied by a duly executed sale agreement, marked to reflect variations to the Sale Agreement;

      D. Be accompanied by a down payment deposit in immediately available funds of not less than ten (10%) percent of the proposed purchase price (the "<u>Deposit</u>"). The Deposit will be subject to forfeiture upon a breach by the bidder and non-refundable if the bidder is selected as a Successful Bidder (as defined below) and fails to consummate the purchase (other than as a result of a breach by the Debtor). The Deposit will be refundable if the bidder is not selected as a Successful Bidder;

      E. State that it is not subject to any further due diligence or financing; and

      F. Be accompanied by an irrevocable commitment to refinance the debtor in possession financing facility provided by Kravet (the "<u>DIP Facility</u>") no later than two (2) business days following entry of an order authorizing and approving the bid as the highest and best offer;

   iii. The proposed purchase price for a Qualified Bid shall be an amount in cash of at least the sum of (A) the Purchase Price as defined in the Sale Agreement (the "<u>Stalking Horse Bid</u>"), plus (B) the amount of the Break-Up Fee/Expense Reimbursement (*i.e.*, $325,000), plus (C) $100,000 (the "<u>Subsequent Incremental Bid Amount</u>")((A), (B) and (C), collectively, the "<u>Initial Overbid</u>"). In the event a bidder (including Purchaser) is the second best bidder (the "<u>Back-Up Bidder</u>"), its bid shall be irrevocable and such bidder shall remain ready, willing and able to purchase the Assets through the closing of the transaction with the Successful

Bidder (subject to the terms and conditions of such Backup Bidder's last submitted bid);

    iv.   Without limiting the generality of the foregoing, such bid shall be for substantially all of the Assets and the Assumed Liabilities and any liabilities to be assumed under the Sale Agreement on an as-is, where-is basis and shall not include any due diligence, financing or other contingency;

    v.   The bid must be expressly made subject to the Debtor's obligations to pay the Break-Up Fee/Expense Reimbursement pursuant to the terms of the Sale Agreement;

    vi.   Simultaneously with the delivery of the Deposit and the executed Sale Agreement, an entity submitting an alternative bid shall deliver financial information evidencing that such party has the financial wherewithal to consummate the proposed transaction on the terms proposed. Such financial information may include current audited or verified financial statements and/or a letter from a depository institution indicating the ability to close on a proposed transaction. In the event the financial information pertains to the parent or other equityholder of an acquisition affiliate, the bid of the affiliate shall be guaranteed by the parent or other equityholder;

    vii.   The entity submitting an alternative bid shall also provide evidence or affirm under oath that all necessary approvals have been obtained authorizing the submission of the bid by such entity;

    viii.   Only those bids bidders having submitted Qualified Bids (a "<u>Qualified Bidder</u>") will be permitted to participate in the Auction. The CRO, upon consultation with the Committee (if any), will promptly notify each alternative bidder after the Alternative Bid Deadline whether it is a Qualified Bidder. The Auction shall occur no later than two (2) business days following the Alternative Bid Deadline. Purchaser shall be deemed a Qualified Bidder and, in consideration of providing the DIP Facility, shall have satisfied the requirement for the Deposit.

   d.   <u>Auction Procedures and Bidding Increments</u>.

    i.   In the event one or more Qualified Bids are received by the Debtor prior to the Alternative Bid Deadline, the Debtor will conduct the Auction. No later than one business day prior to the Auction, the Debtor shall circulate to each Qualified Bidder copies of the Qualified Bid determined to be the highest or best Qualified Bid submitted as of the Alternative Bid Deadline, and that will constitute the opening bid at the Auction.

    ii.   At the Auction (A) all bids shall be made and received in one room, on an open basis, and all other bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each bid will be fully disclosed to all other bidders throughout the entire Auction; (B) the opening bid at the Auction

shall not be less than the Initial Overbid; (C) all offers subsequent to the opening bid at the Auction (*i.e.*, the Subsequent Incremental Bid Amount) must exceed the prior offer by not less than $100,000; (D) with respect to any such further overbid submitted by the Purchaser, the consideration offered by the Purchaser shall be deemed to include the full amount of the Break-Up Fee/Expense Reimbursement potentially payable to the Purchaser; and (E) bidding at the Auction will continue until such time as no further bids are made within the time limit announced by the CRO, upon consultation with the Committee (if any);

iii. Upon conclusion of the Auction, the CRO, upon consultation with the Committee, shall determine the highest or otherwise best bid (the "Successful Bidder"), and such bid shall be submitted for approval by the Bankruptcy Court. Subject to the Court's calendar, the Sale Hearing will occur no later than two (2) business days after the conclusion of the Auction.

iv. The Successful Bidder shall have the burden of establishing by competent evidence that it qualifies for section 363(m) protections, and that it is capable of providing adequate assurance of future performance with respect to any executory contract or unexpired lease it wishes to have assumed and assigned pursuant to section 365;

v. If the Debtor does not receive any Qualified Bids, the Debtor will report the same to the Bankruptcy Court and will proceed with the Sale Hearing and no Auction shall be held;

vi. The Purchaser shall have the right to credit bid with respect to the amount outstanding under the DIP Facility to be made by Purchaser;

vii. The CRO, upon consultation with the Committee, reserves the right to establish such other reasonable rules and procedures for the conduct of the Auction, provided that such rules and procedures are publicly announced at the Auction.

e. <u>Break-Up Fee/Expense Reimbursement</u>. The Break-Up Fee/Expense Reimbursement shall be payable to Purchaser under the following terms and conditions:

i. If a person other than the Purchaser is determined to be the Successful Bidder for the Assets and the Debtor closes a transaction with such other Successful Bidder, the Purchaser shall receive the Break-Up Fee/Expense Reimbursement, payable at closing from the proceeds of such transaction; and

ii. The Break-Up Fee/Expense Reimbursement shall be accorded treatment as a superpriority administrative expense claim in the Chapter 11 case, senior to (x) the liens and claims of the prepetition secured lender, (y) any replacement liens or superpriority claims granted as adequate protection to the prepetition secured lender under any order approving the DIP Facility, and (z) all other administrative claims at any time allowed in the Chapter 11 case.

## The Bidding Procedures are
## Reasonable and should be Approved

36.     Bankruptcy Rule 6004(f)(1) provides that a sale of property outside of the ordinary course of business may be by private sale or public auction. The Debtor believes that subjecting the Offer to higher or better bids will ensure the maximization of the value of the Assets. The Debtor submits that the Bidding Procedures are fair and reasonable and should be approved. They afford the Debtor the opportunity to subject the Assets to competitive bidding while preserving the Purchaser as a stalking horse bidder and thereby providing a floor price for the Assets.

37.     The Bidding Procedures will also ensure that the Sale Hearing is conducted in a fair and orderly manner, and that participants are *bona fide* bidders with ability and desire to consummate any proposed transaction. The Initial Overbid will ensure that the competitive bidding process compensates the Debtor for the cost of the Break-Up Fee/Expense Reimbursement and permits the Debtor to derive an added economic benefit from any such bids. The Subsequent Incremental Bid Amount reflects a fair and reasonable increment that should encourage competitive bidding and ensure that there is a true economic benefit to the Debtor and the estate for each successive bid.

38.     The Break-Up Fee/Expense Reimbursement is intended to compensate the Purchaser for its out of pocket expenses, the time expended by its staff in connection with the pursuit of this transaction, and as an incentive for the Purchaser to serve as the Debtor's stalking horse bidder and subject the Assets to competitive bidding. The structure of the Break-Up Fee/Expense Reimbursement is the result of good faith, arm's length negotiation among the parties. *See In re: Integrated Resources, Inc.,* 147 B.R. 650, 658 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2nd Cir. 1993); *In re: 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (Break-up fee which is the result of good faith, arm's length agreement and not tainted by self-dealing should be upheld).

39.     In the instant case, the proposed Break-Up Fee/Expense Reimbursement is fair and reasonable in relation to the proposed Purchase Price in light of the funds and efforts expended by the

Purchaser to consummate this transaction. Accordingly, the Debtor respectfully requests that this Court enter an order approving the Break-Up Fee/Expense Reimbursement and Bidding Procedures (the "Bidding Procedures Order") in the form annexed hereto as **Exhibit C**.

**Assumption and Assignment
of Executory Contracts**

40.     Section 365 of the Bankruptcy Code authorizes a debtor-in-possession to assume and assign executory contracts or unexpired leases subject to court approval. The Sale Agreement provides for the assumption and assignment of the Assigned Contracts and Leases. The decision to assume and assign an executory contract or unexpired lease is based upon the exercise of the debtor's "business judgment." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (!984); *In re III Enterprises Inc. V.*, 163 B.R. 453, 469 (Bankr.E.D.Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject the contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment - - a standard which we have concluded many times is not difficult to meet"). Section 365(b) of the Bankruptcy Code requires that a debtor-in-possession satisfy certain requirements at the time of assumption if a default exists under the contract or lease to be assumed.

41.     Here, the Debtor has made the business decision to sell the Assets to Purchaser pursuant to the Sale Agreement, subject to higher and better offers. The Debtor has a number of nonresidential real property leases and agency agreements with third parties to sell products and other goods in the ordinary course of the Debtor's business. Thus, a meaningful element of the value of the business to be sold stems from the executory contracts. As such, the assumption and assignment of the Assigned Contracts and Leases is an integral component of the Sale Agreement. If the Debtor is not able to assume and assign the Assigned Contracts and Leases, the sale of the Assets would be substantially impaired - - resulting in reduced proceeds for the benefit of the estate.

42.     To effectuate the assumption/assignment process, the Debtor proposes to serve the non-debtor parties to the Assigned Contracts and Leases set forth on Exhibit B to the Bidding Procedures Order advising each of them of the Debtor's interest to assume and assign such executory contract.  The list of Assigned Contracts and Leases, which comprises all of the Debtor's executory contracts and unexpired leases,[6] sets forth (a) the name and address of the counterparties to the executory contracts proposed to be assumed and assigned to the Purchaser, or its designee; (b) the nature of the executory contract; and (c) the amount of any cure costs that the Debtor believes to be due and owing as reflected on its books and records.   Purchaser shall, no later than 15 calendar days prior to the Sale Hearing, advise the Debtor of those executory contracts and unexpired leases it wishes to have assumed and assigned.

43.     Under the terms of the Sale Agreement, the Purchaser is responsible for paying cure costs, if any, under any Assigned Contracts and Leases that are ultimately assumed and assigned to Purchaser.  The proposed pre-fixed Order Scheduling Hearing provides for a bar date for the assertion of any cure costs by the non-debtor parties to the Assigned Contracts and Leases to be assumed and assigned to the Purchaser under the Sale Agreement. The Debtor submits that such non-debtor parties to the Assigned Contracts and Leases must be required to file a claim by the deadline fixed by the Court setting forth all claims and arrearages against the Debtor under such Assigned Contracts and Leases, to the extent any such party disagrees with the amount set forth in its respective Cure Notice (the "Cure Claims").  In order to facilitate the sale process, the Debtor requests that all Cure Claims be filed on or before February 18, 2011, and the Court hear any disputed Cure Claims at the Sale Hearing or a later date to be determined by the Court.  The Debtor further requests that the Court provide that any party that is required to

---

[6] The Debtor has prepared this list to the best of its knowledge and ability.  To the extent the Debtor subsequently determines that there are any other executory contracts or unexpired leases not included on the list, the Debtor will supplement the list, file it with the Court, and provide prompt notice to the counterparty (or counterparties) thereto.

file a Cure Claim, but fails to do so, shall be bound by the cure amount corresponding to their contract as set forth on Exhibit B to the Bidding Procedures Order, or on the party's Cure Notice, as applicable, and shall be forever barred from asserting any other claim(s) against the Debtor, the estate and/or any successful purchaser of the Assets arising under such executory contract.

44.     In an effort to provide the most up-to-date information to non-debtor parties to the Assigned Contracts and Leases, in the event the Purchaser is not the Successful Bidder at the Auction, the Debtor will use its reasonable best efforts to provide non-debtor parties to the Assigned Contracts and Leases with the identity of the Successful Bidder prior to the Sale Hearing. Otherwise, the non-debtor parties to the Assigned Contracts and Leases may wish to plan to attend the Sale Hearing.

**The Debtor Requests that the Court
Schedule the Sale Hearing and
<u>Fix the Manner and Notice of Sale</u>**

45.     The purpose of the Sale Hearing is to approve the sale of the Assets to the Purchaser, or such other bidder as may tender a higher or better offer at the Auction. Nevertheless, the Debtor respectfully requests that the Sale Hearing be scheduled at the earliest possible time. Bankruptcy Rule 2002(a)(2) provides for twenty (20) days' notice of a "proposed use, sale or lease of property of the estate other than in the ordinary course of business . . . ." Thus, it is requested that the Court schedule the Auction and Sale Hearing during the week of March 7, 2011. The Debtor submits that such relief is reasonable and appropriate under the circumstances.

46.     The Debtor proposes that a true and complete copy of the proposed pre-fixed Order Scheduling Hearing, this Motion, together with all exhibits be served upon: (a) counsel to the Purchaser, (b) the Prepetition Lender, by its counsel, (c) all entities known to assert a lien, claim, interest or encumbrance in the Debtor's assets; (d) the twenty (20) largest creditors of the Debtor; (e) the United States Attorney's Office for the Southern District of New York; (f) all parties that have previously

expressed interest in acquiring all or a portion of the Debtor's assets; and (g) the Office of the United States Trustee.

47.     The Debtor further requests that the Court approve the form of notice annexed as **Exhibit B** hereto (the "<u>Sale Notice</u>").  The Debtor proposes to serve a copy of the Sale Notice upon (a) all known creditors of the Debtor; (b) all federal, state and local taxing authorities in which the Debtor operates business; and (c) all parties that have filed a notice of appearance in the case.

**<u>No Previous Request</u>**

48.     No previous application for the relief sought herein has been made by the Debtor to this or any other court.

(Remainder of Page Intentionally Blank)

**WHEREFORE**, the Debtor respectfully requests that this Court enter (a) the Order Scheduling Hearing (i) fixing the date and time of a Sale Hearing to consider approval of the Sale; (ii) if a timely objection to the Break-Up Fee/Expense Reimbursement and Bidding Procedures is timely filed, fixing the date and time of the Bidding Procedures Hearing to consider any objections to approval of the Break-Up Fee/the Expense Reimbursement and Bidding Procedures and entering orders thereon, (iii) fixing a bar date for the Cure Claims, and (iv) fixing the manner and form of notice of the Sale Hearing; (b) the Bidding Procedures Order in the form annexed as **Exhibit C** hereto; and (c) enter an Order authorizing the sale of the Assets pursuant to §§105(a), 363(b), (f), (k), (m), and (n) of the Bankruptcy Code and Bankruptcy Rule 2002, 6004 and 9014 and approving the assumption and assignment of the Assigned Contracts and Leases pursuant to §365 of the Bankruptcy Code and Bankruptcy Rule 6006, and (d) for such other and further relief as this Court deems just and proper.

Dated: New York, New York
      January 12, 2011                  **BRUNSCHWIG & FILS, INC.**
                                     Debtor and Debtor-in-Possession

                                 By:      */s/ T. Olivier Peardon*
                                           T. Olivier Peardon,
                                         President and Chief Executive Officer

Filed by:
**HALPERIN BATTAGLIA RAICHT, LLP**

By:     */s/ Robert D. Raicht*
       Alan D. Halperin, Esq.
       Robert D. Raicht, Esq.
       Jocelyn Keynes, Esq.
       555 Madison Avenue, 9th Floor
       New York, New York 10022
       Phone: (212) 765-9100; Fax: (212) 765-0964
       ahalperin@halperinlaw.net; rraicht@halperinlaw.net
       jkeynes@halperinlaw.net

*Proposed Counsel to the Debtor and Debtor- in-Possession*