ASSET PURCHASE AGREEMENT

DATED AS OF

JANUARY 28, 2011

BY AND AMONG

BRUNSCHWIG & FILS, INC.,

T. OLIVIER PEARDON,

THOMAS P. PEARDON, JR.

AND

KRAVET INC.

# TABLE OF CONTENTS

## ARTICLE 1 DEFINITIONS

SECTION 1.01   Definitions...................................................................................... 7
SECTION 1.02   Other Definitions and Interpretive Matters..................................... 19

## ARTICLE 2 PURCHASE AND SALE; PURCHASE PRICE

SECTION 2.01   Purchase and Sale of Acquired Assets........................................... 20
SECTION 2.02   Excluded Assets............................................................................. 24
SECTION 2.03   Assumed Liabilities ....................................................................... 24
SECTION 2.04   Excluded Liabilities....................................................................... 25
SECTION 2.05   Purchase Price............................................................................... 26
SECTION 2.06   Payment of Purchase Price............................................................ 27
SECTION 2.07   Allocation of Purchase Price......................................................... 27

## ARTICLE 3 CLOSING

SECTION 3.01   Closing Date................................................................................... 27
SECTION 3.02   Closing Deliveries by Buyer.......................................................... 28
SECTION 3.03   Closing Deliveries by Sellers........................................................ 28
SECTION 3.04   Further Assurances........................................................................ 29

## ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS

SECTION 4.01   Organization and Good Standing.................................................... 30
SECTION 4.02   Authority; Validity; Consents........................................................ 30
SECTION 4.03   Subsidiaries................................................................................... 31
SECTION 4.04   No Conflict..................................................................................... 31
SECTION 4.05   Financial Statements; No Undisclosed Liabilities. ....................... 32
SECTION 4.06   Real Property.................................................................................. 32
SECTION 4.07   Environmental Matters................................................................... 33
SECTION 4.08   Title to Acquired Assets................................................................ 34
SECTION 4.09   Taxes.............................................................................................. 34
SECTION 4.10   Absence of Certain Developments................................................. 34
SECTION 4.11   Sufficiency of Assets. ................................................................... 35
SECTION 4.12   Tangible Property and Equipment. ................................................ 35
SECTION 4.13   Legal Proceedings......................................................................... 35
SECTION 4.14   Compliance with Laws; B&F Permits. .......................................... 35
SECTION 4.15   Employment Matters...................................................................... 36
SECTION 4.16   Intellectual Property...................................................................... 37
SECTION 4.17   No Brokers or Finders.................................................................... 38
SECTION 4.18   Affiliate Transactions.................................................................... 39
SECTION 4.19   Material Contracts and Leases; No Breach of Assigned Contracts or
               Assigned Leases.............................................................................. 39

SECTION 4.20     Insurance. ................................................................................................ 39
SECTION 4.21     Receivables. .............................................................................................. 40
SECTION 4.22     Accounts Payable. ...................................................................................... 40

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER

SECTION 5.01     Organization and Good Standing. ............................................................. 40
SECTION 5.02     Authority; Validity; Consents. .................................................................. 40
SECTION 5.03     No Conflict. ............................................................................................... 41
SECTION 5.04     No Brokers or Finders. .............................................................................. 41
SECTION 5.05     Buyer's Acknowledgment. ........................................................................ 41
SECTION 5.06     Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same. ..... 41

ARTICLE 6 BANKRUPTCY COURT MATTERS

SECTION 6.01     Bankruptcy Court Approval. ...................................................................... 42
SECTION 6.02     Bankruptcy Court Filings. ......................................................................... 43
SECTION 6.03     Break-up Fee and Expense Reimbursement. .............................................. 43
SECTION 6.04     Assumption and Assignment of Assigned Contracts and Assigned Leases. 43
SECTION 6.05     Determined Cure Costs. ............................................................................. 44

ARTICLE 7 ADDITIONAL AGREEMENTS

SECTION 7.01     Investigation of the Business By Buyer Prior to Closing. ........................... 45
SECTION 7.02     Conduct of Business Prior to the Closing Date. ......................................... 46
SECTION 7.03     Third Party Consents. ................................................................................ 48
SECTION 7.04     Reasonable Best Efforts. ........................................................................... 49
SECTION 7.05     Sellers' Disclosure Schedule ..................................................................... 50
SECTION 7.06     Notice of Developments. ........................................................................... 50
SECTION 7.07     Taxes. ........................................................................................................ 50
SECTION 7.08     Collection of Receivables. ......................................................................... 51
SECTION 7.09     Name Change. ............................................................................................ 51
SECTION 7.10     Employee Matters. ..................................................................................... 52
SECTION 7.11     Post-Closing Cooperation and Access to Books and Records. .................... 52
SECTION 7.12     Tax Returns. ............................................................................................... 53
SECTION 7.13     Use of Customer Deposits. ........................................................................ 53
SECTION 7.14     Insurance Proceeds. ................................................................................... 53

ARTICLE 8 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

SECTION 8.01     Satisfactory Completion of Due Diligence. ................................................ 53
SECTION 8.02     Inventory. ................................................................................................... 53
SECTION 8.03     Accuracy of Representations ...................................................................... 54
SECTION 8.04     Sellers' Performance .................................................................................. 54
SECTION 8.05     No Order ..................................................................................................... 54
SECTION 8.06     No Proceedings. ......................................................................................... 54

SECTION 8.07     Consents and Approvals. ............................................................... 54
SECTION 8.08     No Material Adverse Effect. ........................................................... 54
SECTION 8.09     Sellers' Deliveries. ........................................................................ 55
SECTION 8.10     Sale Order. .................................................................................... 55
SECTION 8.11     Termination of Repurchase Option. ............................................... 55
SECTION 8.12     Delivery of Final Sellers' Disclosure Schedule. ............................. 55

## ARTICLE 9 CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

SECTION 9.01     Accuracy of Representations. ......................................................... 55
SECTION 9.02     Buyer's Performance. .................................................................... 55
SECTION 9.03     No Order. ....................................................................................... 56
SECTION 9.04     No Proceedings. ............................................................................ 56
SECTION 9.05     Consents and Approvals. ............................................................... 56
SECTION 9.06     Buyer's Deliveries. ....................................................................... 56
SECTION 9.07     Sale Order. .................................................................................... 56
SECTION 9.08     Payment of Purchase Price. ........................................................... 56

## ARTICLE 10 TERMINATION

SECTION 10.01     Termination. .................................................................................. 56
SECTION 10.02     Effect of Termination. ................................................................... 58

## ARTICLE 11 GENERAL PROVISIONS

SECTION 11.01     Survival of Representations, Warranties and Covenants. .............. 58
SECTION 11.02     Confidential Nature of Obligations. ............................................... 58
SECTION 11.03     Public Announcements. ................................................................. 59
SECTION 11.04     Notices. ......................................................................................... 59
SECTION 11.05     Waiver. .......................................................................................... 60
SECTION 11.06     Entire Agreement; Amendment. .................................................... 60
SECTION 11.07     Assignment. .................................................................................. 61
SECTION 11.08     Severability. .................................................................................. 61
SECTION 11.09     Section Headings, Construction. .................................................... 61
SECTION 11.10     Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver. ..... 61
SECTION 11.11     Counterparts. ................................................................................ 62
SECTION 11.12     Time of Essence. ........................................................................... 62
SECTION 11.13     No Third Party Beneficiaries. ........................................................ 62
SECTION 11.14     Sellers' Disclosure Schedule. ........................................................ 62
SECTION 11.15     Expenses. ...................................................................................... 63
SECTION 11.16     Non-Recourse. .............................................................................. 63

EXHIBITS

| Exhibit A | Form of Assignment of Copyrights |
|---|---|
| Exhibit B | Form of Assignment of Domain Names |
| Exhibit C | Form of Assignment of Patents |
| Exhibit D | Form of Assignment of Trademarks |
| Exhibit E | Form of Assumption Agreement |
| Exhibit F | Form of Bid Procedures Order |
| Exhibit G | Form of Bill of Sale |
| Exhibit H | Buyer's Disclosure Schedule |

| | Section 5.02 | Consents |
|---|---|---|

| Exhibit I | Sellers' Disclosure Schedule |
|---|---|

| | Section 1.01(a) | Acquired Equity |
|---|---|---|
| | Section 1.01(b)(i) | Assigned Contracts |
| | Section 1.01(b)(ii) | Assigned Leases |
| | Section 1.01(c) | Other Permitted Encumbrances |
| | Section 1.01(d) | Sellers' Knowledge and B&F's Knowledge |
| | Section 1.01(e) | Third Party Consents |
| | Section 2.02(vii) | Other Excluded Assets |
| | Section 2.03(g) | Other Assumed Liabilities |
| | Section 2.04(m) | Other Excluded Liabilities |
| | Section 4.02 | Consents |
| | Section 4.03 | Subsidiaries |
| | Section 4.05(a) | Financial Statements |
| | Section 4.06(a)(i) | Owned Real Property |
| | Section 4.06(a)(ii) | Leased Real Property |
| | Section 4.07 | Disclosures Related to Environmental Matters |

| | |
|---|---|
| Section 4.08 | Title Matters |
| Section 4.09 | Tax Matters |
| Section 4.10(c) | Certain Changes |
| Section 4.11 | Disclosures Related to Sufficiency of Assets |
| Section 4.12 | Disclosures Related to Tangible Property and Equipment |
| Section 4.13 | Legal Proceedings |
| Section 4.14(a) | Compliance with Law |
| Section 4.14(b) | Permits and Licenses |
| Section 4.15(b) | Benefit Plans |
| Section 4.15(c) | Post-Employment Benefits under Benefit Plans |
| Section 4.16(a) | Intellectual Property |
| Section 4.16(b) | Disclosures Related to Licenses |
| Section 4.16(d) | Intellectual Property Disclosures |
| Section 4.18 | Affiliate Transactions |
| Section 4.19(a) | Material Contracts and Leases |
| Section 4.19(b) | Disclosures Related to Material Contracts and Leases |
| Section 4.22 | Accounts Payable |
| Section 8.07 | Required Consents |
| | |
| Exhibit J | Transition Services Agreement |

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of January 28, 2011 by and among Brunschwig & Fils, Inc., a New York corporation ("B&F"), T. Olivier Peardon ("T. Olivier Peardon") and Thomas P. Peardon, Jr. ("Thomas Peardon" and together with T. Olivier Peardon and B&F, "Sellers") and Kravet Inc., a Delaware corporation ("Buyer").

## RECITALS

**WHEREAS**, B&F and its Subsidiaries are primarily engaged in the wholesale distribution and sale of decorative fabric, wallpaper, trimming, upholstery, lamps, tables, and mirrors (the "Business");

**WHEREAS**, T. Olivier Peardon and Thomas Peardon (the "Principals") are Affiliates of B&F, and together own certain Equity Interests in Brunschwig et Fils Centrale SARL, a French Société à Responsabilité Limitée ("B&F France");

**WHEREAS**, Sellers collectively own the Acquired Assets (as defined below);

**WHEREAS**, in order to consummate the transactions contemplated hereby, B&F has commenced a voluntary case (Case No. 11-22036) (the "Chapter 11 Case") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, B&F continues to operate the Business and remains in possession of its assets (including those comprising the B&F Acquired Assets (as defined below)) as debtor and debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, Sellers desire to sell to Buyer, and Buyer desires to purchase from Sellers, the Acquired Assets, and Buyer intends to assume the Assumed Liabilities (as defined below), all upon the terms and conditions set forth herein;

**WHEREAS**, the Parties intend to effectuate the transactions contemplated hereby in accordance with sections 363 and 365 of the Bankruptcy Code and the terms and conditions hereof;

**WHEREAS**, the execution and delivery of this Agreement, and B&F's ability to consummate the transactions set forth in this Agreement, are subject, among other things, to the entry of the Sale Order (as defined below) by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code, among others, which Sale Order shall have become a Final Order; and

**WHEREAS**, in connection with the transactions contemplated hereby, Buyer may designate prior to Closing, one or more of its Affiliates to purchase the Acquired Assets and to assume the Assumed Liabilities pursuant to Section 11.07.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and intending to be legally bound, the Parties agree as follows.

## ARTICLE 1
## DEFINITIONS

SECTION 1.01     Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"Acquired Assets" has the meaning set forth in Section 2.01.

"Acquired Equity" means all right, title and interest of (a) B&F in or to the Equity Interests in B&F France, Brunschwig & Fils Fabrics Ltd., a Canadian private limited company ("B&F Canada"), Brunschwig & Fils Pty Ltd., an Australian proprietary limited company ("B&F Australia"), and (b) T. Olivier Peardon and Thomas Peardon in or to the Equity Interests in B&F France, in each case, as set forth in Section 1.01(a) of the Sellers' Disclosure Schedule; provided, however, that the Buyer shall have the right at any time prior to the Closing to amend this definition to remove one or more of B&F Australia, B&F Canada and B&F France from this definition of Acquired Equity.

"Additional Receivable Amount" means an amount equal to the amount, if any, by which the Current Accounts Receivable, as reflected on the books and records of B&F two Business Days prior to the Closing Date, exceed $900,000.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Affiliate Transaction" has the meaning set forth in Section 4.18.

"Agreement" has the meaning set forth in the preamble.

"Allocation" has the meaning set forth in Section 2.07.

"Alternative Proposal" means any proposal or potential proposal in respect of (a) a sale, transfer, lease or other disposition, directly or indirectly, including through an asset sale, stock sale, lease, stock issuance, merger, plan of reorganization, or similar transaction, whether in connection with a bankruptcy case or otherwise, of all or a substantial portion of the capital stock or assets of B&F and/or its Subsidiaries, or (b) any recapitalization, restructuring, liquidation, dissolution, issuance of significant indebtedness (except for the DIP Note), or other transaction, whether in connection with a bankruptcy case or otherwise, that in the case of either (a) or (b) would be inconsistent with the transactions contemplated hereby.

"Amended Bill of Sale" means the Bill of Sale, dated as of January 11, 2011, by and between B&F and Buyer, as amended by Amendment No. 1, dated as of February 24, 2011, and as may be further amended or modified from time to time.

"Assigned Contracts" means the Contracts described in Section 1.01(b)(i) of the Sellers' Disclosure Schedule. Notwithstanding anything herein to the contrary, "Assigned Contracts" shall not include any Contracts that are Excluded Assets.

"Assigned Leases" means the Leases described in Section 1.01(b)(ii) of the Sellers' Disclosure Schedule. Notwithstanding anything herein to the contrary, "Assigned Leases" shall not include any Leases that are Excluded Assets.

"Assignment of Copyrights" has the meaning set forth in Section 3.03(c), and shall be in substantially the form attached hereto as **Exhibit A**.

"Assignment of Domain Names" has the meaning set forth in Section 3.03(c), and shall be in substantially the form attached hereto as **Exhibit B**.

"Assignment of Patents" has the meaning set forth in Section 3.03(c), and shall be in substantially the form attached hereto as **Exhibit C**.

"Assignment of Trademarks" has the meaning set forth in Section 3.03(c), and shall be in substantially the form attached hereto as **Exhibit D**.

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Assumption Agreement" has the meaning set forth in Section 2.03, and shall be in substantially the form attached hereto as **Exhibit E**.

"Auction" has the meaning set forth in the Bid Procedures.

"Avoidance Actions" means any and all claims for relief of Sellers under chapter 5 of the Bankruptcy Code.

"B&F" has the meaning set forth in the preamble.

"B&F Acquired Assets" has the meaning set forth in Section 2.01(a).

"B&F Australia" has the meaning set forth in Section 1.01 under the definition of "Acquired Equity."

"B&F Canada" has the meaning set forth in Section 1.01 under the definition of "Acquired Equity."

"B&F France" has the meaning set forth in the recitals.

"B&F Permits" has the meaning set forth in Section 2.01(a)(xvi).

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Benefit Plan" has the meaning set forth in Section 4.15(b).

"Bid Procedures" means the bid procedures attached as an exhibit to the Bid Procedures Order, as the same may be entered by the Bankruptcy Court and shall have become a Final Order, and which Bid Procedures (as they may be amended, modified, supplemented from time to time) shall be in form and substance acceptable to Buyer.

"Bid Procedures Order" means an Order of the Bankruptcy Court, which Order (including exhibits) shall be in substantially the form attached hereto as **Exhibit F**, and which Order, as it may be amended, modified, supplemented from time to time, shall be in form and substance acceptable to Buyer.

"Bill of Sale" means a bill of sale which shall be in substantially the form attached hereto as **Exhibit G**.

"Break-up Fee and Expense Reimbursement" has the meaning set forth in Section 6.03.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to close.

"Business Trade Secrets" has the meaning set forth in Section 4.16(f).

"Buyer" has the meaning set forth in the preamble.

"Buyer's Disclosure Schedule" means the Disclosure Schedule attached hereto as **Exhibit H**, dated as of the date hereof, delivered by Buyer to Sellers in connection with this Agreement.

"Buyer Termination Notice" has the meaning set forth in Section 10.01(b)(i).

"Cash Consideration" means $9,655,000.

"Chapter 11 Case" has the meaning set forth in the recitals.

"Closing" has the meaning set forth in Article 3.

"Closing Date" means the date and time as of which the Closing occurs as set forth in Section 3.01.

"Confidentiality Agreement" means the confidentiality agreement, dated as of December 20, 2010, between Buyer and B&F.

"Consent" means any consent, waiver, approval, Order or authorization of, or registration, declaration or filing with or notice to, any Governmental Authority or other Person.

"Consent Pending Contract" has the meaning set forth in Section 6.04(c).

"Contract" means any agreement, contract, obligation, understanding, or undertaking (whether written or oral) or any other instrument that is legally binding.

"Contract Retention Period" has the meaning set forth in Section 6.04(d).

"Copyrights" means all United States and foreign copyrights and copyrightable subject matter (including, but not limited to, Software), whether registered or unregistered, including all United States copyright registrations and applications for registration and foreign equivalents, all moral rights, all common-law copyright rights, and all rights to register and obtain renewals, extensions, restorations and reversions of copyright registrations, together with all other copyright rights accruing by reason of any international copyright convention.

"Cure Costs" means, for any given Assigned Contract or Assigned Lease, the amounts required to cure any defaults arising under such Assigned Contract or Assigned Lease, as applicable, including for any pecuniary losses arising from such defaults, and all contingent, unliquidated or unmatured liabilities under such Assigned Contracts or Assigned Leases, as applicable, as may be required to be paid upon the assumption and assignment of such Assigned Contract or Assigned Lease, as applicable pursuant to section 365(b) of the Bankruptcy Code.

"Current Accounts Receivable" means the aggregate amount of all Receivables (other than any intercompany receivables) that are less than 90 days outstanding from the date of invoice.

"Data" means all information and data, whether in printed or electronic form and whether contained in a database or otherwise.

"Deeds" means the deeds transferring title to the Owned Real Property to be delivered pursuant to Section 3.03(a).

"Determined Cure Costs" means, in the aggregate, all Cure Costs payable to counterparties of Assigned Contracts and Assigned Leases as such amounts are determined pursuant to a Final Order of the Bankruptcy Court, which may be the Sale Order (as it shall have become a Final Order).

"DIP Financing Payoff Amount" means the amount of cash necessary to pay the Indebtedness outstanding under the DIP Note at the time of Closing, in full, including all outstanding principal, accrued and unpaid interest, fees, expenses or other amounts owing thereunder, in each case as of the Closing Date.

"DIP Lender" means Kravet Inc.

"DIP Note" means that certain Amended and Restated Revolving Loan Promissory Note, dated as of January 31, 2011, between B&F and the DIP Lender, as the same may be amended, modified, ratified, extended, renewed, restated or replaced.

"Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet. A Domain Name may or may not also be a Trademark.

"Encumbrance" means any charge, lien, claim, mortgage, lease, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Environmental, Health and Safety Laws" has the meaning set forth in Section 4.07(b).

"Environmental, Health and Safety Permits and Licenses" means any Consent required under any Environmental, Health and Safety Laws.

"Equipment" means all furniture, equipment, computers, machinery, apparatus, appliances, implements, spare parts, supplies and all other tangible personal property of every kind and description owned by B&F.

"Equity Interests" means the legal, equitable, contractual and other rights of any ownership interest in a Person (other than an individual or Governmental Authority), including, without limitation, all issued, unissued authorized or outstanding shares or stock (including common stock or preferred stock), and the rights of any Person to purchase or demand the issuance of any of the foregoing, and shall include, without limitation: (i) conversion, exchange, voting, participation and dividend rights; (ii) liquidation preferences; (iii) any warrants, options, puts, calls, rights, awards, commitments or contract rights to purchase or acquire any such shares or stock at any time or other contract rights with the Sellers in any way related thereof; and (iv) share-appreciation rights.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" has the meaning set forth in Section 4.15(b).

"Estimated Cure Costs" has the meaning set forth in Section 6.05(b).

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Final Order" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the Proceeding or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the Proceeding or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the Proceeding or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the Proceeding or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Financial Statements" has the meaning set forth in Section 4.05.

"Finished Goods Inventory" means all furniture, fabrics in stock and other inventory of B&F available for sale in the ordinary course of business.

"GAAP" means United States generally accepted accounting principles.

"Governmental Authority" means any United States federal, state or local, or any foreign (federal, state, provincial, local or otherwise) government, governmental authority, regulatory or administrative authority or any court, tribunal or judicial body having jurisdiction, or any quasi-governmental or private body exercising any regulatory, governmental or quasi-governmental authority, or any self-regulatory organization.

"Hazardous Substance" means any "pollutant", "contaminant", "solid waste", "hazardous waste", "hazardous material" or "hazardous substance" under any Environmental, Health and Safety Laws.

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the ordinary course of the business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means all intellectual property rights of any kind (whether owned, used or licensed (as licensor or licensee)), including all Software, Copyrights, Patents, Trademarks, Trade Secrets, Domain Names, all rights of privacy and publicity and all proprietary rights to personal information, and all rights and remedies related thereto (including the right to sue for and recover damages, profits and any other remedy in connection therewith) for past, present or future infringement, misappropriation or other violation relating to any of the foregoing.

"Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable Law), together with all extensions, modifications and amendments thereto, authorizing, on an interim basis, B&F to execute and perform under the terms of the DIP Note.

"Inventory" means all inventory and all finished goods, merchandise, work in progress, residual by-products, samples, supplies, spare parts, shipping materials, packaging materials, raw materials and other consumables relating to the Business and maintained, held or stored by or for B&F or any of its Subsidiaries as of the Closing Date, wherever located, and any prepaid deposits for any of the same.

"IRC" means the Internal Revenue Code of 1986, as amended, and regulations issued by the IRS pursuant to the Internal Revenue Code.

"IRS" means the Internal Revenue Service of the United States.

"IT Systems" means electronic data processing, information, recordkeeping, communications, telecommunications, networking, account management, inventory management and other such applications, Software, and hardware, equipment and services (including, but not limited to, all applications and Software installed on all hardware and equipment, and all databases, firmware, and related documentation), and Internet websites and related content.

"Law" means any federal, state, regional, local or foreign law, statute, ordinance, code, treaty, rule, regulation, Order, action or requirement of any Governmental Authority.

"Leased Real Property" means the leasehold interests of B&F and the security deposits appurtenant thereto, together with (a) any prepaid rent, security deposits and options to renew or purchase relating to the foregoing, (b) all buildings and other structures, facilities or improvements currently or hereafter located thereon, (c) all fixtures, systems and items of personal property of B&F used or useful in the Business attached or appurtenant thereto, and (d) all easements, rights of way, options, renewal rights, licenses, rights and appurtenances relating to the foregoing.

"Lease" means any lease or other occupancy agreement pertaining to the Leased Real Property or the Subsidiary Leased Real Property.

"Liability" means all liabilities and obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

"License" has the meaning set forth in Section 4.16(b).

"Material Adverse Effect" means any fact, condition, change, violation, inaccuracy, circumstance, effect or event ("Effect"), individually or in the aggregate, (i) that has, or would reasonably be likely to have, a material adverse effect on the assets, liabilities, properties, results of operations or financial condition of the Business (excluding the Excluded Assets and the Excluded Liabilities), and the Acquired Assets and the Assumed Liabilities, taken as a whole, or (ii) has or would reasonably be likely to prevent, materially delay or materially impair the ability of the Sellers to perform their respective obligations hereunder or to consummate the transactions contemplated hereby ; provided, however, that "Material Adverse Effect" shall not include the following, nor shall any of the following be taken into account in determining whether there has been a Material Adverse Effect: (a) events or conditions that generally affect the industry in which B&F and its Subsidiaries operate; (b) general business or economic conditions; (c) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any actual or threatened military or terrorist attack; (d) the conditions of any financial, banking, or securities markets; (e) changes in GAAP made after the date hereof; (f) acts or omissions of any Seller carried out (or omitted to be carried out) in accordance with this Agreement or upon the written consent of Buyer in accordance with this Agreement; or (g) any condition arising by reason of the commencement of the Chapter 11 Case; unless, in the case of clause (a), (b), (c), (d) or (e) above, such Effect would reasonably be expected to result in a materially disproportionate adverse effect on, or change in, the Acquired Assets, the Assumed Liabilities or the Business (other than the Excluded Assets and Excluded Liabilities), taken as a whole, relative to the businesses of other comparable companies in the industries in which the Business operates.

"Material Contract or Lease" means any of the following Contracts or Leases relating to, connected with or used in the Business, to which any Seller or Subsidiary of B&F is a party, or by which any of the Acquired Assets or any of the assets and properties of B&F's Subsidiaries are bound:

(i)     any limited liability company agreement, joint venture, partnership agreement, profit sharing arrangement or other similar agreement or arrangement relating to the formation, creation, operation, management or control of any partnership or joint venture with regard to which a Seller or any of B&F's Subsidiaries is a party;

(ii)     any Contract for the purchase or sale of goods, services, assets, properties, rights and claims resulting in expenses by the Sellers or any of the B&F Subsidiaries in excess of $50,000;

(iii)     any Contract for the sale of goods, services, assets, properties, rights or claims resulting in revenue to the Sellers or any of B&F's Subsidiaries in excess of $50,000;

(iv)     any Contract relating to (A) any outstanding capital lease obligations requiring annual payments in excess of $50,000 or (B) conditional sale arrangements;

(v)     a loan, guarantee of Indebtedness or Contract relating to Indebtedness of B&F or any of its Subsidiaries, or pursuant to which B&F or any of its Subsidiaries has mortgaged, pledged or otherwise placed an Encumbrance on any portion of the properties or assets of B&F or its Subsidiaries;

(vi)     any Contract that requires B&F or any of its Subsidiaries to make a loan or capital contribution to or investment in any Person;

(vii)     any Benefit Plan;

(viii)     any Contract for the lease of tangible personal property;

(ix)     any Contract providing for the indemnification by a Seller or any of B&F's Subsidiaries;

(x)     any Contract which purports to limit the right of B&F or any of its Subsidiaries to engage freely or compete in any line of business or to compete with any Person or operate in any location;

(xi)     any Contract that relates to the development, ownership, licensing or use of Intellectual Property (other than a shrink wrap or similar license for generally available "off-the-shelf" software);

(xii)     a settlement or similar agreement with any Governmental Authority or Order or Consent of a Governmental Authority to which B&F or any of its Subsidiaries is subject involving future performance by B&F or any of its Subsidiaries which is material to the B&F and any of its Subsidiaries, taken as a whole;

(xiii)     any Lease; and

(xiv)     any other Contract that is material to B&F and its Subsidiaries, take as a whole.

"Order" means any award, writ, injunction, judgment, order, ruling, directive, stipulation, determination or decree entered, issued, made, or rendered by or with any Governmental Authority.

"Outside Date" means March 21, 2011.

"Owned Real Property" has the meaning set forth in Section 4.06(a).

"Patents" means United States and foreign patents (including certificates of invention and other patent equivalents), patent applications, provisional applications and patents issuing therefrom, as well as any continuations, continuations-in-part, divisions, extensions,

reexaminations, reissues, renewals, patent disclosures, discoveries, ideas, inventions (whether or not patentable or reduced to practice) or improvements thereto.

"Peardon Acquired Assets" has the meaning set forth in Section 2.01(b).

"Permitted Encumbrances" means (i) statutory liens for current property Taxes and assessments (A) not yet due and payable or (B) being contested in good faith by appropriate proceedings for which adequate reserves have been made in accordance with GAAP, including liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by Sellers, (ii) easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the present use of the property subject thereto, (iii) Encumbrances that constitute or secure Assumed Liabilities (including Encumbrances arising under the Assigned Contracts or Assigned Leases), (iv) Encumbrances, title exceptions or other imperfections of title caused by or resulting from the acts of Buyer or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees, (v) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's liens or other like Encumbrances arising in the ordinary course of business with respect to amounts not yet overdue or amounts being contested in good faith by appropriate Proceedings, (vi) Laws now or hereafter in effect relating to the Real Property that are not violated by the current use and operation by B&F and its Subsidiaries of the Real Property and (vii) the other Encumbrances listed in Section 1.01(c) of the Sellers' Disclosure Schedule.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or other entity or Governmental Authority.

"Petition Date" means January 12, 2011.

"Principals" has the meaning set forth in the recitals.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Purchased Deposits" means all deposits (including customer deposits and security deposits for rent and electricity) and prepaid charges and expenses of B&F.

"Purchase Price" has the meaning set forth in Section 2.05.

"Real Property" means, collectively, any Owned Real Property, the Leased Real Property and the Subsidiary Leased Real Property.

"Receivable Shortfall Amount" means an amount equal to the amount, if any, by which Current Accounts Receivable, as reflected on the books and records of B&F two Business Days prior to the Closing Date, are less than $800,000.

"Receivables" means, with respect to B&F and its Subsidiaries, any and all accounts receivable, notes and other amounts receivable from third parties, including customers, and intercompany receivables, in each case, arising from the conduct of the Business before the Closing, whether or not in the ordinary course of business, together with any unpaid financing charges accrued thereon.

"Registered" with respect to Intellectual Property, means issued, registered, renewed or the subject of a pending application.

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Substance).

"Representative" means with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, financial advisors and restructuring advisors.

"Requested Party" has the meaning set forth in Section 7.11(b).

"Sale Hearing" has the meaning set forth in the Bid Procedures.

"Sale Order" means an Order of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, inter alia, the sale of the Acquired Assets to the Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances, and the assumption by B&F, and assignment to Buyer, of the Assigned Contracts and Assigned Leases, and containing a finding that Buyer has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code, which Order, including exhibits, and as the same may be amended, modified, supplemented from time to time, shall be in form and substance acceptable to Buyer.

"Sellers" has the meaning set forth in the preamble.

"Sellers' Chief Operating Officer" means Benjamin Capital Advisors, Inc.

"Sellers' Disclosure Schedule" means the Disclosure Schedule delivered by Sellers to Buyer on the date hereof in draft form attached hereto as **Exhibit I**, it being understood and agreed that the final form of the Sellers' Disclosure Schedule shall be delivered by Sellers to Buyer in accordance with Section 7.05(a) hereof.

"Sellers' Knowledge or B&F's Knowledge" means the actual knowledge of the persons listed in Section 1.01(d) of the Sellers' Disclosure Schedule.

"Sellers' Termination Notice" has the meaning set forth in Section 10.01(c).

"Software" means all computer software programs (whether in source code, object code or other form) and software systems (whether owned, licensed, or used), including

all databases, compilations, tool sets, compilers, "proprietary" languages, related documentation, technical manuals and materials, and any license to use or other rights related to the foregoing.

"Successful Bid" has the meaning set forth in the Bid Procedures.

"Successful Bidder" has the meaning set forth in the Bid Procedures.

"Subsidiaries" means, when used with reference to any Person, any corporation, partnership, limited liability company, joint venture, stock company or other entity of which such Person (either acting alone or together with its other Subsidiaries), directly or indirectly, owns or has the power to vote or to exercise a controlling influence with respect to 50% of more of the capital stock or other voting interests, the holders of which are entitled to vote for the election of a majority of the board of directors or any similar governing body of such corporation, partnership, limited liability company, joint venture, stock company or other entity.

"Subsidiary Leased Real Property" means the leasehold interests of B&F's Subsidiaries and the security deposits appurtenant thereto, together with (a) any prepaid rent, security deposits and options to renew or purchase relating to the foregoing, (b) all buildings and other structures, facilities or improvements currently or hereafter located thereon, (c) all fixtures, systems and items of personal property of B&F's Subsidiaries attached or appurtenant thereto, and (d) all easements, rights of way, options, renewal rights, licenses, rights and appurtenances relating to the foregoing.

"T. Olivier Peardon" has the meaning set forth in the preamble.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the IRC), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any transferee Liability in respect of any items described in clause (i) above.

"Tax Return" means any return, declaration, report, claim for refund, information return, or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment, or collection of any Tax or the administration of any Tax Laws.

"Third Party Consents" means the Consents set forth in Section 1.01(e) of the Sellers' Disclosure Schedule.

"Thomas Peardon" has the meaning set forth in the preamble.

"Title IV Plan" has the meaning set forth in Section 4.15(c).

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, brand names, certification names, collective marks, trade dress and trade names (including all assumed or fictitious names), and any other indicia of source of goods and services, designs and logotypes related to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), and all goodwill related to or symbolized by the foregoing.

"Trade Payables" means any and all trade payables of B&F and its Subsidiaries arising from the conduct of the Business, incurred by B&F and its Subsidiaries prior to the Closing and that are not yet due and payable to such third parties on or prior to the Closing Date in accordance with the terms of the Contracts giving rise to such trade payables, in each case solely to the extent such trade payables are (i) incurred in the ordinary course of business, and (ii) disclosed in Section 4.22 of the Sellers' Disclosure Schedule.

"Trade Secrets" means confidential and proprietary information and trade secrets and know-how, including, without limitation, processes, schematics, databases, formulae, prototypes, models, drawings and customer lists.

"Transaction Documents" means this Agreement and any other agreements, instruments, or documents entered into pursuant to this Agreement.

"Transfer" has the meaning set forth in Section 6.04(c).

"Transferred Intellectual Property" has the meaning set forth in Section 2.01(a)(viii).

"Transfer Taxes" has the meaning set forth in Section 7.07(b).

"Transition Services Agreement" means the transition services agreement by and among the Sellers and Buyer, which shall be in the form attached hereto as **Exhibit J**..

"Unfulfilled Customer Orders with Purchased Deposits" has the meaning set forth in Section 2.01(a)(xii).

"Unfulfilled Customer Orders without Purchased Deposits" has the meaning set forth in Section 2.01(a)(xiii).

SECTION 1.02    Other Definitions and Interpretive Matters.

(a)    For purposes of this Agreement, the following rules of interpretation shall apply, except to the extent otherwise expressly provided or the context otherwise requires:

(i)    when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If

the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day;

(ii) any reference in this Agreement to $ shall mean U.S. dollars;

(iii) all Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement;

(iv) any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa;

(v) the words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear; and

(vi) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b) The parties hereto participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE; PURCHASE PRICE

SECTION 2.01    Purchase and Sale of Acquired Assets.

Upon the terms, and subject to the conditions, of this Agreement, at Closing:

(a) B&F shall, and the Principals shall cause B&F to, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase and acquire, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of B&F in, to or under all of the properties, assets, rights and claims of B&F (other than any Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used, useful or held for use in or relating to the Business (collectively, the "B&F Acquired Assets"), including, but not limited to, the following:

(i) all rights and benefits accruing under any Assigned Contracts and Assigned Leases, including any outstanding deposits thereunder;

(ii)    the Inventory (save and except for any Inventory that is an Excluded Asset);

(iii)    the Receivables (save and except for any Receivables that are Excluded Assets);

(iv)    the Acquired Equity (to the extent of B&F's right, title and interest in same);

(v)    the Real Property (save and except for any that is an Excluded Asset or, in the case of Leased Real Property, that is leased under a Lease that is an Excluded Asset);

(vi)    all tangible personal property related to, or used or useful in or held for use in the conduct of, the Business, including, without limitation, archives, samples, furniture, fixtures, furnishings, screens, artwork, equipment (including, without limitation, warehouse, office and computer equipment), machinery, tools, supplies, spare parts, molds, trucks, cars, other vehicles and rolling stock, furniture, fixtures, trade fixtures, leasehold improvements, office materials and supplies, and other tangible personal property located on, or off, the premises of any Real Property (save and except for any such tangible personal property that is an Excluded Asset);

(vii)    all goodwill associated with the Business or the Acquired Assets, including rights under any confidentiality agreements executed by any third party for the benefit of B&F or its Subsidiaries to the extent relating to the Business;

(viii)    all Intellectual Property related to, owned or used by B&F in connection with the Business (save and except for any such Intellectual Property that is an Excluded Asset) (collectively, the "Transferred Intellectual Property");

(ix)    all telephone numbers used in connection with the Business;

(x)    the sales and promotional literature, customer lists and other sales related materials related to the Business (save and except for any that is an Excluded Asset);

(xi)    all rights under any unfulfilled vendor purchase orders;

(xii)    all unfulfilled customer orders (including, without limitation, firm orders, cutting for approvals, custom orders, regular orders and reserve orders) in respect of which a Purchased Deposit has been made by the customer and the related payment has been made to the relevant vendor (collectively, the "Unfulfilled Customer Orders with Purchased Deposits");

(xiii)    all unfulfilled customer orders (including, without limitation, firm orders, cutting for approvals, custom orders, regular orders and reserve orders) in

respect of which no Purchased Deposit has been made the by customer (collectively, the "Unfulfilled Customer Orders without Purchased Deposits");

(xiv)   cash and cash equivalents (other than the Purchase Price), securities and other investments of B&F as of the Closing Date;

(xv)   all files, operating data, books of account, general, financial and Tax records, personnel records, invoices, shipping records, supplier lists, price lists, vendor lists, mailing lists, catalogs, sales promotion literature, advertising materials, brochures, standard forms of documents, manuals of operations or business procedures, research materials, Contracts, instruments, filings, administrative and pricing manuals, correspondence, memoranda, plats, architectural plans, surveys, title insurance policies, drawings, plans and specifications, environmental reports, maintenance or service records, soil tests, engineering reports, expired purchase orders, operating records, operating safety manuals, and other material and documents, books (including applicable portions of minute books), financial statements, records and files (whether or not in the possession of any of the Sellers or their respective Representatives, stored in hardcopy form or on magnetic, optical or other media) and any rights thereto owned, associated with or employed by B&F or its Subsidiaries in the conduct of the Business or otherwise related to the Acquired Assets or the Assumed Liabilities;

(xvi)   all of the rights and benefits accruing under any franchises, permits, Consents, certificates, clearances, approvals, exceptions, variances, permissions, filings, publications, declarations, notices, licenses, agreements, waivers and authorizations, including Environmental, Health and Safety Permits and Licenses, of or with any Governmental Authority (collectively, the "B&F Permits") held, used or made by B&F in connection with the Business, and all deposits and prepaid expenses held by third parties and/or Governmental Authorities (save and except any such B&F Permit that is an Excluded Asset);

(xvii)   all rights, claims, causes of action and Avoidance Actions (whether or not asserted as of the Closing Date) relating to any of the Acquired Assets, the Assumed Liabilities or the Business (including, without limitation, vendors, suppliers and customers thereof) or B&F's operations relating to the Business or any of the foregoing, including all causes of action arising under sections 510 and 544 through 550 of the Bankruptcy Code, or under similar state Law (in each case other than to the extent relating to Excluded Assets or Excluded Liabilities);

(xviii)   all prepaid and deferred items that relate to the Business or the Acquired Assets, including all prepaid rentals and unbilled charges, fees and deposits (other than to the extent relating to Excluded Assets or Excluded Liabilities);

(xix)   the amount of, and all rights to any, insurance proceeds received by any of the Sellers after the date hereof in respect of the loss, destruction or condemnation of any Acquired Assets occurring prior to, on or after the Closing or relating to any Assumed Liabilities;

(xx)   all rights and obligations with respect to existing claims made as of the Closing Date under the insurance policies of any of the Sellers that relate to the Business or any of the Acquired Assets or Assumed Liabilities, and all rights and benefits of any nature, including, without limitation, all insurance recoveries hereunder and rights to assert claims with respect to any such insurance recoveries, but excluding any D&O liability insurance policies;

(xxi)   to the extent transferable and to the extent related to the Acquired Assets, or in connection with the Business, the full benefit of all representations, warranties, guarantees, indemnities, undertakings, certificates, covenants, agreements and all security therefor received by B&F on the purchase or other acquisition of the Acquired Assets;

(xxii)   any rights, demands, claims, credits (including Tax refunds and similar credits and benefits), allowances, rebates, or rights of setoff arising out of or relating to any of the Acquired Assets;

(xxiii)  all confidentiality, non-compete and similar agreements entered into by B&F or any of its respective Representatives in connection with a sale of the Acquired Assets or the Business (save and except for any such agreement that is an Excluded Asset); and

(xxiv)  all other assets, properties, rights and claims of any of the Sellers of any kind or nature which relate to the Business, which are used or useful in or held for use in the Business, or which relate to the Acquired Assets (in each case, other than the Excluded Assets) not otherwise described above.

(b)   Each of the Principals shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase and acquire, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of each of the Principals, respectively, in, to or under the Acquired Equity, to the extent of each Principal's respective right, title and interest in same (collectively, the "Peardon Acquired Assets," and together with the B&F Acquired Assets, the "Acquired Assets").

SECTION 2.02    Excluded Assets.  Notwithstanding anything in Section 2.01 to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey the following assets to Buyer, and Sellers shall retain all of their respective rights, title and interests in, to and under, and Buyer shall have no rights with respect to, any of the following (collectively, the "Excluded Assets"):

(i)    any portion of the Purchase Price delivered (or required to be delivered) to B&F pursuant to this Agreement;

(ii)    any Contract or Lease that is not an Assigned Contract or Assigned Lease, respectively (including, without limitation, any Contract or Lease that is excluded pursuant to Section 6.05(c) hereof), and any rights or benefits thereunder;

(iii)    any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document;

(iv)    all Purchased Deposits paid by B&F in connection with, or relating primarily to, any Excluded Asset or Excluded Liability;

(v)    any Equity Interests in B&F or any securities convertible into, exchangeable or exercisable for shares of capital stock or other Equity Interests in B&F;

(vi)    any Benefit Plan; and

(vii)    any right, property or asset that is listed or described in Section 2.02(vii) of the Sellers' Disclosure Schedule.

SECTION 2.03    Assumed Liabilities

Upon the terms and subject to the conditions of this Agreement, at Closing, Buyer shall execute and deliver to Sellers an assumption agreement (the "Assumption Agreement") pursuant to which Buyer shall assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), the following Liabilities (collectively the "Assumed Liabilities") and no others:

(a)    all Liabilities arising after the Closing Date solely in connection with the ownership, operation and use of the Acquired Assets or the operation of the Business from and after the Closing Date;

(b)    all Liabilities of B&F under the Assigned Contracts and Assigned Leases, including all Determined Cure Costs (to be satisfied in accordance with Section 6.05(a));

(c)    the Liabilities of B&F under any Unfulfilled Customer Orders with Purchased Deposits;

(d)　　　　the Liabilities of B&F under any Unfulfilled Customer Orders without Purchased Deposits;

(e)　　　　all Transfer Taxes;

(f)　　　　Liabilities arising under residential warranty claims; and

(g)　　　　all other Liabilities set forth in Section 2.03(g) of the Sellers' Disclosure Schedule.

SECTION 2.04　　Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume, and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Sellers, and Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers, other than the Assumed Liabilities (collectively the "Excluded Liabilities"). The Excluded Liabilities include, but are not limited to, the following:

(a)　　　　other than as specifically set forth in Section 2.03, any Liability of Sellers or their Affiliates arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including all Liabilities for the expenses of Sellers or any of their Affiliates for the negotiation and preparation of this Agreement and expenses incurred in connection with the commencement and continuation of the Chapter 11 Case;

(b)　　　　other than as specifically set forth in Section 2.03, any Liability relating to events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Acquired Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(c)　　　　any Liability of B&F arising under the DIP Note;

(d)　　　　other than as specifically set forth in Section 2.03, any Liability to any current or former employee, independent contractor, consultant or agent at any time employed or engaged by B&F, or who otherwise provided services to B&F, at any time, or to any such Person's spouse, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by B&F, whenever such claims mature or are asserted, including (except as otherwise specifically set forth herein), all Liabilities arising (i) under the Benefit Plans, (ii) under any employment, wage and hour restriction, equal opportunity, discrimination, plant closing or immigration and naturalization Laws, (iii) under any collective bargaining Laws, agreements or arrangements or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(e)        any Liability of B&F to its current or former employees or to any other Person under any Benefit Plan and any pension or retirement Liability of B&F to its current or former employees or to any other Person which are accrued as of the Closing Date, whether or not under any Benefit Plan, including, for the avoidance of doubt, underfunded pension liabilities guaranteed by the Pension Benefit Guaranty Corporation;

(f)        other than as specifically set forth in <u>Section 2.03</u>, any Liability for Taxes attributable to periods prior to the Closing Date;

(g)        any Liability incurred by B&F or its respective directors, officers, stockholders, agents or employees (acting in such capacities) at any time;

(h)        any Liabilities arising from the operation of any successor liability Laws, including, without limitation, "bulk sales" statutes, to the extent that non-compliance therewith or the failure to obtain necessary clearances would subject the Buyer or the Acquired Assets to the claims of any creditors of any of the Sellers, or would subject any of the Acquired Assets to any Encumbrances or other restrictions (except for Permitted Encumbrances);

(i)        any Liabilities of any of the Sellers not related to the operation of the Business;

(j)        any Liabilities for personal injury claims, product recalls or similar claims or actions relating to the operation of the Business prior to the Closing;

(k)        any Liability relating to or arising out of any violation of an applicable Law or Order prior to the Closing by the Sellers;

(l)        any Liability relating to or arising out of the ownership or operation of an Excluded Asset; and

(m)        all other Liabilities set forth in <u>Section 2.04(m)</u> of the Sellers' Disclosure Schedule.

Nothing contained in this Agreement shall require the Buyer to pay or discharge any Assumed Liabilities (i) prior to such Assumed Liabilities becoming due and payable in accordance with (if applicable) the underlying terms of any Contracts giving rise to or governing such Assumed Liabilities or (ii) so long as the Buyer shall in good faith contest the amount or validity thereof.

SECTION 2.05   <u>Purchase Price</u>.  In addition to the assumption by Buyer at Closing of the Assumed Liabilities (including, among other things, the Determined Cure Costs) pursuant to <u>Section 2.03</u>, the purchase price (the "<u>Purchase Price</u>") for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Acquired Assets, shall be an amount in cash equal to:

(i)        the Cash Consideration; plus

(ii)        the Additional Receivable Amount, if any; minus

(iii)      the DIP Financing Payoff Amount; minus

(iv)      the Receivable Shortfall Amount, if any.

SECTION 2.06    <u>Payment of Purchase Price</u>.  On the terms and subject to the conditions set forth in this Agreement, at Closing, the Buyer shall pay to the Sellers an amount in cash equal to the Purchase Price by wire transfer of immediately available funds to the accounts designated in writing by B&F at least two Business Days prior to the Closing Date.

SECTION 2.07    <u>Allocation of Purchase Price</u>.

The Purchase Price shall be allocated solely for federal income Tax purposes among the Acquired Assets and Assumed Liabilities in accordance with a schedule to be delivered by Buyer to the Sellers within 30 days after the Closing Date (the "<u>Allocation</u>").  The Allocation shall be reasonable and shall be prepared in accordance with Section 1060 of the IRC and the regulations thereunder.  The Sellers shall be entitled to review and comment on the Allocation and the Buyer shall consider in good faith the Sellers' comments thereon.  Subject to the foregoing, the transactions contemplated hereby shall be reported in a manner consistent with the terms of this Agreement, including the Allocation, and none of the Sellers nor Buyer shall take any position inconsistent therewith in any Tax Return, in any refund claim, in any litigation, or otherwise.  Buyer and Sellers will each file IRS Form 8594, and all Tax Returns, in accordance with the Allocation agreed upon by the Parties pursuant to the terms of this <u>Section 2.07</u>.  Sellers and Buyer each agree to cooperate with each other in preparing IRS Form 8594, and to furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date.  If such Allocation is disputed by any Governmental Authority, the Buyer or any Seller receiving notice of such dispute will promptly notify the other party, and the parties will use their reasonable best efforts to sustain the Allocation.

## ARTICLE 3
## CLOSING

SECTION 3.01    <u>Closing Date</u>.

The consummation of the transactions contemplated by this Agreement, including the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "<u>Closing</u>") shall take place at the offices of Schulte Roth & Zabel LLP at 919 Third Avenue, New York, NY  10022 at 10:00 a.m. New York time, no later than the third Business Day following the date on which the conditions set forth in <u>Article 8</u> and <u>Article 9 </u>have been satisfied or waived (other than those conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction of such conditions (or the waiver thereof by the party entitled to waive such conditions)), or at such other place or time as the parties hereto may mutually agree in writing.  The date and time at which the Closing actually occurs shall be the "<u>Closing Date</u>."

SECTION 3.02    Closing Deliveries by Buyer.

At or prior to the Closing, Buyer shall deliver or cause to be delivered to B&F:

(a)    an amount equal to the Purchase Price by wire transfer of immediately available funds to the account in the United States specified in writing by B&F at least two Business Days prior to the Closing Date;

(b)    a certificate of an authorized officer of Buyer, dated as of the Closing Date, in form and substance reasonably satisfactory to Sellers, as to (i) a copy of the resolutions of the board of directors of Buyer authorizing and approving Buyer's execution and delivery of this Agreement and the other Transaction Documents to which it is a party and the performance by Buyer of its obligations hereunder and thereunder; and (ii) incumbency and signatures of the officers of Buyer executing the Transaction Documents;

(c)    the Bill of Sale, the Assumption Agreement, the Transition Services Agreement, the Deeds and each other Transaction Document (other than the Transaction Documents set forth in <u>Section 3.02(d)</u>) to which Buyer is a party, duly executed by Buyer;

(d)    the Assignment of Patents, the Assignment of Trademarks, the Assignment of Copyrights and the Assignment of Domain Names, if any, duly executed by Buyer, in form for recordation with the appropriate Governmental Authorities, and any other assignments or instruments with respect to any Transferred Intellectual Property for which an assignment or instrument is required to assign, transfer and convey such assets to Buyer, and which other assignments or instruments shall be in form and substance reasonably acceptable to B&F and Buyer;

(e)    the certificates required to be delivered pursuant to <u>Section 9.01</u> and <u>Section 9.02</u>; and

(f)    such other bills of sale, assignments, deeds, endorsements and other good and sufficient instruments of conveyance, assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request in order to consummate the transactions contemplated hereby.

SECTION 3.03    Closing Deliveries by Sellers.

At or prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(a)    a certificate of an authorized officer of B&F, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer, as to (i) a copy of the resolutions of the board of directors of B&F authorizing and approving its execution and delivery of this Agreement and the other Transaction Documents to which it is a party and the performance by B&F of its obligations hereunder and thereunder; and (ii) incumbency and signatures of the officers of such Seller executing the Transaction Documents;

(b)        the Bill of Sale, Assumption Agreement, the Transition Services Agreement, the Deeds and each other Transaction Document (other than the Transaction Documents set forth in <u>Section 3.03(c)</u>) to which each Seller is a party, duly executed by the Sellers party thereto;

(c)        instruments of assignment of the Patents (the "<u>Assignment of Patents</u>"), Trademarks (the "<u>Assignment of Trademarks</u>"), Copyrights (the "<u>Assignment of Copyrights</u>") and Domain Names (the "<u>Assignment of Domain Names</u>") that are owned by B&F and included in the Acquired Assets, if any, duly executed by B&F, in form for recordation with the appropriate Governmental Authorities, and any other assignments or instruments with respect to any Transferred Intellectual Property for which an assignment or instrument is required to assign, transfer and convey such assets to Buyer, and which other assignments or instruments shall be in form and substance reasonably acceptable to B&F and Buyer;

(d)        a certified copy of the Sale Order, as entered by the Bankruptcy Court;

(e)        stock or share certificates or other instruments representing or evidencing, as applicable, all of the outstanding Equity Interests of the Acquired Equity, duly endorsed in blank for transfer or delivered with stock powers duly executed in blank;

(f)        written evidence that each director and officer of the Subsidiaries of B&F has resigned effective as of the Closing Date;

(g)        the certificates required to be delivered pursuant to <u>Section 8.01</u> and <u>Section 8.04</u>;

(h)        certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the IRC; and

(i)        such other bills of sale, assignments, deeds, endorsements, and other good and sufficient instruments of conveyance, assumption and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request in order to consummate the transactions contemplated hereby.

SECTION 3.04    <u>Further Assurances</u>.

At the Closing, and at all times thereafter as may be necessary, Sellers shall execute and deliver to Buyer such other instruments of transfer as shall be reasonably necessary or appropriate to vest in Buyer good and indefeasible title to the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances) and to comply with the purposes and intent of this Agreement and such other instruments as shall be reasonably necessary or appropriate to evidence the assignment by Sellers and assumption by Buyer of the Assigned Contracts and Assigned Leases, and each of the Parties hereto shall use its reasonable best efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and execute and deliver such documents and other papers, as may be required to consummate the transactions contemplated by this Agreement.

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the corresponding sections or subsections of the Sellers' Disclosure Schedule or in any update thereto pursuant to Section 7.05 (whether or not the representations and warranties in this Article 4 expressly refer to such schedule), the Sellers hereby jointly and severally represent and warrant to Buyer as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as follows:

SECTION 4.01    Organization and Good Standing.

B&F and its Subsidiaries have the full power and authority to own their respective property and assets, and B&F and its Subsidiaries have the full power and authority to carry on the Business. B&F is a corporation duly organized, validly existing and, except as a result of the commencement or continuance of the Chapter 11 Case, in good standing under the Laws of the State of New York. B&F and its Subsidiaries are duly qualified or licensed to do business and are in good standing in the respective jurisdictions where the character of the Business or the nature of their respective properties makes such qualification or licensing necessary, except where the failure to so qualify or be licensed or in good standing would not have a Material Adverse Effect.

SECTION 4.02    Authority; Validity; Consents.

Subject to requisite Bankruptcy Court approval, each Seller has the requisite power, capacity and authority necessary to enter into and deliver and perform its obligations under this Agreement and the other Transaction Documents to which each Seller is party and to consummate the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approval, the execution, delivery and performance by each of the Sellers of this Agreement and the other Transaction Documents to which each Seller is party, the performance of each such Seller's obligations hereunder and thereunder and the consummation of the transactions contemplated herein and therein are within each such Seller's powers and, to the extent such Seller is not a natural person, have been duly and validly authorized by all requisite corporate actions in respect thereof and no other corporate proceedings on the part of such Sellers are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents to which the Sellers are party constitute the legal, valid and binding obligations of Sellers enforceable against each of them in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to requisite Bankruptcy Court approval, except as set forth in Section 4.02 of the Sellers' Disclosure Schedule, Sellers are not required to give any notice to, make any filing with or obtain any Consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby or thereby.

SECTION 4.03     Subsidiaries.

(a)     Section 4.03 of the Sellers' Disclosure Schedule sets forth a complete and accurate list of all Subsidiaries of B&F together with the jurisdiction of organization of each such Subsidiary and the jurisdiction in which each such Subsidiary is qualified or licensed to do business, all of the outstanding Equity Interests of each such Subsidiary (including all securities convertible into or exchangeable for Equity Interests of each such Subsidiary) and the record and beneficial owner of such Equity Interests.  All outstanding shares of capital stock of, or other Equity Interests or voting interests in, each Subsidiary of B&F have been duly authorized and validly issued and are fully paid and non-assessable, are owned beneficially and of record by the Sellers free and clear of all Encumbrances, free of pre-emptive rights and issued in compliance with all applicable securities Laws and upon delivery by Sellers of the Acquired Equity at Closing, good and valid title to the Acquired Equity, free and clear of all Encumbrances, other than those resulting from Buyer's ownership, will pass to Buyer.  Other than the Subsidiaries of B&F, B&F does not own, directly or indirectly, any capital stock, voting interests or Equity Interests in any Person.  The Sellers have provided to Buyer true and complete copies of the organizational and governing documents (including all amendments thereto) of each of B&F's Subsidiaries.

(b)     There are no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements or commitments of any character under which the Subsidiaries of B&F are or may become obligated to issue or sell, or which give any Person a right to subscribe for or acquire, or in any way dispose of, any Equity Interests, of B&F's Subsidiaries, and no securities or obligations evidencing such rights are authorized, issued or outstanding.  The outstanding Equity Interests of B&F's Subsidiaries are not subject to any voting trust agreement or other Contract restricting or otherwise relating to or providing voting rights, dividend rights or the disposition of such Equity Interests.  There are no phantom stock or other rights providing economic benefits based, directly or indirectly, on the value or price of the Equity Interests of B&F's Subsidiaries.  No Subsidiary of B&F owns, directly or indirectly, any Equity Interests of any Person or has any direct or indirect Equity Interests in any business, or is a member of or participant in any partnership, joint venture or similar Person.  There are no outstanding contractual obligations of B&F's Subsidiaries to provide funds to, or to make any investment (in the form of a loan, capital contribution or otherwise) in, any other Person.

SECTION 4.04     No Conflict.

When the Consents and other actions described in Section 4.02 of the Sellers' Disclosure Schedule have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents, the performance by the Sellers of their respective obligations hereunder and thereunder, and the consummation of the transactions provided for herein and therein will not (with or without notice, lapse of time or both) result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any termination, cancellation, modification or acceleration of any obligation of, the Sellers or B&F's Subsidiaries, result in a loss of any benefit to which the Sellers or B&F's Subsidiaries is entitled to, or result in the creation of any Encumbrance upon any of the Acquired Assets or any assets or

properties of B&F's Subsidiaries, under (a) any agreement, understanding or Contract to which any of the Sellers or B&F's Subsidiaries, or any of their respective properties or assets, is bound, (b) the certificates of formation or incorporation, bylaws or other organizational or governing documents of B&F or its Subsidiaries, (c) any Order, or (d) any B&F Permit or Law; in the case of the preceding clauses (a), (c) and (d), except for such breaches, defaults, conflicts or accelerations that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 4.05    Financial Statements; No Undisclosed Liabilities.

(a)    Attached as Section 4.05(a) of the Sellers' Disclosure Schedule are (i) the audited consolidated balance sheets of B&F and its Subsidiaries as of December 31, 2008 and December 31, 2007 and the related audited consolidated statements of operations, capital and cash flows for the fiscal years then ended, together with all related footnotes, accompanied by the unqualified reports thereon of B&F's independent auditors and (ii) the unaudited consolidated balance sheet of B&F and its Subsidiaries as of the twelve months ended December 31, 2009 and the nine months ended September 30, 2010 and the related unaudited consolidated statements of operations, capital and cash flows for the respective periods referred to therein (collectively, the "Financial Statements"). Each of the Financial Statements were prepared from the books and records of B&F and its Subsidiaries, in accordance with GAAP (in the case of such unaudited financial statements, subject to normal year-end adjustments (none of which are material in amount or effect) and the lack of footnotes) and consistently applied and maintained throughout the periods indicated, and fairly present in all material respects the consolidated financial position, results of operations and cash flows of B&F and its Subsidiaries as of the date thereof and for the periods covered thereby.

(b)    There are no Liabilities of (i) B&F or its Subsidiaries relating to the Acquired Assets or which constitute Excluded Liabilities or (ii) of the Subsidiaries of B&F, in each case, other than:  (i) Liabilities to the extent adequately reflected or reserved against on the Financial Statements, or (ii) Liabilities incurred in the ordinary course of business consistent with past practice after December 31, 2009 that are not material to B&F or its Subsidiaries, taken as a whole.

SECTION 4.06    Real Property.

(a)    Section 4.06(a)(i) of the Sellers' Disclosure Schedule lists, as of the date hereof, any and all real property which is owned by B&F and its Subsidiaries (collectively, the "Owned Real Property"). Section 4.06(a)(ii) of the Sellers' Disclosure Schedule lists, as of the date hereof, all Leased Real Property and Subsidiary Leased Real Property. Sellers have made available to Buyer true, complete and correct copies of all Leases, including any and all exhibits, schedules, annexes, amendments, supplements, and modifications thereto. Section 4.06(a)(i) and Section 4.06(a)(ii) of the Sellers' Disclosure Schedule collectively list all of the Real Property used in connection with the Business.

(b)    B&F and its Subsidiaries have received all material B&F Permits that are necessary in connection with B&F's and its Subsidiaries' occupancy, ownership or leasing of

the Real Property, and the present use of the Real Property by B&F and its Subsidiaries does not materially violate the B&F Permits applicable thereto.

(c)     B&F and its Subsidiaries have not received written notice of, nor to Sellers' Knowledge, is there any threatened (A) condemnation, eminent domain, expropriation or similar proceeding affecting the Real Property, (B) proceeding to change the zoning classification of any portion of the Real Property or (C) imposition of any special assessments for public betterments affecting the Real Property.

(d)     The Real Property used by Sellers and B&F's Subsidiaries, and the present uses of the Real Property by Sellers and B&F's Subsidiaries, are in compliance in all material respects with, and not in default under or in material violation of, any building, zoning, land use, public health, public safety, sewage, water, sanitation or other comparable Law or Order.

SECTION 4.07     Environmental Matters.

Except as set forth in Section 4.07 of the Sellers' Disclosure Schedule or as would not have a Material Adverse Effect:

(a)     B&F and its Subsidiaries have all Environmental, Health and Safety Permits necessary for the lawful operation of the Business as currently conducted;

(b)     the current operations of the Business comply with, and are not subject to any Order that is not generally applicable to Persons engaged in a business similar to the Business with respect to, any Laws concerning environmental, health or safety matters ("Environmental, Health and Safety Laws"), and neither B&F nor its Subsidiaries have received written notice alleging that the activities of the Business are in violation of any Environmental, Health and Safety Laws;

(c)     there has been no Release of any Hazardous Substances at, on or under any of the Real Property, and to Sellers' Knowledge, none of such properties has been used by any Person as landfill or storage, treatment or disposal site for any type of Hazardous Substance or non-hazardous solid wastes as defined under the Resource Conservation and Recovery Act of 1976, as amended;

(d)     there are no claims, suits or Proceedings by any employee pending or, to Sellers' Knowledge, threatened, against B&F or any of its Subsidiaries that are premised on the exposure to asbestos or asbestos-containing material in any of the Real Property;

(e)     any storage tanks that presently exist on, at or under any of the Real Property are, to Sellers' Knowledge, currently operated and maintained in accordance with all Environmental, Health and Safety Laws and none of them is Releasing any Hazardous Substance; and

(f)     B&F has made available or provided Buyer with copies of all material documents, records and information in B&F's or any of its Subsidiaries' possession concerning

the condition of the environment at any of the Real Property, whether generated by B&F, its Subsidiaries or others, including environmental audits and environmental site assessments.

SECTION 4.08    Title to Acquired Assets.

Sellers have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 3.03, and subject to the terms of the Sale Order, Sellers will thereby transfer to Buyer, good and marketable title to, or, in the case of property leased or licensed by the Sellers, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except (a) as set forth in Section 4.08 of the Sellers' Disclosure Schedule, (b) for the Assumed Liabilities and (c) for Permitted Encumbrances.  Each of B&F's Subsidiaries has good and valid title to, or in the case of property leased or licensed by B&F's Subsidiaries, a valid leasehold or licensed interest in, all of the assets used or held for use in the conduct of the business of each such Subsidiary, free and clear of all Encumbrances (other than Permitted Encumbrances).

SECTION 4.09    Taxes.

Except as set forth in Section 4.09 of the Sellers' Disclosure Schedule, B&F and its Subsidiaries have each timely filed all material Tax Returns required to be filed with the appropriate Governmental Authority in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted, or to be obtained on behalf of, B&F or its Subsidiaries, as applicable), and all Taxes shown to be payable on such Tax Returns have been paid.  Except as set forth in Section 4.09 of the Sellers' Disclosure Schedule, on the date hereof, (i) no material examination of any such Tax Return of B&F or its Subsidiaries is currently in progress by any Governmental Authority; (ii) no material adjustment has been proposed in writing with respect to any such Tax Returns for the last five (5) fiscal years by any Governmental Authority; and (iii) no material claim has been made in writing within the last five (5) years by any Governmental Authority in a jurisdiction where B&F and its Subsidiaries do not file Tax Returns to the effect that such filings may be required with respect to the Acquired Assets by that jurisdiction.

SECTION 4.10    Absence of Certain Developments.

Except as required by Law or GAAP, since December 31, 2008, through and including the date hereof:

(a)    B&F and its Subsidiaries have conducted the Business in the ordinary course of business consistent with past practice;

(b)    there have not occurred any facts, conditions, changes, violations, inaccuracies, circumstances, effects or events that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(c)    except as set forth on Section 4.10(c) of the Sellers' Disclosure Schedule, neither the Sellers nor any of the Subsidiaries of B&F has taken or authorized any

action which, if taken or authorized on or after the date hereof, would require the consent of the Buyer pursuant to Section 7.02.

SECTION 4.11    Sufficiency of Assets.

Except as set forth in Section 4.11 of the Sellers' Disclosure Schedule, the Acquired Assets, together with the assets, rights, interests and properties owned by B&F's Subsidiaries are constitute all of the assets, rights and interests of every nature and kind whatsoever necessary for the Buyer to operate the Business from and after the Closing Date in substantially the same manner as the Business is currently being operated by B&F and its Subsidiaries. Without limiting the foregoing, the information, records and documentation relating to the Acquired Assets and Assumed Liabilities held by Gibney, Anthony & Flaherty, LLP do not, and from and after the Closing, will not, in any manner limit or otherwise effect the ownership, use or enjoyment of the Acquired Assets prior to Closing by the Company and, from and after the Closing, the Buyer.

SECTION 4.12    Tangible Property and Equipment.

B&F has good and valid record and marketable title to, or a valid leasehold interest in, the tangible property and Equipment constituting a portion of the Acquired Assets and B&F's Subsidiaries have good and valid record and marketable title to, or a valid leasehold interest in, the tangible property and assets necessary for the conduct of the Business as presently conducted. Except as set forth in Section 4.12 of the Sellers' Disclosure Schedule, all such tangible property and Equipment of B&F, and all such tangible property and assets of B&F's Subsidiaries, are free from material defects, have been maintained in accordance with normal industry practice, and are in good operating condition and repair, subject to normal wear and tear.

SECTION 4.13    Legal Proceedings.

Except as set forth in Section 4.13 of the Sellers' Disclosure Schedule, neither B&F nor any of its Subsidiaries, nor any of their respective officers, directors, shareholders or employees in their capacity as such, is a party to any Proceeding or, to Sellers' Knowledge, has been threatened with, any Proceeding. To Sellers' Knowledge, there is no outstanding Order of any Governmental Authority to which the Sellers or any of B&F's Subsidiaries is subject nor is any Seller or any of B&F's Subsidiaries in default with respect to any such Order.

SECTION 4.14    Compliance with Laws; B&F Permits.

(a)    Except as set forth in Section 4.14(a) of the Sellers' Disclosure Schedule, and except as would not have a Material Adverse Effect, the Sellers and B&F's Subsidiaries (i) have conducted and continue to conduct the Business in all material respects in accordance with all Laws and Orders applicable to the Business, (ii) are not in violation of any Law or Order applicable to the operation of the Business and (iii) have not received any notice that any violation of any such Law or Order is being or may be alleged.

(b)     (i) <u>Section 4.14(b)</u> of the Sellers' Disclosure Schedule sets forth a true and complete list of all material B&F Permits; (ii) B&F and its Subsidiaries are in possession of all B&F Permits; (iii) all B&F Permits are valid and are in full force and effect; (iv) to the Knowledge of B&F, no suspension, cancellation or non-renewal of any of the B&F Permits is pending or threatened; (v) B&F and its Subsidiaries are not, and since December 31, 2008 have not been, in material violation or breach of, or material default under, any B&F Permit and neither B&F nor any of its Subsidiaries have been notified in writing that any B&F Permit may not in the ordinary course be renewed upon its expiration or that, by virtue of the transactions contemplated by this Agreement, any B&F Permit may be terminated or materially amended or not be granted or renewed and (vi) no event or condition has occurred or exists which would reasonably be expected to result in a material violation of, material breach of, loss of a material benefit under or non-renewal of, any B&F Permit (in each case, with or without notice or lapse of time or both).

SECTION 4.15     <u>Employment Matters</u>.

(a)     B&F and its Subsidiaries are in compliance with all applicable Laws respecting employment and employment practices, terms and conditions of employment and wages and hours, except as would not have a Material Adverse Effect.

(b)     <u>Section 4.15(b)</u> of the Sellers' Disclosure Schedule sets forth a true and complete list of each (i) deferred compensation plan, (ii) incentive compensation plan, (iii) equity compensation plan, (iv) "welfare" plan, fund or program (within the meaning of Section 3(I) of ERISA), (v) "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA) (vi) "employee benefit plan" (within the meaning of Section 3(3) of ERISA, (vi) employment (other than offer letters entered into in the ordinary course of the Business), termination, severance or "change in control" agreement and (vii) other material employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by B&F or any of its Subsidiaries, as applicable, or by any trade or business, whether or not incorporated (an "<u>ERISA Affiliate</u>"), that together with B&F or such Subsidiary, as applicable, would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA, or to which B&F, any of its Subsidiaries, or any ERISA Affiliate is party, for the benefit of any employee or director or any former employee or director of B&F or its Subsidiary, as applicable (each such plan is referred to herein as a "<u>Benefit Plan</u>").  Each Benefit Plan is operated and administered in all material respects in accordance with its terms and applicable Law (including ERISA and the Code).

(c)     With respect to each Benefit Plan subject to Title IV or Section 302 of ERISA ("<u>Title IV Plan</u>"), no material Liability under Title IV of ERISA has been incurred by B&F, any of its Subsidiaries, or any ERISA Affiliate that has not been satisfied in full and no condition exists, that could reasonably be expected to result in the imposition of any Liability upon Buyer thereunder.  Except as set forth in <u>Section 4.15(c)</u> of the Sellers' Disclosure Schedule, no Benefit Plan provides any medical, disability or life insurance benefits to any employees of the Business after termination of employment.  No Title IV Plan is a "multiemployer pension plan," as defined in Section 3(37) of ERISA, nor is any Title IV Plan a plan described in Section 4063(a) of ERISA.

SECTION 4.16    Intellectual Property.

(a)    Section 4.16(a) of the Sellers' Disclosure Schedule sets forth a true, correct and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; (iii) registered Copyrights and pending applications for Copyrights; and (iv) all Domain Names, in each case which is owned by B&F or any of its Subsidiaries.  Except as set forth in Section 4.16(a) of the Sellers' Disclosure Schedule, B&F or its Subsidiary is the sole record owner of all of the Intellectual Property set forth in Section 4.16(a) of the Sellers' Disclosure Schedule, and all such Intellectual Property is subsisting and, to Sellers' Knowledge, valid and enforceable.

(b)    Section 4.16(b) of the Sellers' Disclosure Schedule sets forth a true, correct and complete list of all material licenses, sublicenses or other material Contracts or Leases to which B&F or any of its Subsidiaries is a party or otherwise bound pursuant to which B&F or its Subsidiary, as applicable, has granted to a third party or has been granted or have obtained by or from a third party any right to use any Intellectual Property that is material to the Business (other than Contracts or Leases granting rights to use readily available commercial Software that is generally available on nondiscriminatory pricing terms and having an acquisition price of less than $25,000 in the aggregate for all such related Contracts or Leases) (each a "License").  Except as otherwise disclosed in Section 4.16(b) of the Sellers' Disclosure Schedule, each License is in full force and effect and is a valid and binding obligation of B&F or its Subsidiary, as applicable, and, to Sellers' Knowledge, the other parties thereto, in accordance with its terms and conditions, except as such enforceability may be limited by bankruptcy, insolvency or other similar Laws affecting the enforcement of creditors' rights generally.  Upon entry of the Sale Order and payment of the applicable Determined Cure Costs, to Sellers' Knowledge, (x) neither B&F nor any of its Subsidiaries will be in breach or default of its obligations under any License, (y) no condition exists that with notice or lapse of time or both would constitute a default by B&F or any of its Subsidiaries under any of the Licenses, and (z) to Sellers' Knowledge, no other party to any of the Licenses is in breach or default thereunder.

(c)    B&F or its Subsidiaries, as applicable, owns, or has a valid right to use, free and clear of all Encumbrances (other than Permitted Encumbrances and any Encumbrances arising pursuant to the terms of a License), all Intellectual Property used in the Business and such Intellectual Property constitutes all Intellectual Property necessary to conduct the Business.

(d)    Except as disclosed in Section 4.16(d) of the Sellers' Disclosure Schedule, (i) the conduct of the Business by B&F and its Subsidiaries (including the products and services currently sold or provided by B&F and its Subsidiaries) as currently conducted does not infringe, misappropriate or otherwise violate any Person's Intellectual Property, there has been no such claim or Proceeding asserted or threatened in writing in the past three years against B&F or its Subsidiaries and, to Sellers' Knowledge, there is no valid basis for any such claim, and (ii) to Sellers' Knowledge, no Person (including any current or former officer, director, employee or contractor of B&F or its Subsidiaries), is infringing, misappropriating or otherwise violating any Intellectual Property owned or used by B&F or its Subsidiaries in the conduct of the Business, and no such claims or Proceedings have been asserted or threatened in writing

against any Person by B&F or any of its Subsidiaries or, to Sellers' Knowledge, any other Person, in the past three years, and to Sellers' Knowledge, there is no valid basis for any such claim.

(e)    B&F and its Subsidiaries have timely made all filings and payments with the appropriate foreign and domestic agencies required to maintain in subsistence all Registered Intellectual Property owned by B&F and/or its Subsidiaries. All documentation necessary to confirm and effect B&F's and/or its Subsidiaries' ownership of such Intellectual Property, if acquired from other Persons, has been recorded in the United States Patent and Trademark Office, the United States Copyright Office and the corresponding offices of other Governmental Authorities.

(f)    B&F and its Subsidiaries have taken commercially reasonable measures to protect the secrecy, confidentiality and value of all Trade Secrets used in the Business (collectively, "Business Trade Secrets"), including, but not limited to, entering into appropriate confidentiality agreements with all officers, directors, employees, and other Persons with access to the Business Trade Secrets. To the Sellers' Knowledge, no unauthorized disclosure of any Business Trade Secrets has been made.

(g)    B&F and its Subsidiaries have a policy of requiring all employees, agents, consultants or contractors who have contributed to or participated in the creation, development, improvement or modification of Intellectual Property for B&F and/or its Subsidiaries to assign all of their rights therein to B&F and/or its Subsidiaries. To the Sellers' Knowledge, no Person (other than B&F and/or its Subsidiaries) has any reasonable basis for claiming any right, title or interest in and to any such Intellectual Property.

(h)    The IT Systems are adequate in all material respects for their intended use and for the operation of such businesses as are currently operated and as are currently contemplated to be operated by B&F and its Subsidiaries, and are in good working condition (normal wear and tear excepted). There has not been any malfunction with respect to any of the material IT Systems during the last three years that has not been remedied or replaced in all material respects.

(i)    The Data that is used or held for use in the Business by B&F and its Subsidiaries does not infringe or violate the rights of any Person or otherwise violate any Law.

SECTION 4.17    No Brokers or Finders.

With the exception of the fees payable to Sellers' Chief Restructuring Officer (for which Sellers are solely responsible and liable for), neither any Seller nor any Person acting on any Seller's behalf has paid or become obligated to pay any fee, commission, indemnification or similar payment to any broker, finder, investment banker, agent or intermediary in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

SECTION 4.18    Affiliate Transactions.

Except as disclosed in Section 4.18 of the Sellers' Disclosure Schedule, no Principal or any Affiliate of any Seller (a) is a party to any Material Contract or Lease with B&F or any of its Subsidiaries, (b) is involved in any Proceeding against any B&F or any of its Subsidiaries, or (c) has a loan outstanding from B&F or its Subsidiaries (each of the transactions described in clauses (a) through (c), an "Affiliate Transaction").

SECTION 4.19    Material Contracts and Leases; No Breach of Assigned Contracts or Assigned Leases.

(a)       Section 4.19(a) of the Sellers' Disclosure Schedule sets forth a true and complete list of all Material Contracts and Leases.

(b)       Except as set forth in Section 4.19(b) of the Sellers' Disclosure Schedule, upon entry of the Sale Order and payment of the Determined Cure Costs and assuming the validity with respect to and binding effect on the applicable counterparty thereto, each Material Contract and Lease is valid and binding on B&F and each of its Subsidiaries that is a party thereto, as applicable, and is in full force and effect and enforceable against B&F and each such Subsidiary in accordance with its terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.  B&F and each of its Subsidiaries has in all material respects performed all obligations required to be performed by it to date under each Material Contract and Lease.  To B&F's Knowledge, each counterparty to each Material Contract and Lease has in all material respects performed all obligations required to be performed by it under such Material Contract and Lease.  Neither B&F nor any of its Subsidiaries has Knowledge of, or has received written notice of, the existence of any event or condition which constitutes, or, after notice or lapse of time or both, will constitute, a material breach or violation of or material default on the part of B&F or any of its Subsidiaries or their counterparties under any such Material Contract or Lease.  Prior to the date of this Agreement, true and correct copies of all Material Contracts and Leases (including all amendments and modifications thereto) in effect on the date hereof have been made available to Buyer.

SECTION 4.20    Insurance.

Each insurance policy and insurance arrangement that covers the Acquired Assets, the Assumed Liabilities, the Business and B&F's Subsidiaries (the "Insurance Policies") are in full force and effect, all premiums thereon have been paid through May 31, 2011, and, to the Knowledge of B&F, B&F and its Subsidiaries are otherwise in compliance in all material respects with the terms and provisions of such policies.  Neither B&F nor any of its Subsidiaries is in default under any of the Insurance Policies and there exists no event, occurrence, condition or act (including the purchase of the Acquired Assets hereunder) that (with or without notice, lapse of time or both) would become a material default thereunder.  To the Knowledge of B&F: (i) there is no pending notice of cancellation or non-renewal of any such Insurance Policies, (ii) the termination of any such Insurance Policies has not been threatened, and (iii) no event, condition or act (including the purchase of the Acquired Assets hereunder) has occurred and is

continuing or been taken that, with the giving of notice, the lapse of time or the happening of any other event or condition, would entitle any insurer to terminate or cancel any such Insurance Policies.

SECTION 4.21    Receivables.

The Receivables, (i) except for intercompany claims, have arisen out of actual sales with unaffiliated third parties in the ordinary course of business consistent with past practice, (ii) are free and clear of all defenses and claims of any nature whatsoever other than claims for warranties and claims made in the ordinary course of business that are not material in the aggregate to the Business, and (iii) are collectible in the ordinary course of business consistent with past practice, net of reserves.

SECTION 4.22    Accounts Payable.

All of the accounts payable reflected on the unaudited consolidated balance sheet of B&F and its Subsidiaries as of September 30, 2010 and all accounts payable that have arisen since September 30, 2010 arose from bona fide purchases of goods and services in the ordinary course of business.  Section 4.22 of the Sellers' Disclosure Schedule sets forth the Trade Payables outstanding as of the date hereof.

**ARTICLE 5**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Except as set forth in the corresponding sections or subsections of Buyer's Disclosure Schedule (whether or not the representations and warranties in this Article 5 expressly refer to such schedule), Buyer hereby represents and warrants to Sellers as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as follows:

SECTION 5.01    Organization and Good Standing.

Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.  Buyer has the full power and authority to own its property, carry on its business as now being conducted and as proposed to be conducted following the Closing, and to carry out the transactions contemplated hereby.

SECTION 5.02    Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which Buyer is party and the consummation of the transactions contemplated herein and therein have been duly and validly authorized by all necessary corporate actions in respect thereof.  This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligations of Buyer, enforceable against it in accordance with their respective

terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as set forth in Section 5.02 of the Buyer's Disclosure Schedule, Buyer is not required to give any notice to, make any filing with or obtain any Consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby or thereby.

SECTION 5.03     No Conflict.

When the Consents and other actions described in Section 5.02 of the Buyer's Disclosure Schedule have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents, the performance by the Buyer of its respective obligations hereunder and thereunder, and the consummation of the transactions provided for herein and therein will not (with or without notice, lapse of time or both) result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any termination, cancellation, modification or acceleration of any obligation of, the Buyer, result in a loss of any benefit to which the Buyer is entitled to, or result in the creation of any material Encumbrance upon any assets or properties of the Buyer, under (a) any agreement, understanding or Contract, to which any of the Buyer or any of its properties or assets is bound, (b) the certificates of formation or incorporation, bylaws or other organizational or governing documents Buyer, (c) any Order, or (d) any B&F Permit or Law; in the case of the preceding clauses (a), (c) and (d), except for such breaches, defaults, conflicts or accelerations that do not, and are not reasonably likely to, individually or in the aggregate, materially and adversely affect the ability of Buyer to carry out its obligations under this Agreement and the other Transaction Documents to which it is a party, and to consummate the transactions contemplated hereby.

SECTION 5.04     No Brokers or Finders.

Neither Buyer nor any Person acting on its behalf has paid or become obligated to pay any fee, commission, indemnification or similar payment to any broker, finder, investment banker, agent or intermediary in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which any Seller is or will become liable, and Buyer shall indemnify and hold harmless Sellers from any claims with respect to any such fees, commissions or similar payments.

SECTION 5.05     Buyer's Acknowledgment.

Buyer is not aware of any facts or circumstance, which (with or without notice or lapse of time or both) would cause any representations or warranties of any Seller to be untrue or incorrect in any respect.

SECTION 5.06     Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same.

Buyer agrees, warrants, and represents that, except as set forth in this Agreement, (a) Buyer is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis

based solely on Buyer's own investigation of the Acquired Assets and (b) none of the Sellers nor any real estate broker, agent, officer, employee, servant, attorney, or representative of any Seller has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Acquired Assets or the Assumed Liabilities, any part of the Acquired Assets or the Assumed Liabilities, relating to the financial performance of the Acquired Assets or the Business, or the physical condition of the Acquired Assets. Buyer further acknowledges that the consideration for the Acquired Assets specified in this Agreement has been agreed upon by Sellers and Buyer after good-faith arms-length negotiation in light of Buyer's agreement to purchase the Acquired Assets "AS IS" and "WITH ALL FAULTS". Buyer confirms that Sellers have made available to Buyer the opportunity to ask questions of the officers and management of Sellers and to acquire additional information about the Business, the Acquired Assets and the Assumed Liabilities. Buyer agrees, warrants, and represents that, except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon Buyer's own investigation of all such matters, and that Buyer assumes all risks with respect thereto. EXCEPT AS SET FORTH IN THIS AGREEMENT, NO SELLER MAKES ANY EXPRESS WARRANTY, ANY WARRANTY OF MERCHANTABILITY, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, OR ANY IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES OR THE BUSINESS.

## ARTICLE 6
## BANKRUPTCY COURT MATTERS

SECTION 6.01    Bankruptcy Court Approval.

(a)    Sellers and Buyer acknowledge that this Agreement and the sale by B&F of the B&F Acquired Assets (including the assumption and assignment of the Assigned Contracts and Assigned Leases) are subject to Bankruptcy Court approval after commencement of the Chapter 11 Case. Sellers and Buyer further acknowledge that B&F must take reasonable steps to demonstrate that it has sought to obtain the highest or best price for the B&F Acquired Assets, including giving notice thereof to B&F's creditors and other interested parties, providing information about the B&F Acquired Assets to prospective bidders (subject to confidentiality agreements no less restrictive than the Confidentiality Agreement), entertaining higher or better qualified offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the B&F Acquired Assets, conducting an auction, all in accordance with the Bid Procedures Order, as and when the same is approved by the Bankruptcy Court.

(b)    In the event that the Bid Procedures Order and Sale Order are entered by the Bankruptcy Court, and an appeal is taken or a stay pending appeal is requested from either such Orders, B&F shall immediately notify Buyer of such appeal or stay request, and shall promptly provide to Buyer a copy of the related notice of appeal or Order of stay. B&F shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such Orders. From and after the date hereof until the Closing Date, Sellers shall not take any action which is intended to result in, or fail to take any action the intent of

which failure to act would result in the reversal, voiding, modification or staying of the Bid Procedures Order or Sale Order.

SECTION 6.02    Bankruptcy Court Filings.

From and after the date hereof until the Closing Date, B&F shall deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed in the Chapter 11 Case at the time of their filing, but with respect to any such papers that any Seller may file that relates, in whole or in part, to this Agreement, or Buyer, its constituent members or its or their agents or representatives, Sellers shall use their respective reasonable efforts to provide such prior notice as may be reasonable under the circumstances before the filing of such papers.

SECTION 6.03    Break-up Fee and Expense Reimbursement.  The Buyer shall be entitled to payment of a break-up fee and reimbursement for its documented, out-of-pocket expenses reasonably incurred in connection with the transactions contemplated hereby in cash in the amount of $325,000 less the Closing Fee (as defined in the DIP Note) actually paid to the DIP Lender (the "Break-up Fee and Expense Reimbursement") which Break-up Fee and Expense Reimbursement shall be payable to Buyer only if:  (x) Buyer is not in material breach of its obligations under this Agreement, which breach or default has not been waived in writing by B&F; (y) Buyer and Sellers have not otherwise terminated this Agreement pursuant to Section 10.01(a)(ii); and (z) following the Auction, either (1) the Bankruptcy Court approves an Alternative Proposal as the Successful Bid, and the closing of a transaction in respect of such Alternative Proposal has occurred, or (2) Buyer is the Successful Bidder, the conditions set forth in Article 8 and Article 9 have been satisfied or waived in accordance with Section 11.05 on or prior to the Termination Date, and the Buyer has represented to B&F that it is ready, willing and able to consummate the transactions contemplated hereby, but any of the Sellers fail to so consummate the transactions contemplated hereby; provided that in the case of clause (2) the payment to Buyer of the Break-Up Fee and Expense Reimbursement shall not constitute Buyer's exclusive remedy.

SECTION 6.04    Assumption and Assignment of Assigned Contracts and Assigned Leases.

(a)    On the Closing Date, and pursuant to the Sale Order (as it shall have become a Final Order), and/or the consent of the applicable counterparties to the extent necessary to effect the assumption and assignment, B&F shall assume and assign to Buyer, and Buyer shall assume from B&F, the Assigned Contracts and Assigned Leases.

(b)    Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through the Closing Date, the Sellers will not reject or take any action to reject, repudiate or disclaim (or fail to take any action that would result in rejection, repudiation or disclaimer by operation of law of), any Contract or Lease without the prior written consent of Buyer.  Further, B&F shall file in the Chapter 11 Case such motions or pleadings (i) as may be appropriate and necessary to preserve B&F's right or ability to assume and assign any of the

Assigned Contracts (including, without limitation, pursuant to section 365(d)(4) of the Bankruptcy Code with respect to any Leased Real Property).

(c)     To the extent that any Assigned Contract or Assigned Lease to be sold, transferred, conveyed or assigned (any sale, transfer, conveyance or assignment, a "Transfer") to Buyer pursuant to the terms of Section 2.01 is not capable of being so Transferred to Buyer (after giving effect to the Sale Order as it shall have become a Final Order) without the Consent of a third Person (each such Contract or Lease, a "Consent Pending Contract"), or if such Transfer or attempted Transfer, or the subsequent Transfer or attempted Transfer of the equity interests of Buyer would, constitute a breach thereof or a violation of any Law or Order, nothing in this Agreement or in any document, agreement or instrument delivered pursuant to this Agreement will constitute a Transfer or an attempted Transfer thereof prior to the time at which all Consents necessary for such Transfer have been obtained unless an Order of the Bankruptcy Court effects such Transfer without such Consent.

(d)     B&F shall hold and not reject pursuant to section 365 of the Bankruptcy Code any Consent Pending Contracts for a period of sixty (60) calendar days following the Closing Date (the "Contract Retention Period") and otherwise after receiving further written notice(s) (each, an "Assumption Notice") from Buyer during the Contract Retention Period requesting assumption and assignment of any Consent Pending Contract, B&F shall, subject to Buyer's demonstrating adequate assurance of future performance thereunder (if applicable), take all actions reasonably necessary to seek to assume and assign to Buyer pursuant to section 365 of the Bankruptcy Code any Contract(s) or Lease(s) set forth in an Assumption Notice, and any applicable Determined Cure Cost shall be satisfied in accordance with Section 6.05(c) hereof.  B&F agrees and acknowledges that the covenant set forth in this Section 6.04(d) shall survive the Closing; provided, that, with respect to any Consent Pending Contract, Buyer shall compensate B&F for Liabilities for the continuation of such Consent Pending Contracts during the Contract Retention Period up to and including the date which is ten (10) calendar days following B&F's receipt of written notice from Buyer authorizing rejection of the same, it being understood and agreed that B&F's obligation to assume and assign any Consent Pending Contract shall be conditioned upon Buyer's payment of such amounts and that Buyer's covenant to pay such amounts shall survive the Closing until the later of (x) the termination of the Contract Retention Period and (y) payment in full by Buyer to B&F of such amounts required to be paid prior to such termination.  Notwithstanding anything in this Agreement to the contrary, on the date any Contract or Lease is assumed and assigned to Buyer pursuant to this Section 6.04(d), such Contract or Lease shall be deemed an Assigned Contract or Assigned Lease, as applicable.  B&F shall have the right at any time following the expiration of the Contract Retention Period to reject any Consent Pending Contracts pursuant to section 365 of the Bankruptcy Code.

SECTION 6.05     Determined Cure Costs.

(a)     B&F shall use commercially reasonable efforts, including the filing and prosecution of any and all appropriate proceedings in the Bankruptcy Court, to establish the Estimated Cure Cost for each Assigned Contract or Assigned Lease as the Determined Cure Cost for such Assigned Contract or Assigned Lease, as applicable.

(b)     By not later than five calendar days before the Sale Hearing, B&F shall make available, or cause to be made available, to Buyer (i) true and complete copies of the Assigned Contracts and Assigned Leases, or in the case of oral Assigned Contracts or Assigned Leases, true and complete written descriptions thereof (in each case including all amendments thereto and assignments thereof), and (ii) a schedule of B&F's good faith estimate of the Cure Costs (as the same may be updated, supplemented or amended, the "Estimated Cure Costs"), if any, associated with each Assigned Contract or Assigned Lease.

(c)     On the Closing Date, or as soon as reasonably practicable thereafter, in connection with the assumption by B&F, and assignment to Buyer, of the Assigned Contracts and Assigned Leases, Buyer shall make provision for the payment of the Determined Cure Costs in accordance with a Final Order of the Bankruptcy Court providing for such Determined Cure Costs (which may be the Sale Order (as it shall have become a Final Order)); provided, however, that, notwithstanding anything to the contrary herein, if the Determined Cure Cost for any Contract or Lease that, at the time, is an Assigned Contract or Assigned Lease, respectively, exceeds the Estimated Cure Cost in respect of such Contract or Lease, then Buyer, in its sole discretion, may (on notice to B&F and the applicable counterparty) elect to amend Section 1.01(b)(i) or Section 1.01(b)(ii) of the Sellers' Disclosure Schedule, as applicable, so as to exclude such Contract or Lease, whereupon such Contract or Lease so excluded shall not constitute an "Assigned Contract" or "Assigned Lease" (and shall therefore constitute an "Excluded Asset"), and Buyer shall not acquire any rights, or assume any Liabilities, with respect to such Contract or Lease so excluded.  Notwithstanding anything to the contrary herein, Buyer shall in no way be liable for Determined Cure Costs related to any Contract or Lease excluded from Section 1.01(b)(i) or Section 1.01(b)(ii) of the Sellers' Disclosure Schedule, as applicable, in accordance with this Section 6.05(c).

### ARTICLE 7
### ADDITIONAL AGREEMENTS

SECTION 7.01     Investigation of the Business By Buyer Prior to Closing.

(a)     From and after the date hereof until the Closing, and subject to the confidentiality obligations to which Sellers may be bound, upon reasonable notice, B&F shall, and the Principals shall cause B&F to, afford Buyer's Representatives reasonable access during normal business hours to the offices, properties, key employees, Sellers' Chief Restructuring Officer of B&F and outside counsel and agreements and other documentation and financial records (including computer files, retrieval programs and similar documentation) with respect to the Business, the Acquired Assets and the Assumed Liabilities to the extent Buyer reasonably deems necessary, and shall permit Buyer and its Representatives to make copies of such materials at Buyer's sole expense.  From and after the date hereof until the Closing, and subject to the confidentiality obligations to which Sellers may be bound, B&F shall, and the Principals shall cause B&F to, furnish to Buyer or its authorized Representatives such additional information concerning the Acquired Assets, the Business and the Assumed Liabilities as shall be reasonably requested by Buyer or its authorized Representatives, including all such information as shall be reasonably necessary to enable Buyer or its authorized Representatives to (i) verify the accuracy of Sellers' representations and warranties contained in this Agreement, (ii)

verify that Sellers have complied with the covenants contained in this Agreement and (iii) determine whether the conditions set forth in Article 8 have been satisfied. From and after the date hereof until the Closing, Sellers shall use their commercially reasonable efforts to cause Sellers' Chief Restructuring Officer of B&F and Sellers' outside counsel to cooperate with Buyer in such investigation. It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Sellers in this Agreement. Notwithstanding anything to the contrary herein, no such investigation or examination shall be permitted, and no such documents or information shall be required to be provided or made available, to the extent that it would require Sellers to disclose documents or information subject to attorney-client privilege.

(b)     From and after the date hereof until the Closing, as reasonably requested by Buyer from time to time, B&F shall, and the Principals shall cause B&F to, use its commercially reasonable efforts to cooperate with Buyer in connection with arranging such meetings or telephone conferences with landlords, material suppliers and customers of the Business as may be necessary and appropriate for Buyer to conduct a comprehensive review of B&F's relations with its landlords, customers and suppliers.

SECTION 7.02     Conduct of Business Prior to the Closing Date.

Between the date hereof and the Closing, B&F shall, and the Principals shall cause B&F to, use its reasonable best efforts to maintain, or cause the maintenance of, the Acquired Assets and Business, and operate and carry on the Business only in the ordinary course consistent with past practice and taking into account B&F's status as debtor and debtor in possession except as otherwise expressly provided in this Agreement. Between the date hereof and the Closing Date, consistent with the foregoing and to the extent required by the Chapter 11 Case, B&F shall, and the Principals shall cause B&F to, use its reasonable best efforts to continue (and to cause the continuation of) operations of the Business as a going concern, to maintain (and to cause the maintenance of) the business organization of the Business intact and to preserve (and to cause the preservation of) the goodwill of the manufacturers, suppliers, contractors, licensors, employees, customers, distributors and others having business relations with the Business. In connection therewith, between the date hereof and the Closing Date, and except with the written prior consent of Buyer, B&F shall (and shall cause its Subsidiaries to), and the Principals shall cause B&F and its Subsidiaries to:

(a)     not enter into (or agree to enter into) any transactions out of the ordinary course of business involving payment of sums by B&F or any of its Subsidiaries greater than $25,000;

(b)     not incur, create or assume any Encumbrance on any of the assets, properties, rights and claims of B&F and its Subsidiaries;

(c)     not sell, lease, license, transfer or dispose of any assets, properties, rights and claims other than in the ordinary course of business;

(d)	not enter into, terminate, extend or modify any Material Contract;

(e)	not declare, set aside or pay any dividend or distribution on any Equity Interests of Sellers and the Subsidiaries of B&F;

(f)	not amend the certificate of incorporation, by-laws or other organizational documents of B&F's Subsidiaries;

(g)	not issue, sell, pledge, transfer, or authorize the issuance, sale, pledge or transfer of, any Acquired Equity or any Equity Interests or securities convertible into or exchangeable for Equity Interests of B&F and its Subsidiaries;

(h)	not split, combine, subdivide, reclassify or redeem, or purchase or otherwise acquire, any outstanding securities of B&F or its Subsidiaries;

(i)	other than pursuant to the DIP Note, not assume or incur any Indebtedness or assume, guarantee or endorse any material obligations of any other Person;

(j)	not make any loans, advances or capital contributions to, or investments in, any other Person (other than customary loans or advances to employees in amounts not material to the maker of such loan or advance);

(k)	not accelerate the delivery or sale of products or the incurrence of capital expenditures, or offer discounts on sale of products or premiums on purchase of raw materials, except in the ordinary course of business consistent with past practice;

(l)	not fail to maintain all Insurance Policies for Sellers and the Business and the Acquired Assets in full force and effect;

(m)	(i) not make or rescind any election relating to Taxes of any Subsidiary of B&F or (ii) not file any amended income Tax Return of, or claim for refund for, any Subsidiary of B&F or (iii) not make any change in any method of accounting, keeping of books of account or accounting practices or in any material method of Tax accounting of any Subsidiary of B&F unless required by GAAP or applicable Law;

(n)	not enter into any "non-compete", "non-solicit" or similar agreement that would restrict the Business;

(o)	not cancel any Indebtedness owed to B&F or any of its Subsidiaries that is material, individually or in the aggregate, to B&F and its Subsidiaries, taken as a whole, or waive any claims or rights of substantial value;

(p)	not enter into any new, or amend in a manner adverse to B&F or any of its Subsidiaries or otherwise alter in a manner adverse to B&F or any of its Subsidiaries, any Affiliate Transaction or transaction which would be an Affiliate Transaction if such transaction occurred prior to the date hereof;

(q)     agree or resolve to take or make any commitment to take any of the foregoing actions;

(r)     maintain and conduct the Business substantially in the condition as of the date hereof, and in the ordinary course consistent with past practice (including not breaching any Material Contracts or Leases), subject to any changes as may result solely from the commencement and continuation of the Chapter 11 Case;

(s)     use its commercially reasonable efforts to and take all necessary actions to preserve intact in all material respects the Acquired Assets, to maintain, preserve and keep the Acquired Assets in good condition and repair (normal wear and tear excepted), and to maintain in effect all material B&F Permits which are necessary for the conduct of the Business;

(t)     maintain in full force and effect and free from infringement or other violation the Transferred Intellectual Property;

(u)     maintain in all material respects the goodwill and organization of the Business and its relationship with the employees, suppliers, customers, lenders, lessors and others having business dealings with it in connection with the Business;

(v)     provide Buyer with reasonable notice and advance drafts of all communications proposed to be sent by B&F or any of its Subsidiaries to any employees, suppliers, customers, lenders, lessors and others having business dealings with it in connection with the Business, which communications, as and when sent, shall in all respects be acceptable to Buyer;

(w)     use reasonable best efforts to obtain all necessary Consents to the Transfer of the Assigned Contracts and Assigned Leases pursuant to this Agreement;

(x)     use commercially reasonable efforts to obtain authorization pursuant to the Sale Order as and when entered by the Bankruptcy Court to execute, deliver and/or file Uniform Commercial Code, lien releases, discharges, financing change statements and such other documents, notices or instruments as Buyer may reasonably deem necessary to release all Encumbrances, except for Permitted Encumbrances, against the Acquired Assets and any restrictions against the Acquired Equity; and

(y)     consult in good faith with Buyer and its Representatives, from time to time following Buyer's reasonable request, to report material operational developments and the general status of ongoing operations of the Business, including any Material Adverse Effect.

SECTION 7.03     Third Party Consents.

Subject to Section 6.04(c) and Section 6.04(d), from and after the date hereof until the Closing, each Seller, on the one hand, and Buyer, on the other hand, will use their reasonable best efforts to cooperate with the other to secure, before the Closing Date, all Third Party Consents to the extent such Third Party Consents are not provided for or satisfied by the

Sale Order; provided, however, that neither Buyer nor Sellers shall be required to waive any of the conditions to Closing set forth in Article 8 or Article 9, respectively.

SECTION 7.04 Reasonable Best Efforts.

(a) From and after the date hereof until the Closing Date, Sellers and Buyer shall use their respective reasonable best efforts to cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable Laws and Orders to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any Consents of any Governmental Authority required to be obtained by them, in order to assign or transfer any B&F Permits to Buyer, to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions set forth in Article 8 and Article 9, in each case as necessary to the extent such Consents are not provided for or satisfied by the Sale Order; provided, however, that neither Sellers, on the one hand, nor Buyer, on the other hand, shall make any agreement or understanding affecting the Acquired Assets or the Business (excluding the Excluded Assets or Excluded Liabilities) as a condition for obtaining any such Consents except with the prior written consent of the other (which consent shall not be unreasonably withheld or delayed. Each of Sellers, on the one hand, and Buyer, on the other hand, shall act diligently and reasonably to cooperate with the other, to the extent commercially reasonable, to obtain the Consents contemplated by this Section 7.04(a); provided, however, neither Sellers nor Buyer shall be required to waive any of the conditions to Closing set forth in Article 9 and Article 8, respectively.

(b) Sellers and Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto. In addition, none of parties hereto shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such party consults with the other parties hereto in advance and, to the extent permitted by any such Governmental Authority, gives the other parties hereto the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable Laws, each party shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Each party shall also furnish the other party with such necessary information and assistance as such other party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. Sellers and Buyer shall prosecute all required requests for approval with all

necessary diligence and otherwise use their respective reasonable best efforts to obtain the grant thereof by an Order as soon as possible.

SECTION 7.05    Sellers' Disclosure Schedule.

(a)    The parties hereto acknowledge and agree that (i) the Sellers' Disclosure Schedule delivered to Buyer on the date hereof and attached hereto as Exhibit I is in draft form only, (ii) from and after the date hereof, the parties hereto shall use their commercially reasonable efforts to cooperate to negotiate and finalize the Sellers' Disclosure Schedule and (iii) Sellers, the Company and their respective advisors and representatives shall consider in good faith the comments of Buyer and its legal advisors and other representatives on such Sellers' Disclosure Schedule.  Without limiting the generality of the foregoing, the Sellers shall promptly (but in no event later than 10 Business Days prior to the Closing Date) deliver, or cause to be delivered, to Buyer the final Sellers' Disclosure Schedule in form and substance reasonably acceptable to Buyer (it being understood that, for purposes of determining the Sellers' and the Company's compliance with its representations and warranties set forth herein and for purposes of determining whether the conditions to consummation of the transactions contemplated hereby set forth in Sections 8.03 and 8.04 have been satisfied, the Sellers' shall be deemed to have delivered the Sellers' Disclosure Schedule in final form on the date hereof), incorporating in good faith the comments of Buyer and its legal advisors and other representatives provided to Seller and/or the Company prior to delivery thereof.

(b)    After the date of the delivery of the final Sellers' Disclosure Schedule in accordance with Section 7.05(a) and the acceptance thereof by Buyer, but prior to the Closing, Sellers shall have the right to supplement, modify or update the Sellers' Disclosure Schedule. Notwithstanding anything to the contrary herein, Buyer shall not be entitled to claim that any representation or warranty of any Seller has been breached, and no Seller shall be liable to Buyer, on account of any fact, matter or circumstance of which Buyer was aware on or prior to the date hereof or of which Buyer becomes aware prior to the Closing.  No supplement, modification or update of the Sellers' Disclosure Schedule pursuant to this Section 7.05 shall be taken into account for purposes of determining whether the conditions to consummation of the transactions contemplated hereby set forth in Article 8 have been satisfied.

SECTION 7.06    Notice of Developments.

From and after the date hereof until the Closing, Sellers shall promptly notify Buyer of (a) any change or development which would cause any of the representations and warranties in Article 4 above not to be true and correct in all material respects, or (b) any material failure of Sellers to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

SECTION 7.07    Taxes.

(a)    Except as specifically set forth in this Section 7.07 (including Section 7.07(b)), Sellers shall be liable for and shall pay, and pursuant to Section 7.07(c) shall reimburse Buyer for, all Taxes (whether assessed or unassessed) applicable to the Business and the

Acquired Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date. Without limiting the obligations of Buyer contained elsewhere in this Agreement (including Section 7.07(b)), Buyer shall be liable for and shall pay, and pursuant to Section 7.07(c) shall reimburse the applicable Seller for, all Taxes (whether assessed or unassessed) applicable to the Business, the Acquired Assets and the Assumed Liabilities, in each case attributable to periods (or portions thereof) beginning after the Closing Date. For purposes of this Section 7.07(a), any period beginning before and ending after the Closing Date shall be treated as two partial periods, one ending on the Closing Date and the other beginning on the day after the Closing Date except that Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)     Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or by Section 1146(c) of the Bankruptcy Code ("Transfer Taxes") shall be borne by Buyer. Sellers and Buyer shall use their respective reasonable best efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes. Buyer shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by Sellers, Buyer shall prepare and deliver to Sellers a copy of such Tax Return at least ten days before the due date thereof, and Sellers shall promptly execute such Tax Return and deliver it to Buyer, which shall cause it to be filed.

(c)     Sellers or Buyer, as the case may be, shall provide reimbursement for any Tax paid by one party all or a portion of which is the responsibility of the other party in accordance with the terms of this Section 7.01. Within a reasonable time prior to the payment of any such Tax, the party paying such Tax shall give notice to the other of the Tax payable and each party's respective Liability therefor, although failure to do so will not relieve the other party from its Liability hereunder.

SECTION 7.08     Collection of Receivables.

If, after the Closing Date, B&F shall receive payment from any account debtor with respect to any Assigned Contract or Assigned Lease, B&F shall, and the Principals shall cause B&F to, promptly thereafter deliver such funds and assets to Buyer and take all steps necessary to vest title to such funds and/or assets in Buyer.

SECTION 7.09     Name Change.

Within ten days after the Closing Date, B&F shall, and the Principals shall cause B&F to, take such corporate and other actions necessary to change its corporate name to one that is not confusingly similar to its current name or to any Trademark contained in the Transferred Intellectual Property, including any necessary filings required by the Secretary of the State of New York.

SECTION 7.10    Employee Matters.

Nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any employee of B&F. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of B&F or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

SECTION 7.11    Post-Closing Cooperation and Access to Books and Records.

For a period ending on the later of (i) the closing of the Chapter 11 Case and (ii) three (3) years after the Closing Date (or such longer period as may be required by any Governmental Authority or ongoing claim):

(a)    Buyer shall not dispose of or destroy any of the business records and files of the Business held by Buyer or any of its Subsidiaries and relating to the period preceding the Closing Date. If Buyer wishes to dispose of or destroy such records and files after that time, Buyer shall first give thirty (30) days' prior written notice to B&F, and B&F shall have the right, at their option and expense, upon prior written notice to the notifying party within such 30-day period, to take possession of the records and files within 15 days after the date of such notice.

(b)    Either of Buyer of B&F (the "Requested Party") shall allow the other party (including, for clarity, any trust established under a chapter 11 plan of B&F or any other successors of B&F) and any of their respective directors, officers, employees, counsel, representatives, accountants and auditors, at such other party's sole cost and expense, reasonable access during normal business hours, and upon reasonable advance notice, to all employees and files of the Requested Party and any books and records and other materials included in the Acquired Assets relating to periods prior to the Closing Date in connection with (A) the wind-down of the operations of B&F, whether or not relating to or arising out of this Agreement or the transactions contemplated hereby, including the preparation of Tax Returns, amended Tax Returns or claim for refund (and any materials necessary for the preparation of any of the foregoing), financial statements for periods ending on or prior to the Closing Date, the management and handling of any audit, investigation, litigation or other proceeding in, whether such audit, investigation, litigation or other proceeding is a matter with respect to which indemnification may be sought hereunder), and complying with the rules and regulations of the IRS, the Securities and Exchange Commission or any other Governmental Authority or otherwise relating to B&F's other businesses or operations or such causes of action; (B) the prosecution, investigation or resolution of any pending or potential causes of action; (C) the resolution or reconciliation of claims filed against B&F's bankruptcy estate; or (D) otherwise in connection with carrying out the functions of any such trusts or successors; provided, however, that B&F, on the one hand, and Buyer, on the other hand, will be required to sign a non-disclosure agreement, if reasonably requested by Buyer or B&F, respectively, prior to Buyer's or B&F's provision of information to B&F or Buyer, respectively, that constitutes a Trade Secret, or is otherwise confidential or proprietary in nature.

SECTION 7.12     Tax Returns.

Buyer hereby covenants that it will cooperate and assist B&F in the preparation and filing of all necessary Tax Returns of B&F for 2010 and 2011 that are required to be filed by B&F following the Closing Date; provided, however, that any costs and expenses with respect to the preparation and filing of any such Tax Returns by B&F shall be borne by B&F; provided, further, however, that, except as expressly set forth in this Agreement, Buyer shall have no Liability with respect to Taxes payable in connection with such Tax Returns, and Buyer shall have no Liability with respect to such Tax Returns other than in connection with the willful or intentional misconduct of Buyer.

SECTION 7.13     Use of Customer Deposits.  From and after the date hereof, upon the receipt of a customer deposit the Seller shall promptly place the necessary purchase order with a vendor to acquire the materials needed to fulfill the customer's order and either (a) promptly remit to the vendor funds necessary to pay for such goods, or (b) set aside from such customer deposit in a segregated account an amount sufficient to ensure that funds are available as and when necessary to effect payment for the materials needed to fulfill the customer's order.

SECTION 7.14     Insurance Proceeds.  The Sellers shall, or shall cause their Affiliates to, assign, to the extent assignable, to Buyer any proceeds of Sellers' or any of their Affiliates' third party-insurance policies to the extent related to any Assumed Liabilities.  Sellers agree to use their reasonable efforts to obtain any necessary Consents of any insurance company or other third party relating to any such assignment.  If such proceeds are not assignable, Sellers agree to pay any such proceeds received by them or any of their Affiliates to Buyer promptly upon the receipt thereof.

## ARTICLE 8
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived (but only in writing) by Buyer:

SECTION 8.01     Satisfactory Completion of Due Diligence.

Buyer shall have completed, and shall be satisfied (in its sole discretion) with the results of, its due diligence in respect of the Acquired Assets, Assumed Liabilities and the Business.

SECTION 8.02     Inventory.

The aggregate value of the Finished Goods Inventory, as of the Closing Date, valued at cost, shall be not less than $5,400,000.

SECTION 8.03    Accuracy of Representations

All of the representations and warranties made by Sellers in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date); provided, however, that in the event of a breach of a representation or warranty, other than a representation or warranty qualified by a Material Adverse Effect, the condition set forth in this Section 8.03 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect. Buyer shall have received a certificate signed by a duly authorized representative of each of the Sellers to such effect.

SECTION 8.04    Sellers' Performance

Each Seller shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by such Seller on or prior to the Closing Date, and Buyer shall have received a certificate signed by a duly authorized representative of each of the Sellers to such effect.

SECTION 8.05    No Order

No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order or Law which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

SECTION 8.06    No Proceedings.

There shall not be pending or threatened by any Governmental Authority any Proceeding challenging or seeking to enjoin or otherwise prohibit any of the transactions contemplated by this Agreement or seeking to obtain from Buyer in connection with the transactions contemplated by this Agreement any damages or to impose any restrictions or conditions.

SECTION 8.07    Consents and Approvals.

All Consents of any Person (including any Governmental Authority) which are necessary to consummate the transactions contemplated hereby as set forth on Section 8.07 of the Sellers' Disclosure Schedule shall have been filed, been obtained or occurred and such Consents shall not have expired or been withdrawn.

SECTION 8.08    No Material Adverse Effect.

Since the date hereof, there shall not have occurred any state of facts, event or change in circumstance that has had or could reasonably be expected to have a Material Adverse Effect on the Acquired Assets, as a whole, or the Business.

SECTION 8.09     Sellers' Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 3.03 shall have been so delivered.

SECTION 8.10     Sale Order.

The Bankruptcy Court shall have issued the Sale Order which Sale Order shall have become a Final Order by not later than the Outside Date.

SECTION 8.11     Termination of Repurchase Option.

To the extent not exercised prior to the end of the Option Period (as defined in the Amended Bill of Sale), the Repurchase Option as set forth in the Amended Bill of Sale shall have been terminated on terms reasonably satisfactory to Buyer and B&F on or prior to the Closing Date.

SECTION 8.12     Delivery of Final Sellers' Disclosure Schedule.

At least 10 Business Days prior to Closing, the Sellers shall deliver, or cause to be delivered, to the Buyer the final Sellers' Disclosure Schedule in form and substance reasonably satisfactory to the Buyer.

# ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived (but only in writing) by B&F:

SECTION 9.01     Accuracy of Representations.

All of the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date).  Sellers shall have received a certificate signed by a duly authorized representative of Buyer to such effect.

SECTION 9.02     Buyer's Performance.

Buyer shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by Buyer on or prior to the Closing Date, and Sellers shall have received a certificate signed by a duly authorized representative of Buyer to such effect.

SECTION 9.03    No Order.

No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order or Law which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

SECTION 9.04    No Proceedings.

There shall not be pending or threatened by any Governmental Authority any Proceeding challenging or seeking to enjoin or otherwise prohibit any of the transactions contemplated by this Agreement or seeking to obtain from Buyer in connection with the transactions contemplated by this Agreement any damages or to impose any restrictions or conditions.

SECTION 9.05    Consents and Approvals.

All Consents from any Person (including any Governmental Authority) which are necessary to consummate the transactions contemplated hereby shall have been filed, been obtained or occurred and such Consents shall not have expired or been withdrawn.

SECTION 9.06    Buyer's Deliveries.

Each of the deliveries required to be made to Sellers pursuant to Section 3.02 shall have been so delivered.

SECTION 9.07    Sale Order.

The Bankruptcy Court shall have issued the Sale Order which Sale Order shall have become a Final Order by not later than the Outside Date.

SECTION 9.08    Payment of Purchase Price.

Buyer shall have paid the Purchase Price in accordance with Section 3.02(a).

**ARTICLE 10**
**TERMINATION**

SECTION 10.01    Termination.

Notwithstanding anything contained to the contrary in this Agreement, this Agreement may be terminated at any time prior to the Closing Date:

(a)        by either Sellers or Buyer:

(i)        if a Governmental Authority of competent jurisdiction issues a final non-appealable ruling or Order that permanently enjoins or otherwise prohibits the transactions contemplated hereby; or

(ii)　　upon mutual written consent of Sellers and Buyer.

(b)　　by Buyer:

(i)　　if the Closing Date shall not have occurred by the Outside Date; provided, however, that the right to terminate this Agreement under this Section 10.01(b)(i) shall not be available to the Buyer if the Buyer's failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to have occurred on or prior to such date;

(ii)　　in the event of any material breach by Sellers of any of Sellers' agreements, covenants, representations or warranties contained herein, or of the Bid Procedures Order or the Sale Order, and the failure of Sellers to cure such breach within seven days after receipt of the Buyer Termination Notice specified in this subsection; provided, however, that Buyer (i) is not itself in material breach of its representations, warranties, covenants or agreements contained herein or in the Bid Procedures Order or the Sale Order, (ii) notifies Sellers in writing (the "Buyer Termination Notice") of its intention to exercise its rights under this Agreement as a result of the breach, and (iii) specifies in such Buyer Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bid Procedures Order or the Sale Order of which Sellers are allegedly in material breach;

(iii)　　if (A) the Bankruptcy Court fails to enter an Order designating Buyer as the successful bidder on or before March 9, 2011, or (D) the Bankruptcy Court fails have issued the Sale Order which Sale Order shall have become a Final Order by on or prior to the Outside Date;

(iv)　　if the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Sellers and such trustee rejects the transactions contemplated by this Agreement;

(v)　　the Bankruptcy Court enters an Order authorizing the Sellers or any of their Affiliates to enter into any Contract with respect to or consummate an Alternative Proposal;

(vi)　　the Bid Procedures Order or the Sale Order has been stayed, modified, amended, supplemented, reversed, vacated or otherwise rendered ineffective by any court of competent jurisdiction without Buyer's prior written consent or otherwise fails to be in full force and effect; or

(vii)　　any event of default under the DIP Note shall have occurred and be continuing which would result in an acceleration of B&F's obligations thereunder.

(c)        by the Sellers, in the event of any material breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein, or of the Bid Procedures Order or the Sale Order, and the failure of the Buyer to cure such breach within seven days after receipt of the Seller Termination Notice specified in this subsection; provided, however, that (i) Sellers are not themselves in material breach of their representations, warranties, covenants or agreements contained herein or in the Bid Procedures Order or the Sale Order, (ii) B&F notifies Buyer in writing (the "Sellers' Termination Notice"), and (iii) B&F specifies in such Sellers' Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bid Procedures Order or the Sale Order of which Buyer is allegedly in material breach.

SECTION 10.02   Effect of Termination.  In the event of termination of this Agreement by either party in accordance with Section 10.01 hereof, all rights and obligations of the parties under this Agreement shall terminate without any Liability of any party to any other party; provided, however, that the provisions of Section 6.03 and Article 11 (except Section 11.01) shall expressly survive the expiration or termination of this Agreement.

## ARTICLE 11
## GENERAL PROVISIONS

SECTION 11.01   Survival of Representations, Warranties and Covenants.

All representations and warranties herein shall terminate on the Closing Date. The covenants and agreements contained herein that are required to be performed on or prior to the Closing Date shall terminate on the Closing Date and the covenants that require performance after the Closing Date shall survive in accordance with the terms thereof.

SECTION 11.02   Confidential Nature of Obligations.

Subject to any disclosure requirements under the Bankruptcy Code or imposed by the Bankruptcy Court, Buyer and Sellers each agree that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, at the request of the disclosing party, will return to the other party all copies of nonpublic documents and materials which have been furnished in connection therewith.  Such non-public documents, materials and information shall not be communicated to any third Person (other than to Buyer's and Sellers' counsel, accountants or financial advisors, in each case subject to the recipient's agreement to keep the same confidential).  No other party shall use any confidential information in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Acquired Assets; provided, however, that after the Closing, any confidential information included in the Acquired Assets or the Assumed Liabilities shall be deemed the confidential information of Buyer, and Sellers shall maintain the confidentiality thereof in accordance with this Section 11.02.  The obligation of each party to treat such documents, materials and other

information in confidence shall not apply to any information which (i) is or becomes available to such party from a source other than the disclosing party, (ii) is or becomes available to the public other than as a result of disclosure by such party or its agents or (iii) is required to be disclosed under applicable Law (including under the Bankruptcy Code or as required by the Bankruptcy Court), but only to the extent it must be disclosed. Notwithstanding clause (iii) of the preceding sentence, in the event that any party is required to disclose any confidential information by applicable Law or rule of any national securities exchange, it is agreed that the party subject to such requirement will provide the other party with prompt notice of such requirement and such party may seek an appropriate protective order if it so desires.

SECTION 11.03   Public Announcements.

Unless otherwise required by applicable Law or by obligations of the parties hereto or any of their Affiliates pursuant to any listing agreement with or rules of any securities exchange, the parties hereto shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other party and shall not issue any such release or make any such statement without the prior written consent of the other party (such consent not to be unreasonably withheld or delayed).

SECTION 11.04   Notices.

All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given: (a) on the same Business Day if sent by email followed by facsimile (with written confirmation of receipt), (b) when delivered by hand (with written confirmation of receipt), (c) when sent by facsimile (with written confirmation of receipt), (d) when received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (e) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses, representative (if applicable) and facsimile numbers set forth below (or to such other addresses, representative and facsimile numbers as a party may designate by notice to the other Parties given in accordance with this Section 11.04):

> (a)   If to Sellers, then to:
>
>> c/o Brunschwig & Fils, Inc.
>> 75 Virginia Road
>> N. White Plains, NY  10603-0905
>> Attention:     T. Olivier Peardon, President & CEO
>> Facsimile:     914-684-6140
>> E-mail:         opeardon@brunschwig.com
>
>> with a copy (which shall not constitute notice) to:
>
>> Halperin Battaglia Raicht, LLP
>> 555 Madison Avenue

9th Floor
New York, NY 10022-3301
Attention: Alan D. Halperin, Esq.
Facsimile: 212-765-0964
E-mail: ahalperin@halperinlaw.net

(b) If to Buyer, then to:

Kravet Inc.
225 Central Avenue South
Bethpage, NY 11714
Attention: Cary Kravet, President & CEO
Facsimile: 516-293-8675
E-mail: cary.kravet@kravet.com

with a copy (which shall not constitute notice) to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Attention: Adam C. Harris, Esq.
Facsimile: 212-593-5955
E-mail: adam.harris@srz.com

SECTION 11.05  Waiver.

Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by applicable Law, (a) no waiver that may be given by a party shall be applicable except in the specific instance for which it is given; and (b) no notice to or demand on one party shall be deemed to be a waiver of any right of the party giving such notice or demand to take further action without notice or demand.

SECTION 11.06  Entire Agreement; Amendment.

This Agreement (including the disclosure schedules and the exhibits hereto) and the other Transaction Documents supersede all prior agreements (other than the Confidentiality Agreement, which shall remain in full force and effect) between the Parties with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between the Parties with respect to their subject matter (other than the Confidentiality Agreement, which shall remain in full force and effect).  This Agreement may not be amended except by a written agreement executed by the Parties.

SECTION 11.07   Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any party hereto by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other party); provided, however, that, prior to Closing, Buyer shall be permitted, upon prior notice to B&F, to assign all or part of its rights or obligations hereunder to an Affiliate, whereupon, references to "Buyer" herein shall be deemed to refer to such Affiliate; provided further that any such assignment shall not relieve Buyer of any of its financial obligations to Sellers hereunder.

SECTION 11.08   Severability.

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party in any material respect. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

SECTION 11.09   Section Headings, Construction.

The headings of Sections in this Agreement are provided for convenience only and shall not affect its construction or interpretation. All references to "Article," "Section" or "Sections" refer to the corresponding Article, Section or Sections of this Agreement. All words used in this Agreement shall be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms. The Exhibits attached hereto and the Schedules attached hereto (including the Sellers' Disclosure Schedule and Buyer's Disclosure Schedule referred to herein and attached hereto) are hereby incorporated herein and made a part hereof as if fully set forth herein.

SECTION 11.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)   This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York applicable to Contracts executed in and to be performed in that State, and, to the extent applicable, the Bankruptcy Code.

(b)   The Parties agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Agreement or the transactions contemplated hereby and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; provided that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party: (i) agrees that all such actions or proceedings shall be heard and determined in a New York federal court sitting in The

City of New York; (ii) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (iv) agrees that service of process in any such action or proceeding may be effected by providing a copy thereof by any of the methods of delivery permitted by <u>Section 11.04</u> to such party at its address as provided in <u>Section 11.04</u> (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Law).

(c)       EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.10(C)</u>.

SECTION 11.11   <u>Counterparts</u>.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 11.12   <u>Time of Essence</u>.

Time is of the essence in this Agreement.

SECTION 11.13   <u>No Third Party Beneficiaries</u>.

This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

SECTION 11.14   <u>Sellers' Disclosure Schedule</u>.

The Sellers' Disclosure Schedule is qualified in its entirety by reference to the specific provisions of this Agreement and is not intended to constitute, and shall not be construed as constituting, representations or warranties of Sellers, except as and to the extent provided in this Agreement.  The specification of any dollar amount in the representations and warranties contained in this Agreement or the inclusion of any specific item in the Sellers' Disclosure

Schedule is not intended to imply that such amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed or are within or outside of the ordinary course of business, and none of the Parties shall use the fact of the setting forth of such amounts or the fact of the inclusion of any such item in the Sellers' Disclosure Schedule in any dispute or controversy with any party as to whether any obligation, item or matter not included in a section of the Sellers' Disclosure Schedule is or is not required to be disclosed (including whether such amounts or items are required to be disclosed as material) or in the ordinary course of business for the purposes of this Agreement. If and to the extent any information required to be furnished in any section of the Sellers' Disclosure Schedule is contained in this Agreement or in any section of the Sellers' Disclosure Schedule, such information shall be deemed to be included in all sections of the Sellers' Disclosure Schedule to the extent the relevance of such disclosure to such other section or sections is reasonably apparent on its face. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. In no event shall any disclosure of such additional matters be deemed or interpreted to broaden or otherwise amend any of the covenants or representations or warranties in this Agreement. The information contained in the Sellers' Disclosure Schedule is disclosed solely for purposes of this Agreement, and no information contained therein shall be deemed to be an admission by any party thereto to any third party of any matter whatsoever, including of any violation of Law or breach of any Contract. Headings have been inserted in the sections of the Sellers' Disclosure Schedule for the convenience of reference only and shall to no extent have the effect of amending or changing the express description of the sections as set forth in this Agreement.

SECTION 11.15     Expenses.

Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors, accountants and other advisors, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, subject to Bankruptcy Court approval, whether or not the Closing shall have occurred. As between Buyer and B&F, B&F shall bear all of the costs of administration of the Chapter 11 Case.

SECTION 11.16     Non-Recourse. No past, present or future director, officer, manager, employee, incorporator, member, partner, stockholder, agent, attorney or representative of the respective parties to this Agreement, in such capacity (any such Person in such capacity, a "No Recourse Party"), shall have any Liability with respect to this Agreement or the transactions contemplated hereby, or with respect to any claim or cause of action that may arise out of this Agreement or the transactions contemplated hereby, or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby; in each case except for any claim or cause of action against a No Recourse Party (x) arising out of or in connection with the fraud, bad faith or willful misconduct of such No Recourse Party, including in connection with this Agreement or any other Transaction Document, or (y) otherwise expressly permitted to be brought against a No Recourse Party pursuant to any other Transaction Document, as applicable.*[Remainder of page intentionally left blank; signature pages follow]*

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the date first written above.

KRAVET INC.

By: _____
   Name: Lisa G. Kravet
   Title: VP / Secretary

BRUNSCHWIG & FILS, INC.

By:_____
   Name:
   Title:

T. OLIVIER PEARDON, solely as a Seller of
Acquired Equity and a Principal hereunder

_____

THOMAS P. PEARDON, JR., solely as a Seller of
Acquired Equity and a Principal hereunder

_____

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the date first written above.

KRAVET INC.

By:_____
    Name:
    Title:

BRUNSCHWIG & FILS, INC.

By: _____
    Name: T. Olivier Peardon
    Title: President CEO

T. OLIVIER PEARDON, solely as a Seller of
Acquired Equity and a Principal hereunder

_____

THOMAS P. PEARDON, JR., solely as a Seller of
Acquired Equity and a Principal hereunder

_____

Exhibit A

<u>Form of Assignment of Copyrights</u>

Exhibit A

Form of Assignment of Copyrights

# COPYRIGHT ASSIGNMENT

This COPYRIGHT ASSIGNMENT (the "Assignment") is made and entered into as of [_____], 2011 (the "Effective Date") by and between Brunschwig & Fils, Inc., a corporation formed under the laws of New York ("Assignor"), and Kravet Inc. a corporation formed under the laws of Delaware ("Assignee").

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement made and entered into as of January 28, 2011 (the "Agreement"), pursuant to which Assignor did agree to sell, convey, transfer, assign and deliver to Assignee all of Assignor's legal and beneficial right, title and interest in and to the Acquired Assets (as defined in the Asset Purchase Agreement), including, without limitation, the copyrights listed on Schedule A attached hereto (the "Copyrights"); and

WHEREAS, Assignee wishes to acquire all of Assignor's right, title and interest in and to the Copyrights, and Assignor wishes to assign same to Assignee.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns, sells and transfers unto Assignee all of its right, title and interest in and to the Copyrights, including, but not limited to, all of its copyright and other rights of exploitation attendant thereto, throughout the universe, in perpetuity, and in any and all media whether now known or hereafter developed (including without limitation any and all renewals, derivatives, extensions, restorations and reversions), as well as any right to recover for all past, present and future infringements and other violations thereof, the same to be held and enjoyed by Assignee, its successors and assigns to the same extent that such would have been held and enjoyed by Assignor had this assignment not been made. Assignor hereby covenants and agrees to provide any further necessary documentation and do all further acts reasonably requested by Assignee in this regard to confirm and perfect title in and to the Copyrights in Assignee, its successors, assigns, or other legal representatives.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Copyright Assignment as of the Effective Date.

**ASSIGNOR:**

BRUNSCHWIG & FILS, INC.

By:_____
    Name:
    Title:

**ASSIGNEE:**

KRAVET INC.

By:_____
    Name:
    Title:

# Schedule A

Exhibit B

<u>Form of Assignment of Domain Names</u>

Exhibit B

Form of Assignment of Domain Names

# DOMAIN NAME ASSIGNMENT

This DOMAIN NAME ASSIGNMENT (the "Assignment") is made and entered into as of [_____], 2011 (the "Effective Date") by and between Brunschwig & Fils, Inc., a corporation formed under the laws of New York ("Assignor"), and Kravet Inc. a corporation formed under the laws of Delaware ("Assignee").

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement made and entered into as of January 28, 2011 (the "Agreement"), pursuant to which Assignor did agree to sell, convey, transfer, assign and deliver to Assignee all of Assignor's legal and beneficial right, title and interest in and to the Acquired Assets (as defined in the Asset Purchase Agreement), including, without limitation, the Internet domain names listed on Schedule A attached hereto (the "Domain Names"); and

WHEREAS, Assignee wishes to acquire all of Assignor's right, title and interest in and to the Domain Names, and Assignor wishes to assign same to Assignee.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which the parties hereby acknowledge, Assignor hereby assigns, sells and transfers unto Assignee, all of its right, title and interest in and to the Domain Names and all rights associated therewith, and the right to sue and recover for all past, present and future infringements and other violations of the Domain Names, the same to be held and enjoyed by Assignee, its successors and assigns to the same extent that such would have been held and enjoyed by Assignor had this assignment not been made. Assignor hereby covenants and agrees to provide any further necessary documentation and do all further acts reasonably requested by Assignee in this regard to confirm and perfect title in and to the Domain Names in Assignee, its successors, assigns, or other legal representatives.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Domain Name Assignment as of the Effective Date.

**ASSIGNOR:**

BRUNSCHWIG & FILS, INC.

By:_____
   Name:
   Title:


**ASSIGNEE:**

KRAVET INC.

By:_____
   Name:
   Title:

## Schedule A

Exhibit C

<u>Form of Assignment of Patents</u>

Exhibit C

Form of Assignment of Patents

## PATENT ASSIGNMENT

This PATENT ASSIGNMENT (the "Assignment") is made and entered into as of [_____], 2011 (the "Effective Date") by and between Brunschwig & Fils, Inc., a corporation formed under the laws of New York ("Assignor"), and Kravet Inc. a corporation formed under the laws of Delaware ("Assignee").

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement made and entered into as of January 28, 2011 (the "Agreement"), pursuant to which Assignor did agree to sell, convey, transfer, assign and deliver to Assignee all of Assignor's legal and beneficial right, title and interest in and to the Acquired Assets (as defined in the Asset Purchase Agreement), including, without limitation, the patents listed on Schedule A attached hereto (the "Patents"); and

WHEREAS, Assignee wishes to acquire all of Assignor's right, title and interest in and to the Patents, and Assignor wishes to assign same to Assignee.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns, sells and transfers unto Assignee, all of its right, title and interest in and to the Patents, including any divisions, continuations, reissues and extensions thereof, together with the right to sue and recover for all past, present and future infringements and other violations of the Patents, the same to be held and enjoyed by Assignee, its successors and assigns to the same extent that such would have been held and enjoyed by Assignor had this assignment not been made. Assignor hereby covenants and agrees to provide any further necessary documentation and do all further acts reasonably requested by Assignee in this regard to confirm and perfect title in and to the Patents in Assignee, its successors, assigns, or other legal representatives.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Patent Assignment as of the Effective Date.

**ASSIGNOR:**

[BRUNSCHWIG & FILS, INC.]

By:_____
   Name:
   Title:

**ASSIGNEE:**

KRAVET INC.

By:_____
   Name:
   Title:

## Schedule A

Exhibit D

<u>Form of Assignment of Trademarks</u>

Exhibit D

<u>Form of Assignment of Trademarks</u>

## **TRADEMARK ASSIGNMENT**

   This TRADEMARK ASSIGNMENT (the "<u>Assignment</u>") is made and entered into as of [   ], 2011 (the "<u>Effective Date</u>") by and between Brunschwig & Fils, Inc., a corporation formed under the laws of New York ("<u>Assignor</u>"), and Kravet Inc. a corporation formed under the laws of Delaware ("<u>Assignee</u>").

   WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement made and entered into as of January 28, 2011 (the "<u>Agreement</u>"), pursuant to which Assignor did agree to sell, convey, transfer, assign and deliver to Assignee all of Assignor's legal and beneficial right, title and interest in and to the Acquired Assets (as defined in the Asset Purchase Agreement), including, without limitation, the trademarks and service marks listed on <u>Schedule A</u> attached hereto (the "<u>Trademarks</u>"); and

   WHEREAS, Assignee wishes to acquire all of Assignor's right, title and interest in and to the Trademarks, and Assignor wishes to assign same to Assignee.

   NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns, sells and transfers unto Assignee, all of its right, title and interest, including common law rights, in and to the Trademarks, together with the goodwill associated therewith and the entire business and/or portion thereof to which the Trademarks pertain, and the right to sue and recover for all past, present and future infringements and other violations of the Trademarks, the same to be held and enjoyed by Assignee, its successors and assigns to the same extent that such would have been held and enjoyed by Assignor had this assignment not been made.  Assignor hereby covenants and agrees to provide any further necessary documentation and do all further acts reasonably requested by Assignee in this regard to confirm and perfect title in and to the Trademarks in Assignee, its successors, assigns or other legal representatives.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Trademark Assignment as of the Effective Date.

**ASSIGNOR:**

BRUNSCHWIG & FILS, INC.

By:_____
   Name:
   Title:

**ASSIGNEE:**

KRAVET INC.

By:_____
   Name:
   Title:

# Schedule A

Exhibit E

Form of Assumption Agreement

# FORM OF

# ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of _____, 2011, by and between Brunschwig & Fils, Inc., a New York corporation ("Assignor"), and Kravet Inc., a Delaware corporation ("Assignee"), is executed pursuant to that certain Asset Purchase Agreement, dated as of January 28, 2011 (the "Purchase Agreement"), by and between Assignor and Assignee and the other parties thereto. All capitalized terms used but not otherwise defined in this Agreement shall have the respective meanings ascribed to such terms in the Purchase Agreement.

## W I T N E S S E T H :

**WHEREAS,** pursuant to, and on the terms and subject to the conditions of, the Purchase Agreement, Assignor has agreed to sell, transfer, assign, convey and deliver to Assignee or its designated Affiliates, and Assignee has agreed to purchase and acquire or cause its designated Affiliates to purchase and acquire from Assignor all right, title and interest of Assignor in, to and under the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances), and Assignee has agreed to assume and pay, perform and discharge when due, or cause its designated Affiliates to assume and pay, perform and discharge when due all of the Assumed Liabilities of Assignor;

**WHEREAS,** Assignor wishes to sell, transfer, assign, convey and deliver to Assignee and Assignee wishes to (i) purchase and acquire, or cause its designated Affiliates to purchase and acquire, all right, title and interest of Assignor in, to and under the Acquired Assets, including, without limitation, the assets listed on Annex A hereto, free and clear of all Encumbrances (other than Permitted Encumbrances) (the "Transferred Assets") and (ii) assume and pay, perform and discharge when due the Assumed Liabilities of Assignor, where such Assumed Liabilities arise solely in connection with the ownership, operation and use of the Acquired Assets or the operation of the Business from and after the Closing Date (the "Transferred Liabilities"), in each case as set forth below and to the extent provided for in the Purchase Agreement.

**NOW, THEREFORE,** in consideration of the Purchase Price and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, Assignor and Assignee do hereby agree as follows:

Transferred Assets. Effective upon the date of this Agreement, Assignor hereby sells, transfers, assigns, conveys and delivers to Assignee, and Assignee does hereby acquire from Assignor all right, title and interest in, to and under all of the Transferred Assets free and clear of all Encumbrances (other than Permitted Encumbrances) on the terms and subject to the conditions of the Purchase Agreement. Notwithstanding anything to the contrary contained herein, the Transferred Assets shall not include any Excluded Assets.

Liabilities Assumed. Effective upon the date of this Agreement, Assignee hereby assumes, and agrees to pay, perform and discharge when due the Transferred Liabilities on the terms and subject to the conditions of the Purchase Agreement. Notwithstanding the foregoing, the Transferred Liabilities shall not include any Excluded Liabilities.

Terms of the Purchase Agreement. Nothing in this Agreement shall be deemed to supersede, enlarge or modify any of the provisions of the Purchase Agreement, all of which survive the execution and delivery of this

Agreement as provided and subject to the limitations set forth in the Purchase Agreement. In the event of any conflict or inconsistency in any manner between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern and control.

Further Assurances. At any time and from time to time after the Closing Date, as and when requested by any party hereto, the other party shall promptly execute and deliver, or cause to be executed and delivered, all such documents, instruments and certificates and shall take, or cause to be taken, all such further or other actions as are necessary to evidence and effectuate the transactions contemplated by this Agreement.

Amendment. Assignor and Assignee may mutually amend or waive any provision of this Agreement at any time. No amendment or waiver of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of Assignor and Assignee.

Governing Law. This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York applicable to Contracts executed in and to be performed in that State without regard to its provisions concerning conflicts of laws, and, to the extent applicable, the Bankruptcy Code.

Counterparts. This Agreement may be executed in any number of counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement, binding on all of the parties hereto. Delivery of an executed counterpart to this Agreement by facsimile or other electronic means (e.g., electronic mail or PDF) shall be effective as delivery of a manually executed counterpart to this Agreement.

No Third Party Beneficiaries. None of the provisions contained in this Agreement are intended by Assignor or Assignee, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement.

Headings The headings contained in this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement.

Binding Effect. This Agreement and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

No Release. Nothing in this Agreement, express or implied, is intended to relieve Assignor of its obligations to Assignee under the Purchase Agreement.

[Remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, this Agreement has been signed on behalf of each of the parties hereof as of the date first written above.

**KRAVET INC.**

By: _____

Name:

Title:

**BRUNSCHWIG & FILS, INC.**

By: _____
     Name:
     Title:

# ANNEX A

Exhibit F

Form of Bid Procedures Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

BRUNSCHWIG & FILS, INC.,

                    Debtor.

-----------------------------------------------------------x

Chapter 11

Case No. 11-22036 (RDD)

## ORDER APPROVING APPROVAL OF (A) BREAK-UP FEE/EXPENSE REIMBURSEMENT, (B) BIDDING PROCEDURES FOR THE CONDUCT OF AN AUCTION, AND (C) FIXING MANNER AND NOTICE OF SALE HEARING AND CURE CLAIMS BAR DATE

This matter is before the Court upon the <u>Motion for Orders (I) Scheduling Hearing to Consider (A) Sale of Substantially All of the Debtor's Assets, Free and Clear of All Liens, Claims and Encumbrances, Subject to Higher and Better Offers; and (B) Assumption and Assignment of Executory Contracts; (II) Scheduling Hearing to Consider Approval of (A) Break-Up Fee/Expense Reimbursement and (B) Bidding Procedures for the Conduct of an Auction and Entering Order Thereon; (III) Fixing a Cure Claims Bar Date With Respect to the Assumption and Assignment of Executory Contracts; and (IV) Fixing Manner and Notice of Sale Hearing; (V) Authorizing the Debtor to Sell Assets, Free and Clear of All Liens, Claims and Encumbrances, Subject to Higher and Better Offers; and (VI) Authorizing Assumption and Assignment of Executory Contracts</u>, dated January 12, 2011 (the "<u>Motion</u>")[1] filed by Brunschwig & Fils, Inc., the debtor and debtor-in-possession herein ("<u>Brunschwig</u>" or the "<u>Debtor</u>"), seeking, *inter alia*, entry of an order (this "<u>Bidding Procedures Order</u>") approving the bidding procedures (the "<u>Bidding Procedures</u>"), a copy of which is attached hereto as **Exhibit A** and made a part hereof, the Breakup Fee/Expense Reimbursement, and the manner and form of

---

[1] Unless otherwise expressly defined herein, any capitalized term shall have the meaning ascribed to such term in the Motion or the Sale Agreement, as defined below, as applicable.

notice of the hearing on the Motion (the "Sale"); and a schedule of all of the Debtor's executory contracts and unexpired leases, together with (among other things) the cure costs associated with each (if any) calculated in accordance with the Debtor's books and records attached hereto as **Exhibit B**; and the Court having reviewed the Motion; it is

**FOUND AND DETERMINED THAT:**

A.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334,

B.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A);

C.     Proper and adequate notice of the Bidding Procedures and request for approval of the Breakup Fee/Expense Reimbursement and the hearing thereon has been given, and no other or further notice is necessary;

D.     The Debtor has articulated good and sufficient reasons for approving the Bidding Procedures;

E.     The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the return for the Assets;

F.     The Debtor has articulated good and sufficient reasons for approving the Break-Up Fee/Expense Reimbursement;

G.     The Break-Up Fee/Expense Reimbursement has been negotiated at arm's length and is reasonable under the circumstances;

**AND**, after due deliberation and sufficient cause appearing therefor.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Bidding Procedures, as attached hereto and incorporated herein by reference, are hereby approved.

2.      Payment by the Debtor of the Break-Up Fee/Expense Reimbursement to the Purchaser on the terms and conditions contained in the Bidding Procedures and Sale Agreement is hereby approved.   The Break-Up Fee/Expense Reimbursement shall be accorded treatment as a superpriority administrative expense claim in the Chapter 11 case, senior to (x) the liens and claims of the prepetition secured lender, (y) any replacement liens or superpriority claims granted as adequate protection to the prepetition secured lender under any interim or final order approving the DIP Facility, and (z) all other administrative claims at any time allowed in the Chapter 11 case

3.      All non-debtor parties to the executory contracts and unexpired leases set forth on **Exhibit B** hereto are hereby directed to electronically file with the Clerk of the Bankruptcy Court a cure claim, setting forth all claims and arrearages against the Debtor due under such executory contract (the "Cure Claim"), and serve a copy of the Cure Claim upon Halperin Battaglia Raicht, LLP, counsel to the Debtor, 555 Madison Avenue, 9th Floor, New York, New York 10022, Attn: Alan D. Halperin, Esq. and Robert D. Raicht, Esq., on or before **February [18], 2011 at 4:00 p.m. (ET)**, provided, however, that any party that is required to file a Cure Claim pursuant to this paragraph, but fails to do so, shall be bound by the cure amount as set forth on **Exhibit B** hereto and shall be forever barred from asserting any other Cure Claim against the Debtor, its estate and/or any purchaser of the Assets arising under such executory contract.

4.     The Alternative Bid Deadline shall be **March [3], 2011 at 4:00 p.m. (ET).**

5.     The Auction shall be held on **March [7], 2011 at 10:00 a.m. (ET)** at the offices of Halperin Battaglia Raicht, LLP, 555 Madison Avenue, 9th Floor, New York, New York 10022, to consider any higher and better offers made in accordance with the Bidding Procedures.

6.     The Sale Hearing shall be held on **March [9], 2011 at 10:00 a.m. (ET)** at United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601-4140 to consider (a) approval of the Sale Agreement and the sale of the Assets, pursuant to §§ 105(a), 363(b), (f), (m) and (n) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014, free and clear of all liens, claims and encumbrances, subject to higher or better offers; and (b) approval of the assumption and assignment of executory contracts and unexpired leases of the Debtor, pursuant to § 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

7.     On or before **February [4], 2011** (the "Service Deadline"), the Debtor shall (to the extent not already served) serve, by regular mail, a copy of this Order, together with exhibits thereto, upon: (a) Schulte Roth & Zabel LLP, attorneys for Purchaser, 919 Third Avenue, New York, New York 10022, Attn: Adam C. Harris, Esq.; (b) Counsel to any creditors' committee appointed in this case, or, if no creditors' committee has been appointed, to the top 20 unsecured creditors in this case; (c) all entities known to assert a lien, claim, interest or encumbrance in the Debtor's assets; (d) all parties that have previously expressed interest in acquiring all or a portion of the Debtor's assets; and (e) the Office of the United States Trustee, 33 Whitehall Street, New York, New York 10004, Attn: Serene Nakano, Esq.

8.     The form of notice of the Sale, the Auction and the Sale Hearing (the "Sale Notice"), annexed as **Exhibit C** hereto, is hereby approved, and the Debtor is directed to

serve a copy of the Sale Notice upon (a) all known creditors of the Debtor; (b) all federal, state and local taxing authorities in which the Debtor operates its business; and (c) all parties that have filed a notice of appearance in this case, by regular mail on or before the Service Deadline.

9. The form of notice of Potential Assumption and Assignment of Executory Contracts and Unexpired Leases and Establishment of Cure Claims Bar Date for Non-Debtor Counterparties to Executory Contracts and Unexpired Leases (the "Cure Claims Bar Date Notice"), annexed as **Exhibit D** hereto, is hereby approved, and the Debtor is directed to serve a copy of the Cure Claims Bar Date Notice upon all non-debtor counterparties to the executory contracts and unexpired leases set forth on **Exhibit B** hereto, by regular mail on or before the Service Deadline.

10. The following procedures shall be used in connection with any executory contracts and unexpired leases proposed to be assumed and assigned to the Successful Bidder:

a. The Debtor shall make good faith and reasonable efforts to resolve any disputed Cure Claims with the counterparty to such contract or lease in advance of the Sale Hearing;

b. Any disputed Cure Claims shall be scheduled for resolution at the Sale hearing;

c. Cure Claims (if any) under any executory contracts and unexpired leases to be assumed and assigned to the Success Bidder shall be paid, as follows:

i. If there is no dispute as to the amount of the Cure Claim, such Cure Claim shall be paid at the time of the closing of the transaction;

ii. If there is a dispute as to the amount of the Cure Claim but the Successful Bidder desires to proceed with the assumption and assignment of the applicable

contract, (x) the undisputed portion of the Cure Claim shall be paid at the time of the closing of

the transaction, and (y) the Debtor or the Successful Bidder, as applicable, shall make provision

for the payment of the disputed portion of the Cure Claim in form and substance reasonably

satisfactory to the Debtor, the Successful Bidder and the counterparty to such contract or lease.

Upon the entry of a final order determining the amount of the Cure Claim, the balance of the

Cure Claim, if any, shall be paid to the counterparty;

     iii.  If there is a dispute as to the amount of the Cure Claim and

the Successful Bidder elects to defer a decision on assumption and assignment until final

adjudication of the amount of the Cure Claim, then (x) such contract or lease will not be assumed

or assigned at the time of closing of the transaction, (y) the Cure Claim will be adjudicated by

the Court, and (z) within two (2) business days following the entry of a final order determining

the amount of the Cure Claim, the Successful Bidder shall notify the Debtor and the counterparty

that the Successful Bidder either (A) desires to have the applicable contract or lease assumed and

assigned (in which case the Debtor or Buyer, as applicable, shall pay the determined Cure

Claim), or (B) has determined not to have the applicable contract or lease assumed and assigned;

     d.  Notwithstanding anything to the contrary set forth herein, the

rights of the Debtor under any executory contract or unexpired lease shall be preserved until

either (i) assumed and assigned, or (ii) rejected, pursuant to the provisions of section 365 of the

Bankruptcy Code.

     11.  The Court shall retain jurisdiction over any matter or dispute arising from

or relating to the implementation of this Bidding Procedures Order.

Dated: White Plains, New York
   January __, 2011

           _____
           UNITED STATES BANKRUPTCY JUDGE

## **Exhibit A**

Bidding Procedures

# BIDDING PROCEDURES

Set forth below are the Bidding Procedures[1] to be employed with respect to the Sale Agreement and the transfer of the Assets under the Sale Agreement to Kravet Inc. ("Kravet" or the "Purchaser"), subject to higher and better offers (the "Asset Sale"). The Asset Sale is subject to competitive bidding as set forth herein, made at an auction sale (the "Auction") to be held on **March [7], 2011 at __:__ .m. (ET)** at the offices of Halperin Battaglia Raicht, LLP, 555 Madison Avenue, 9th Floor, New York, New York 10022, to consider any higher and better offers made in accordance with the Bidding Procedures and approved by the Bankruptcy Court at a hearing to be held following the Auction on **March [9], 2011 at __:__ .m. (ET)** at United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601-4140, under § 363 of the Bankruptcy Code (the "Sale Hearing"). The following Bidding Procedures are designed to facilitate a full and fair process designed to maximize the value of the Assets:

a. Alternative Bid Deadline. All alternative bids must be submitted to the Debtor, c/o Charles D. Benjamin, the Debtor's Chief Restructuring Officer (the "CRO"), 75 Virginia Road, North White Plains, New York 10603-0905, by **March [3], 2011 at 4:00 p.m. (ET)** (the "Alternative Bid Deadline"), with a copy to Debtor's counsel, Halperin Battaglia Raicht, LLP, 555 Madison Avenue, 9th Floor, New York, New York 10022, Attn: Alan D. Halperin, Esq.

b. Due Diligence. To the extent any proposed bidder wants to undertake any due diligence with respect to the Assets, such proposed bidder must execute a non-disclosure agreement (to the extent such an agreement has not been previously executed and delivered by such proposed bidder) in form and substance acceptable to the Debtor prior to undertaking any such due diligence and all such due diligence must be undertaken and completed prior to the Alternative Bid Deadline.

c. Qualified Bid. Only alternative bids that meet with the following qualifications will be considered a "Qualified Bid":

    i. the bid must be received by the Debtor, , c/o Charles D. Benjamin, the CRO, with copies as detailed in paragraph (a), above, by the Alternative Bid Deadline;

    ii. The bid must :

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Debtor's Motion for Orders (I) Scheduling Hearing to consider (A) Sale of substantially all of the Debtor's assets free and clear of all liens, claims and encumbrances, subject to higher and better offers; and (B) Assumption and Assignment of Executory Contracts; (II) Scheduling Hearing to consider approval of (A) Break-Up Fee/Expense Reimbursement and (B) Bidding Procedures for the conduct of an Auction and entering order thereon; (III) Fixing a Cure Claim Bar Date with respect to the Assumption and Assignment of Executory Contracts; and (IV) Fixing Manner and Notice of Sale Hearing; (V) Authorizing the Debtor to Sell Assets, Free and Clear of all Liens, Claims and Encumbrances, subject to higher and better offers; and (VI) Authorizing Assumption and Assignment of Executory Contracts (the "Sale Motion").

a. Be in writing;

b. State that it is irrevocable;

c. Be accompanied by a duly executed sale agreement, together with a copy marked to reflect variations from the Sale Agreement;

d. Be accompanied by a down payment deposit in immediately available funds of not less than ten (10%) percent of the proposed purchase price (the "Deposit"). The Deposit will be subject to forfeiture upon a breach by the bidder and non-refundable if the bidder is selected as a Successful Bidder (as defined below) and fails to consummate the purchase (other than as a result of a breach by the Debtor). The Deposit will be refunded if the bidder is not selected as a Successful Bidder;

e. State that it is not subject to any further due diligence or financing; and

f. Be accompanied by an irrevocable commitment from a creditworthy entity (as determined by the Debtor) to refinance the debtor in possession financing facility provided by Kravet (the "DIP Facility") no later than two (2) business days following entry of an order authorizing and approving the bid as the highest and best offer;

iii. The proposed purchase price for a Qualified Bid shall be an amount in cash of at least the sum of (A) the Purchase Price as defined in the Sale Agreement (the "Stalking Horse Bid"), plus (B) the amount of the Break-Up Fee/Expense Reimbursement (*i.e.*, $325,000), plus (C) $100,000 (the "Subsequent Incremental Bid Amount")((A), (B) and (C), collectively, the "Initial Overbid"). In the event a bidder (including Purchaser) is the second best bidder (the "Back-Up Bidder"), its bid shall be irrevocable and such bidder shall remain ready, willing and able to purchase the Assets through the closing of the transaction with the Successful Bidder (subject to the terms and conditions of such Backup Bidder's last submitted bid);

iv. Without limiting the generality of the foregoing, such bid shall be for substantially all of the Assets and the Assumed Liabilities and any liabilities to be assumed under the Sale Agreement on an as-is, where-is basis and shall not include any due diligence, financing or other contingency. At the request of the Pension Benefit Guaranty Corporation (the "PBGC"), the Debtor advises prospective bidders that it is the sponsor of the Brunschwig & Fils, Inc. Employee Pension Plan (the "Pension Plan"). If the Pension Plan is terminated, the PBGC has advised that the

Debtor shall be liable for any unfunded benefit liabilities of the Pension Plan, missed minimum funding contributions, and unpaid insurance premiums. Currently, there are 123 participants in the Pension Plan. As of the last valuation available to the Debtor, the Pension Plan is estimated to be underfunded by approximately $3,940,000. All Qualified Bids may state whether the bidder intends to assume the Pension Plan. Any Qualified Bid may be a combination of cash and certain assumed obligations, including obligations with respect to the Pension Plan. In determining the successful bidder, the Debtor shall give appropriate credit for the value of the liabilities under the Pension Plan that the bidder agrees to assume.

v. The bid must be expressly made subject to the Debtor's obligations to pay the Break-Up Fee/Expense Reimbursement pursuant to the terms of the Sale Agreement;

vi. Simultaneously with the delivery of the Deposit and the executed Sale Agreement, an entity submitting an alternative bid shall deliver financial information evidencing that such party has the financial wherewithal to (A) refinance the DIP Facility, (B) consummate the proposed transaction on the terms proposed; and (C) provide adequate assurance of future performance with respect to any contracts and leases proposed to be assumed and assigned to such entity. Such financial information may include current audited or verified financial statements and/or a letter from a depository institution indicating the ability to close on a proposed transaction and provide adequate assurance of future performance. In the event the financial information pertains to the parent or other equityholder of an acquisition affiliate, the bid of the affiliate shall be guaranteed by the parent or other equityholder. Upon receipt of the financial information and a determination by the Debtor that the bid constitutes a Qualified Bid, the Debtor shall deliver such financial information to each counterparty to any executory contract or unexpired lease proposed by to be assigned to such Qualified Bidder (provided however that each such counterparty shall maintain the confidentiality of such information and shall not use it for any purpose other than evaluating the Qualified Bidder's ability to provide adequate assurance of future performance);

vii. The entity submitting an alternative bid shall also provide (A) evidence or affirm under oath that all necessary approvals have been obtained authorizing the submission of the bid by such entity; and (B) provide assurances that, in the event of a sale of a customer list, that the bidder will substantially follow the Debtor's current privacy policy;

viii. Only those bids bidders having submitted Qualified Bids (a "Qualified Bidder") will be permitted to participate in the Auction. The CRO, upon consultation with the Committee (if any), will promptly notify each

alternative bidder after the Alternative Bid Deadline whether it is a Qualified Bidder. The Auction shall occur no later than two (2) business days following the Alternative Bid Deadline. Purchaser shall be deemed a Qualified Bidder and, in consideration of providing the DIP Facility, shall have satisfied the requirement for the Deposit.

d.   <u>Auction Procedures and Bidding Increments</u>.

    i.   In the event one or more Qualified Bids are received by the Debtor prior to the Alternative Bid Deadline, the Debtor will conduct the Auction. No later than noon on the business day prior to the Auction, the Debtor shall circulate to each Qualified Bidder a copy of the Qualified Bid determined to be the highest or best Qualified Bid submitted as of the Alternative Bid Deadline, and that will constitute the opening bid at the Auction.

    ii.   At the Auction (A) all bids shall be made and received in one room, on an open basis, and all other bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each bid will be fully disclosed to all other bidders throughout the entire Auction; (B) the opening bid at the Auction shall not be less than the Initial Overbid; (C) all offers subsequent to the opening bid at the Auction (*i.e.*, the Subsequent Incremental Bid Amount) must exceed the prior offer by not less than $100,000; (D) with respect to any such further overbid submitted by the Purchaser, the consideration offered by the Purchaser shall be deemed to include the full amount of the Break-Up Fee/Expense Reimbursement potentially payable to the Purchaser; and (E) bidding at the Auction will continue until such time as no further bids are made within the time limit announced by the CRO, upon consultation with the Committee (if any);

    iii.   Upon conclusion of the Auction, the CRO, upon consultation with the Committee, if any, shall determine the highest or otherwise best bid (the "<u>Successful Bidder</u>"), and such bid shall be submitted for approval by the Bankruptcy Court. Subject to the Court's calendar, the Sale Hearing will occur no later than two (2) business days after the conclusion of the Auction.

    iv.   The Successful Bidder shall have the burden of establishing by competent evidence that it qualifies for section 363(m) protections, and that it is capable of providing adequate assurance of future performance with respect to any executory contract or unexpired lease it wishes to have assumed and assigned pursuant to section 365;

     v.   If the Debtor does not receive any Qualified Bids, the Debtor will report the same to the Bankruptcy Court and will proceed with the Sale Hearing and no Auction shall be held;

    vi.   The Purchaser shall have the right to credit bid with respect to the amount outstanding under the DIP Facility to be made by Purchaser;

   vii.   The CRO, upon consultation with the Committee, reserves the right to establish such other reasonable rules and procedures for the conduct of the Auction, provided that such rules and procedures are publicly announced at the Auction.

e.   <u>Break-Up Fee/Expense Reimbursement</u>.  The Break-Up Fee/Expense Reimbursement shall be payable to Purchaser under the following terms and conditions:

    i.   If a person other than the Purchaser is determined to be the Successful Bidder for the Assets and the Debtor closes a transaction with such other Successful Bidder, the Purchaser shall receive the Break-Up Fee/Expense Reimbursement, payable at closing from the proceeds of such transaction; and

    ii.   The Break-Up Fee/Expense Reimbursement shall be accorded treatment as a superpriority administrative expense claim in the Chapter 11 case, senior to (x) the liens and claims of the prepetition secured lender, (y) any replacement liens or superpriority claims granted as adequate protection to the prepetition secured lender under any order approving the DIP Facility, and (z) all other administrative claims at any time allowed in the Chapter 11 case.

**<u>Exhibit B</u>**

List of Executory Contracts and Cure Amounts

# LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| ADAC, LP | C/O PORTMAN HOLDINGS 303 PEACHTREE ST N.E. STE 4600 ATLANTA, GA 30308-0000 ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in the Atlanta Decorative Arts Center, 351 Peachtree Hills Ave. N.E. Atlanta GA | $604,173.23 |
| ADP TotalSource, Inc. | 99 JEFFERSON ROAD, PARSIPPANY, NJ 07054-0000 ATTN: PRES. OR GEN. COUNSEL | Client Services Agreement whereby ADP acts as a Professional Employer Organization providing certain human resource services to Debtor | $0.00 |
| AFCO Premium Credit LLC | AFCO PREMIUM CREDIT LLC 260 FRANKLIN ST. STE. 310, BOSTON, MA 02110-0000 ATTN: PRES. OR GEN. COUNSEL | Corporate Premium Finance Agreement | $0.00 |
| Andre Jean Cabanel | Rue St Martin 30250 AUJARGUES, FRANCE | Licensing agreement for the Cabanel collection dated November 1999. | $14,184.18 |
| Benaki Museum | 1 KOUMBARI STREET ATHENS 10674 GREECE ATTN: PRESIDENT | Nonexclusive license agreement for use of trademarks and reproduction of the Museum dated 8/18/86. | $1,147.21 |
| Bermingham & Co. | 243 EAST 60TH ST. NEW YORK, NY 10022 ATTN: JOHN BERMINGHAM | Agency agreement dated 10/9/09 for B&F to act as an independent sales agent and to receive commission. | $0.00 |
| Bises Novita, Spa | SAN MARCO 3877 30124 VENEZIA ITALY ATTN: PRESIDENT | Royalty Agreement dated November 25, 1996. | $1,055.81 |
| Borderline | UNIT 7, SECOND FLOOR CHELSEA HARBOUR DESIGN CENTRE LONDON SW10 OXE ENGLAND ATTN: PRES. OR GEN. COUNSEL | Exclusive License and Distribution Agreement dated August 19, 1993 for "A Tribute to John S. Churchill" design. | $509.73 |

1

## LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| Brighton Borough Counsel | ROYAL PAVILION LIBRARIES & MUSEUMS 5 PAVILION BUILDINGS, BRIGHTON EAST SUSSEX BN11EE ENGLAND ATTN: PRES. OR GEN. COUNSEL | Colloboration agreement and amendment dated 9/9/05. Includes royalties for various designs. | $2,965.92 |
| Canon Business Solutions Inc. | 21146 NETWORK PLACE CHICAGO,IL 60673 | Studio Copier | $6,777.44 |
| Carole Watson | 8T ST. GEORGES AVENUE, WOLSTANTON,NEWCASTLEUNDE R-LYME STRAFFORDSHIRE ST5 8DG ENGLAND | Assignment agreement dated 3/4/97 and amendments dated 2002. Includes royalties for various designs. | $3,954.27 |
| Charles E. Tausch | 16 SHEEP LANE, LATTINGTON, NY 11560-0000 | Royalty agreement dated 5/21/03 for various wallpaper designs. | $1,098.72 |
| Charlotte Moss and Company, Inc | 135 EAST 65TH ST, 3RD FLOOR NEW YORK, NY 10021-0000 ATTN: CHARLOTTE MOSS | Exclusive License Agreement dated 10/19/04 for use of licensed designs, trademarks, and royalties for fabrics, wallcoverings, furniture, and lighting. | $22,497.70 |
| Chateau de Chanzeaux | DESLAURIERS 92 RUE DE LONGCHAMP A NEUILLY SUR SEINE PARIS 92200 FRANCE ATTN: PRESIDENT | Royalty Agreement (in French) dated 1/9/97. | $58.32 |
| Chateau de Grancey | JACQUES DE MANDAT-GRANCEY, 21580 GRANCEY-LE-CHATEAU-NEUVELLE FRANCE, ATTN: PRESIDENT | License agreement (in French) dated 7/2/2002. | |
| Chateau de Thoiry-en-Yvelines | Viscount and Viscountess Paul de la Panouse 78770 Thoiry France | Confidentiality Agreement signed on 11/9/88 for list of documents photographed with royalties. | $9,865.70 $1,771.54 |

2

# LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| Christopher Norman Collection | 979 THIRD AVE-CONCOURSE LEVEL<br>NEW YORK, NY 10022-0000<br>ATTN:NANCY STOUT & LANCE HOUPT | Agency agreement dated 5/1/08 for B&F to act as an independent sales agent and receive commission. | $0.00 |
| Chuck Fischer | 32 UNION SQUARE EAST #1101,<br>NEW YORK, NY 10003-0000<br>ATTN: PRES. OR GEN. COUNSEL | Assignment Agreement dated 9/11/95 for exclusive rights to various designs. Includes royalties. | $294.55 |
| CLEO | C/o ARS Limited<br>Director-PRODUCT DEVELOPMENT &LICENSING<br>16 FARM PLACE<br>LONDON W8 7SX ENGLAND,<br>ATTN: PRES. OR GEN. COUNSEL | License agreement dated 2/14/92 for various license designs. | $455.22 |
| CMG | Michele and Claude Geslin<br>23 BLVD. FLANDRIN<br>PARIS 75116 FRANCE | Exclusive License Agreement dated 4/10/97 for "Les Bouquets" design. | $920.83 |
| Cody & Wolff, Inc. | 100 MARVELLE ROAD,<br>FAYETTEVILLE, NY 13066-0000<br>ATTN: PRES. OR GEN. COUNSEL | Assignment Agreement dated 3/27/03 for exclusive rights to "Sunderland" design. | $2,429.95 |
| Colefax & Fowler | 39, BROOK STREET, MAYFAIR,<br>LONDON WIY 2JE ENGLAND,<br>ATTN: MR. TOM PARR | Letter of royalty agreement dated 7/28/75 for George Oakes' design. | $952.07 |
| Conservancy for Historic Battery Park, Inc. | THE ARSENAL, CENTRAL PARK<br>NEW YORK, NY 10021<br>ATTN: PRES. OR GEN. COUNSEL | License agreement dated 6/9/95 for worldwide rights to use names, trademarks, and logos. | $172.54 |

3

## LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| Creations Metaphores Inc. | 55 EAST 59TH STREET NEW YORK, NY 10022-0000 ATTN: OLIVIER NOURRY | Agency agreement- B&F is an exclusive agent. | $0.00 |
| CTXVI Design Ctr. Ptnrs, LP | C/O LDC PARTNERS 23811 ALISO CREEK RD., STE 200 LAGUNA NIGUEL, CA 92677-3928 ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in 23811 Aliso Creek Road, Laguna Niguel, CA | $53,324.13 |
| David Easton | EASTON & LA ROCCA INC. 325 EAST 58TH STREET NEW YORK, NY 10022-0000 | Letter of royalty agreement dated 9/2/80 for "Samarkind" design. | $2,312.58 |
| DCOTA Development Co., L.P. | 1855 GRIFFIN RD., STE. A-282 DANIA, FL 33004-0000 ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in the Design Center of the Americas, 1855 Griffin Road, Dania, FL | $139,802.47 |
| Decoration & Design Bld Pship | C/O COHEN BROS REALTY CORP. 750 LEXINGTON AVE, 29TH FL NEW YORK, NY 10022 ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in the Decoration and Design Building, 979 Third Ave., NY, NY | $282,382.07 |
| Decorative Ctr. of Houston LP | C/O COHEN BROS REALTY CORP. 750 LEXINGTON AVE, 29TH FL NEW YORK, NY 10022 ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in the Bldg Tower of the Decorative Center of Houston, 5120 Wodway Dr. Houston, TX | $50,369.46 |
| Decortex, S.P.A. | VIA DI PAGNELLE, 25-5004l CALENZANO, FIRENZE ITALY ATTN: PRESIDENT | Distribution Agreement- B&F exclusive distributor of Decortex products | $0.00 |
| Dennis Kyte | 90 PAINTER RIDGE ROAD WASHINGTON, CT 06793 ATTN: SEYMOUR SURNOW | License agreement and amendments dated 5/26/97 for exclusive rights to various designs.  Includes royalties. | $209.85 |
| Denver Design Center Ltd. | 595 SOUTH BROADWAY, DENVER, CO 80209 ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in the Denver Design Center, 575-595 South Broadway, Denver CO | $140,935.15 |

4

# LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| Descheemaeker | 200 RUE DE ROUBAIX<br>TOURCOING, 59200 FRANCE<br>ATTN: PRESIDENT | Letter of Royalty agreement (in French) dated 1/18/67. | $1,933.59 |
| Diamond Prop Mgt LLC | 333 NORTH BEDFORD ROAD,<br>MOUNT KISCO, NY 10549<br>ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in 75 Virginia Road, North White Plains, NY | $317,647.34 |
| DIV Design, LLC | LLC<br>ONE DESIGN CENTER PL., STE 337<br>BOSTON, MA 02210<br>ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in the Boston Design Center, Boston, Massachusetts | $426,044.63 |
| Edmond Petit | 23 RUE DU MAIL<br>PARIS 75002  FRANCE<br>ATTN: JEAN-FRANCOIS PETIT | Assignment agreement dated 6/4/04 for exclusive rights to use "Plougastel" design. | $16,589.62 |
| English Looking Glasses | 210 THE DESIGN CENTRE<br>CHELSEA HARBOUR LONDON<br>SW10OXF,<br>ATTN: WILLIAM GUILLIVER | Agency Agreement- B&F is the exclusive marketer of ELG products. | $0.00 |
| Farrow & Ball Inc. | 32 EAST PUTNAM AVENUE<br>GREENWICH, CT 06830<br>ATTN: PRES. OR GEN. COUNSEL | Agency agreement- B&F agent for sale of F&B products. | $0.00 |
| Field Museum of Natural History | 1400 S. LAKE SHORE DRIVE<br>CHICAGO, IL 60605<br>ATTN: PRES. OR GEN. COUNSEL | Merchandising license agreement dated 9/14/04 for products and trademarks. Includes royalties. | $2,964.98 |
| Filoli | 86 CANADA ROAD<br>WOODSIDE, CA 94062-0000<br>ATTN: HADLEY OSBORN | Letter of royalty agreement dated 2/6/86 for designs by Fioli. | $722.16 |
| Freeda Brennan | 4 NORTH OAKWOOD TERRACE<br>NEW PALTZ, NY 12561 | Assignment agreement and amendment dated 9/15/00 for various designs. | $1,122.60 |

## LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| Frette | 4 W. 58TH STREET NEW YORK, NY 10019 ATTN: PAUL RAFFIN | Agency agreement- B&F is an independent wholesale sales agent. | $0.00 |
| Fromental, LTD | THE SAGA CENTRE 326 KENSAL RD. LONDON ENGLAND W10 5BZ, ATTN: DAVID JONES | Agency agreement- B&F is an independent sales agent. | $0.00 |
| Gastony y Daniela, S.A. | CALLE HERMOSILLA 26 28001 MADRID SPAIN ATTN: VICENTE BOSQUE MOHINO | Distribution agreement- B&F as exclusive distributor. | $0.00 |
| Georges Le Manach | 31 RUE DE QUATRE SEPTEMBRE 75002 PARIS FRANCE, ATTN: OLIVIER BIOSSE DUPLAN | Exlusive license agreement for exclusive rights to "Grilly" design and sale of products. Rights to use name and trademarks. | $6,176.46 |
| Guy Romagna | 4411 NE 25TH AVENUE FORT LAUDERDALE, FL 33308 | Assignment agreement dated 7/28/00 for exclusive rights to various designs. | $18,479.29 |
| Hatheway House | C/O ANTIQUARIAN & LANDMARKS SOCIETY, INC., 394 MAIN STREET HARTFORD, CT 06103 ATTN: J. BARD MCNULTY, PRESIDENT | Letter of royalty agreement dated 5/18/88 for wallpaper designs and borders. | $1,968.49 |
| Hinson & Company | 74 VIRGINIA ROAD WHITE PLAINS, NY 10603 ATTN: PRES. OR GEN. COUNSEL | Sales and Distribution Agreement | $0.00 |
| Historic Charleston Foundation | P.O. BOX 622 CHARLESTON, SC 29402 ATTN: DIRECTOR, PRES. OR GEN. COUNSEL | License agreement for various fabrics and wallcoverings dated 12/1/89. | $1,359.50 |

6

## LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| Historic Cherry Hill | 523 1/2 SOUTH PEARL STREET ALBANY, NY 12202 ATTN: PRES. OR GEN. COUNSEL | Royalty agreement dated 1984 for "Four Seasons Foile" design. | $2,324.53 |
| Historic Deerfield, Inc. | P.O. BOX 321 DEERFIELD, MA 01342 ATTN: DONALD FRIARY | Exclusive license agreement dated 10/2/00 for exclusive worldwide rights to various designs, and non-exclusive worldwide rights to name, trademarks, and logos. | $7,284.58 |
| Houles USA Corporate | B256 WEST HOLLYWOOD, CA 90069-0000 ATTN: SYLVESTER BONO | Agency agreement- B&F as exclusive agent to sell Houles products. | $0.00 |
| Ichiro Kurihara | CHESTNUT FIELD 119 W. 23RD ST, #702A NEW YORK, NY 10011 | Supplier agreement dated 8/12/91 for designs and products. | $30,464.84 |
| John Andreacci, VP of Finance | 116 FIELDSTONE PLACE WAYNE, NJ 07470 | Employment Agreement | $0.00 |
| John H. Jacoby | 48 EAST 68TH STREET, NEW YORK, NY 10021-0000 | Letters of royalty agreement and amendments last dated 12/12/00 various designs. | $10,957.02 |
| John Quilter | 10 WEST 75th STREET NY, NY 10023 | Assignment agreement dated 5/26/95 for exclusive rights to use designs and rights to use names, trademarks and logos. | $184.91 |
| Kravetcanada | 3600 B LAIRD ROAD-SUITE 6 MISSISSAUGA, ONTARIO L5L 6A7 ATTN: PRES. OR GEN. COUNSEL | Assignment of Lease and Consent of Landlord dated 3/5/08 for the premises located in 320 Davenport Road, Toronto Ontario. | $0.00 |
| Kravetcanada | 3600 B LAIRD ROAD-SUITE 6 MISSISSAUGA, ONTARIO L5L 6A7 ATTN: PRES. OR GEN. COUNSEL | Representation agreement dated 10/23/07 for commission on all B&F product sales in Canada. | $103,646.51 |
| LUI2 Dallas Slocum, L.P. | C/O INVST MGR & DOUG MCKINNON 100 WAUGH DR., STE. 600 HOUSTON, TX 77007-0000 RE: BRUNSCHWIG & FILS, INC. | Commercial lease for tenancy in the Dallas Design Center, 1025 N. Stemmons Freeway, Dallas TX | $20,732.71 |

7

# LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| Maison Hamot | 75 RUE DE RICHELIEU PARIS 75002 FRANCE ATTN: PRESIDENT | Licensing agreement (in French) dated 1995 for various designs. | $0.00 |
| Marie Brocard | 1 RUE JACQUES COEUR 75004 PARIS FRANCE | Royalty agreement for collection of designs dated 10/26/93. | $1,098.11 |
| Merchandise Mart L.L.C. | C/O MERCHANDISE MART PROP. INC 222 MERCHANDISE MART PLZA #470 CHICAGO, IL 60654 ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in the Merchandise Mart, Chicago, IL | $445,402.84 |
| Michigan Design Ctr. Ltd Ptrsp | 1700 STUTZ DRIVE #25, TROY, MI 48084 ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in Michigan Design Center | $333,932.11 |
| Michiko Ogino | 522 WEST END AVENUE, NEW YORK, NY 10024 ATTN: PRES. OR GEN. COUNSEL | Assignment agreement and amendments last dated 7/26/94 for exclusive rights to designs. | $17,088.88 |
| Middlesex University (MoDA) | BOUNDS GREEN ROAD LONDON N11 2NQ ENGLAND, ATTN: PRES. OR CURATOR | Exclusive license agreement (MoDA) and Silver Studio collection and renewal dated 6/19/02. Exclusive worldwide right to use designs and products. Includes royalties. | $6,828.84 |
| Mount Vernon Ladies' Assn of | THE UNION/ DIRECTOR-PROD. DEV. P.O. BOX 110, MOUNT VERNON, VA 22121 ATTN: PRES. OR GEN. COUNSEL | License agreement dated 6/1/93 for exclusive license to use various designs. Includes royalties. | $2,772.30 |
| Musee des Arts Decoratifs-MDAD | 1 RUE FAVART 75001 PARIS FRANCE ATTN: THIERRY MASSIP | License agreement and extensions last dated 2000 and includes royalties. | $6,974.09 |

8

# LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| Museum of New Mexico Foundation | P.O. BOX 2065 SANTA FE, NM 87504-2065 ATTN: SUE ANN SNYDER | Exclusive license agreement dated 4/29/97 for exclusive rights to use designs. | $1,052.51 |
| National Society of the COLONIAL DANES-HENRY BERWIND | 1630 LATIMER STREET PHILADELPHIA, PA 19103 ATTN: PRES. OR GEN. COUNSEL | Royalty agreement dated 5/20/65 to use "Stenton Mansion" quilt and reproduction of the design as fabric and wallpaper. | $585.23 |
| NetSuite Inc. | 2955 CAMPUS DRIVE, SUITE 100 SAN MATEO, CA 94403 ATTN: PRES. OR GEN. COUNSEL | Subscription Services Agreement | $0.00 |
| Old Salem, Inc. | P.O. BOX F, SALEM STATION WINSTON SALEM, NC 27108 ATTN: ANN JOHNSON | Exclusive license agreement dated 1/19/98 for exclusive worldwide right to use the "Salem Tavern Stripe" design. | $983.46 |
| Pacific Design Ctr 1, LLC | C/O COHEN BROS REALTY CORP. 750 LEXINGTON AVE, 29TH FL NEW YORK, NY 10022 ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in the Pacific Design Center, 8687 Melrose Ave, West Hollywood CA | $127,385.43 |
| Patricia Freund | 17 EAST 84TH STREET, NEW YORK, NY 10028-0000 | Assignment agreement dated 4/9/97 for exclusive rights to use "Porcelin Cats" and "Rickrack and Ribbons Coordinate" designs. | $204.66 |
| Patrick Mauny ETS MAUNY PAPIER PEINTS | ZA DU LEARD, BP 15 49380 THOUARCE FRANCE | Royalties for various designs. | $2,059.73 |
| Paul Montgomery Studio of VA | 175 LIME KILN RD - PO BOX 976 CHURCHVILLE, VA 24421-0000 ATTN: PAUL MONTGOMERY | Agency agreement- B&F is an independent sales agent. | $0.00 |

9

## LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| Paule Marrot Editions Paris | 21, RUE CURIE<br>68000 COLMAR- FRANCE<br>ATTN: SEBASTIEN STORCK,<br>PRESIDENT | Exclusive license agreement dated 9/15/04<br>for various designs. | $5,272.75 |
| Pierre Frey | 47, RUE DES PETITS-CHAMPS<br>75001 PARIS FRANCE<br>ATTN: MR. DIDIER SILICE | Supplier agreement dated 1990 for exclusive<br>rights to "Medard Satin/Satin Anjou" design. | $0.00 |
| Pierre Frey, Inc. | 47, RUE DES PETITS-CHAMPS<br>75001 PARIS FRANCE<br>Attn: Patrick Frey | Letter of royalty agreement dated 8/18/06 for<br>"Out of Africa" design. | $96.65 |
| Pip Rau | 39 BELSIZE PARK GARDENTS<br>LONDON NW3 4JJ ENGLAND<br>ATTN: PRES. OR GEN. COUNSEL | Exclusive license agreement dated 6/2/04 for<br>the "Kitab" design. | $1,105.66 |
| Pitney Bowes Global<br>Financial | PO Box 371887<br>Pittsburgh PA 15250-7887<br>Attn: President or Gen. Counsel | Equipment lease for Postage Machine. | $11,275.44 |
| Pivotal Payments | 6800 JERICHO TURNPIKE,STE. 120<br>SYOSSET, NY 11791-0000<br>ATTN: OWNER LETITITA B. | Visa/Mastercard Processing Agreement | $0.00 |
| Ramm, Son, & Crocker, Ltd. | 970 THIRD AVENUE<br>NEW YORK, NY 10022<br>ATTN:KEITH LAMBORN,<br>PRESIDENT | Letter of royalty agreement dated 5/10/91 for<br>various designs. | $1,154.07 |
| RBG Kew Enterprises Ltd. | ROYAL BOTANIC GARDENS KEW<br>RICHMOND SURREY TW93AB<br>ENGLAND.<br>ATTN: CHRISTINA JONES | License agreement dated 1/1/98 for use of<br>trademarks and various designs and products.<br>Includes royalties. | $26,073.71 |
| Richard Neas | 157 EAST 71ST STREET,<br>NEW YORK, NY 10021 | Letter of royalty agreement dated 3/1/89 for a<br>design. | $2,486.28 |
| Ricoh Americas Corporation | 5 DEDRICK PLACE<br>WEST CALDWELL, NJ 07006<br>ATTN: PRES. OR GEN. COUNSEL | Copier | $2,620.72 |

10

# LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| Ricoh Americas Corporation | 5 DEDRICK PLACE<br>WEST CALDWELL, NJ<br>07006 Attn: Gen. Counsel or President | Color Copier | $1,383.98 |
| Robert Crowder & Company | 320 NORTH MADISON AVENUE<br>LOS ANGELES, CA 90004-0000<br>ATTN: STEVE SELLERY | Agency Agreement- B&F is an independent sales agent. | $0.00 |
| Robert Jackson | BOX 185,<br>GERMANTOWN, NY 12526<br>ATTN: PRES. OR GEN. COUNSEL | Letter of royalty agreement dated 4/26/83. | $54.67 |
| Royal Ontario Museum | 100 QUEEN'S PARK<br>TORONTO, ONTARIO CANADA<br>M5S 2C6,<br>ATTN: PRES., GEN. COUNSEL OR<br>ASSC. DIRECTOR,<br>ADMINISTRATION | Licensing agreement dated 7/1/92 for use of trademarks and products. Includes royalties. | $0.00 |
| Rubenstein Public Relations | FL<br>NEW YORK, NY 10105<br>ATTN: RICHARD RUBENSTEIN,<br>PRES | Public relations service agreement. | $11,500.00 |
| Runzheimer International | 1 RUNZHEIMER PARKWAY<br>WATERFORD, WI 53185<br>ATTN: PRES. OR GEN. COUNSEL | Payment Solutions Service Agreement. | $0.00 |
| San Francisco Design Ctr, LLC | 2 HENRY ADAMS ST, # 450<br>SAN FRANCISCO, CA 94103-0000<br>ATTN: MARTHA S. THOMPSON | Commercial lease for tenancy in the San Francisco Design Center, 2 Henry Adams St., San Francisco CA | $60,628.59 |
| Smithsonian Institution | OFFICE OF CONTRACTING,<br>2011 CRYSTAL DR. SUITE 350<br>ARLINGTON, VA 22202<br>ATTN: PRES. OR GEN. COUNSEL | License agreement to use names and products dated 9/3/08. Included are royalties for various products. | $9,449.21 |
| Societe H. Lelievre | 13, RUE DU MAIL<br>75002 PARIS FRANCE,<br>ATTN: PRESIDENT | Supplier agreement for exclusive rights assignment rights to #754A-9466. | $5,208.46 |

# LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| Solon Gershman, Inc., as agent | #7 NORTH BEMISTON, SAINT LOUIS, MO 63106 ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in 21 North Bemiston Ave., Clayton MO | $12,255.19 |
| Sophie Warre | THE WALLED GARDEN, UPPARK, NR. PETERSFIELD HAMPSHIRE GU31 5QR ENGLAND | Exclusive license agreement dated 12/13/96 for various designs and products. | $49.14 |
| SPNEA | HARRISON GRAY OTIS HOUSE 141 CAMBRIDGE STREET BOSTON, MA 02114 ATTN: PRES. OR GEN. COUNSEL | License agreement dated 6/17/96 for various fabrics and wallpapers. | $8,462.87 |
| Stark Carpet Corp. | 979 THIRD AVENUE NEW YORK, NY 10022 ATTN: EDWARD HALEMAN | Sales representation agreement- B&F as exclusive sales representative. | $0.00 |
| Stead, McAlpin & Co., Inc. | ST LONDON, WIP 3AE, ENGLAND, ATTN: DONALD ROSE, DIRECTOR | Royalty agreement | $235.55 |
| Susan Webb | 347 WEST 39TH STREET, NEW YORK, NY 10018 | Assignment agreement dated 9/30/92 for "Bangalore" and other future designs. | $15,922.49 |
| Sybil Connolly Interiors Ltd. | 71 MERRION SQUARE DUBLIN 2 IRELAND ATTN: SYBIL CONNOLLY | License agreement dated 12/1/93 for various designs and use of trademark. | $3,134.89 |
| Taillardatus Corp. | 1251 AVE OF THE AMERICAS,34TH FLR C/O NATIXIS PRAMEX NEW YORK, NY 10020 ATTN: PRES. OR GEN. COUNSEL | Agency agreement- B&F is an independent sales agent. | $0.00 |
| Tassinari & Chatel | 10 RUE DU MAIL 75002 PARIS FRANCE ATTN: PATRICK LELIEVRE | Supplier Assignment dated April 1999 for exclusive right to "Faille Imprimee" design. | $4,091.80 |

# LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| TCF Equipment Finance, Inc. | 801 MINNETONKA, MN 55305 ATTN: PRES. OR GEN. COUNSEL | ASSIGNED TO VAR RESOURCES Assignor S/P: VAR Resources, Inc. 2330 Interstate 30 Mesquite, TX 75150 | $0.00 |
| Thai Silk Industries Limited | TTSI 36/13 Vibhavadi Rangsit Rd. Bangkok, Thailand 10210 | Agency agreement- B&F exclusive sales agent for TTSI | $0.00 |
| The Marketplace | 2400 Market Street Philadelphia, PA | Commercial lease for tenancy in the Marketplace Design Center, 2400 Market Street, Philadelphia, PA | $247,068.09 |
| Thomas Jayne Studio | 136 EAST 57TH STREET #1704 NEW YORK, NY 10022 ATTN: THOMAS JAYNE | Assignment agreement dated 12/10/02 for various designs. | $243.80 |
| Tissus Lauer | MADAME MARIE-THERESE CASANOVA 5 AVENUE DE L'OPERA 75001 PARIS FRANCE ATTN: PRES. OR GEN. COUNSEL | Letter of royalty agreement dated 2/21/95 for "Les Chaises de Ginger" design. | $1.53 |
| Titley & Marr, Ltd.- Kate Marr | UNIT B4 HAZELTON INDUSTRIAL-, ESTATES, LAKESMERE RD.HORNDEAN HAMPSHIRE PO8 9JU ENGLAND, ATTN: PRES. OR GEN. COUNSEL | Exclusive license agreement and amendment dated 6/6/02 for "Blue Bird Toile" design. | $7,312.09 |
| TriStar/Cedar Street, LLC | C/O HARRIS ASSOCIATES P.O. BOX 1017 DAVIDSON, NC 28036 ATTN: PRES. OR GEN. COUNSEL | Commercial lease for tenancy in the Foundry, 619 S. Cedar St. Charlotte, NC | $67,298.71 |
| UPS, Inc. | 643 WEST 43RD STREET NEW YORK, NY 10036-0000 ATTN: ANDREW JAY COTTA OR PRESIDENT | UPS Incentive Program Agreement | $164,498.04 |
| Valentine Museum | 1015 EAST CLAY STREET RICHMOND, VA 23219 ATTN: PRES. OR GEN. COUNSEL | Royalty agreement | $2,575.13 |

13

## LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| VAR Resources | 2330 Interstate 30<br>Mesquite, TX 75150<br>Attn: President or Gen. Counsel | Equipment lease | $4,519.30 |
| Verel De Belval- J. Perrin | 5 RUE DU DOCTEUR ROUX<br>38490 ST-ANDRE LE GAZ FRANCE<br>RCS BOURGOIN-JALLIEU<br>B5636200, 79<br>ATTN: PRESIDENT | Distribution agreement- B&F exclusive right to market and sell. | $0.00 |
| Verizon Business | PO BOX 371355<br>PITTSBURGH, PA 15250-7355<br>ATTN: PRESIDENT OR GEN.<br>COUNSEL | Verizon Business Service Agreement - Contract ID# 605022-05 | $270,000.00 |
| Victoria and Albert Museum | CROMWELL RD, SOUTH<br>KENSINGTON<br>LONDON, SW7 2RL, UNITED<br>KINGDOM<br>ATTN: PRES. OR GEN. COUNSEL | License agreement dated 8/9/02 for products and use of copyrights. | $14,937.17 |
| Warner Fabrics | BRADBOURNE DRIVE, TILBROOK,<br>MILTON KEYNES,<br>BUCKINGHAMSHIRE MK7 8BE<br>ENGLAND,<br>ATTN: PRES. OR GEN. COUNSEL | Letter of agreement dated 9/25/96 for exclusive worldwide rights to the "Engraved Animals" Ref#2609 design fabric design. | $6,066.06 |
| Washington Design Center, LLC | 330 D Street, S.W.<br>WASHINGTON, DC 20024<br>ATTN: PRES. OR GEN. COUNSEL | Commercial leases for tenancy in The Washington Design Center, 330 D Street SW, Washington, DC | $820,644.09 |
| Winterthur Museum, Inc. | 5105 KENNETT PIKE<br>WILMINGTON, DE 19735<br>ATTN: GENERAL MANAGER,<br>LICENSED PRODUCTS DVISION | Non-exclusive license agreement dated 6/12/00 for works of the Museum and includes royalties. | $29,219.82 |
| Zoffany Ltd.-Talbot House | 17 CHURCH ST.,<br>RICKSMANSWORTH,<br>HERTFORDSHIRE WD3 1DE<br>ATTN:ANTONY BAGLIONI | Letter of agreement dated 11/3/99 for use of designs of Archive item and includes royalties. | $0.00 |

14

# LIST OF CONTRACTS AND LEASES

| Name of Counterparty | Address of Counterparty | Description of Contract or Lease | Cure Amount |
|---|---|---|---|
| Chelsea Habour Limited | C2-3, Ground Floor, The Chambers Chelsea Harbour London SW10 0XF | Commercial lease in London located on 102 The Chambers, Chelsea Harbour London SW10 0XF | $28,223.82 |
| Cabinet Maury-Schwab | 154 Boulevard Haussman Paris France | Commercial lease in Paris located on 8 Rue du Mail, 75002 Paris; lease held in the name of Brunschwig et Fils Centrale SARL (France). | $76,560.00 |
| Tondok Pty Ltd. | ACN: 005 267 756 Of 13 Chapel Street Windsor, in the State of Victoria | Commercial lease in 751 High Street, Armdale in the State of Victoria; lease held in the name of Brunschwig & Fils Pty, Ltd (Australia). | $0.00 |
| Brunschwig & Fils, Inc. Employee Pension Plan | C/o Brunschwig & Fils, Inc. 75 Virginia Road North White Plains, NY 10603 | Pension Agreement | $3,393,644.00 |
| Keep It Simple Storage | 45 Brisbane Road Unit 20 Toronto Canada M3J2K1 Attn: Gary Hills | Storage contract dated 1/28/08 for B&F's records. | $578.00 |

15

**Exhibit C**

Form of Sale Notice

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re:

**BRUNSCHWIG & FILS, INC.,**

                    Debtor.

----------------------------------------------------------x

          Chapter 11

          Case No. 11-22036 (RDD)

**NOTICE OF AUCTION SALE AND HEARING ON
CONSIDERATION OF APPROVAL OF SALE OF DEBTOR'S
ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES, SUBJECT TO HIGHER OR BETTER OFFERS
<u>PURSUANT TO SECTION 363(b) OF THE BANKRUPTCY CODE</u>**

**TO ALL CREDITORS OF THE DEBTOR AND OTHER NOTICE PARTIES:**

      **PLEASE TAKE NOTICE** that on January 12, 2011 (the "<u>Petition Date</u>"), Brunschwig & Fils, Inc., the debtor and debtor-in-possession herein ("<u>Brunschwig</u>" or the "<u>Debtor</u>"), filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>").

      **PLEASE TAKE FURTHER NOTICE** that the Debtor has filed a motion (the "<u>Motion</u>") seeking approval of a certain asset purchase and agreement and all ancillary transaction documents (collectively, the "<u>Sale Agreement</u>") by and between the Debtor, T. Olivier Peardon and Thomas P. Peardon, Jr., as sellers, and Kravet Inc. ("<u>Kravet</u>" or the "<u>Purchaser</u>"), dated as of January __, 2011, pursuant to which, among other things, the Debtor proposes to sell substantially all of its assets (the "<u>Assets</u>") to Purchaser, free and clear of all liens, claims and encumbrances, subject to higher or better offers (the "<u>Sale</u>").

      **PLEASE TAKE FURTHER NOTICE** that at a hearing held on January 31, 2011, the Bankruptcy Court entered and order, a copy of which is annexed hereto as **Exhibit A** , approving the Bid Procedures and the Breakup Fee/Expense Reimbursement (the "<u>Bidding Procedures Order</u>").

      **PLEASE TAKE FURTHER NOTICE** that an Auction (as defined in the Bidding Procedures) will be held on **March [7], 2011 at __:__ _.m. (ET)** at the offices of Halperin Battaglia Raicht, LLP, 555 Madison Avenue, 9th Floor, New York, New York 10022 to consider any higher and better offers in accordance with the Bidding Procedures.

      **PLEASE TAKE FURTHER NOTICE** that a hearing will be held on **March [9], 2011 at __:__ _.m. (ET)** before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York

10601-4140 to consider approval of the Sale Agreement or any higher and better offer(s) by the Successful Bidder(s) (the "Sale Hearing").

       **PLEASE TAKE FURTHER NOTICE** that the Motion seeks approval of the assumption and assignment of certain executory contracts to be identified by the Purchased or other Successful Bidder pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. Exhibit A to the Bidding Procedures Order sets forth a list of all of the Debtor's executory contracts and unexpired leases, together with a statement of the cure costs (if any) associated with each such contract and lease, calculated in accordance with the Debtor's books and records. In connection with the potential assumption and assignment of the executory contracts and unexpired leases, the Bankruptcy Court, pursuant to the Bidding Procedures Order, has directed that all non-debtor parties to any executory contract or unexpired lease electronically file with the Clerk of the Bankruptcy Court a cure claim, setting forth all claims and arrearages against the Debtor due under such executory contract (the "Cure Claims"), and serve a copy of the Cure Claim upon Halperin Battaglia Raicht, LLP, proposed attorneys for the Debtor, 555 Madison Avenue, 9th Floor, New York, New York 10022, Attn: Alan D. Halperin, Esq. and Robert D. Raicht, Esq., on or before **February __, 2011 at __:__ _.m. (ET),** provided, however, that any party that is required to file a Cure Claim, but fails to do so, shall be bound by the cure amount as set forth on Exhibit A to the Bidding Procedures Order, and shall be forever barred from asserting any other Cure Claim against the Debtor, its estate, the Purchaser, or its designee, and/or any Successful Bidder arising under such executory contract or unexpired lease.

       **PLEASE TAKE FURTHER NOTICE** that the following is a general explanation of the salient terms of the Sale Agreement. Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion:[1]

       Purchased Assets: The Sale Agreement contemplates the Debtor will sell, convey, assign and transfer to Purchaser all of the Assets (other than the Excluded Assets) on the terms and subject to the conditions set forth in the Sale Agreement, including, but not limited to: (a) rights and benefits under Assigned Contracts and Leases, (b) inventory, (c) accounts receivable, (d) the Debtor's ownership interests in certain non-debtor affiliates, (e) tangible property, (f) goodwill, (g) intellectual property, (h) telephone numbers, (i) sales and promotional materials, customer lists and sales related materials, (j) rights under unfulfilled vendor purchaser orders, (k) unfulfilled customer orders in respect of which a purchase deposit has been made by the customer and the related payment has been made to the relevant vendor, (l) cash and cash equivalents, (m) files and operating data, (n) rights and benefits accruing under any permits, (o) claims and causes of action under Chapter 5 of the Bankruptcy Code, (p) pre-paid items, (q) present or future rights to insurance proceeds relating the acquired assets or assumed liabilities, (r) warranties, guarantees and indemnities related to the

---

[1] The following is merely a summary of the Sale Agreement and is qualified in its entirety by the actual, express terms of the Sale Agreement. To the extent there is any discrepancy between this summary and the terms of the Sale Agreement, the terms of the Sale Agreement shall control.

acquired assets, (s) rights, demands, claims and credits related to the acquired assets and (t) rights under confidentiality agreements.

Purchase Price: The purchase price for the Assets is (a) cash in the amount of $6.5 million, subject to certain adjustments,[2] (b) plus cure costs on any Assigned Contracts and Leases, and (c) minus the sum of all obligations outstanding under the DIP Facility[3] as of the closing (the "Closing") of the Asset Sale (the "Purchase Price").

Assumed Liabilities: Purchase is not assuming any liabilities of the Debtor other than (a) residential warranty claims, (b) customer claims for delivery of goods on open orders that have been prepaid (so long as payment for the goods has been made to the vendor and such claim is specifically set for on a schedule to the Sale Agreement), (c) liabilities arising from and after the Closing under any Assigned Contracts and Leases identified by Purchaser to be assumed and assigned to Purchaser at Closing, and (d) such other liabilities as may be specifically identified in the Sale Agreement.

Assigned Contracts and Leases. The Sale Agreement contemplates that certain executory contracts will be assumed and assigned to Purchaser at Closing (the "Assigned Contracts and Leases"). Purchaser will provide the Debtor with a schedule of the Assigned Contracts and Leases no later than 15 calendar days prior to the Sale Hearing. Purchaser shall be responsible for the payment of any Cure Cost[4] associated with any Assigned Contract or Lease, provided, however, that if the Cure Cost for any Assigned Contract or Lease is disputed by the counterparty thereto and is determined by the Court to be higher than the Cure Cost set forth on the Debtor's books and records, Purchaser has reserved the right not to take an assignment of such Assigned Contract or Lease, notwithstanding the timing provisions otherwise provided herein.

Excluded Assets: The Debtor is not selling to the Purchaser, and the Assets do not include, any asset specifically identified by Purchaser as being an Excluded Asset set forth in Section 2.02 of the Sale Agreement or otherwise excluded in writing no later than fifteen (15) days prior to the Closing.

---

[2] The Purchase Price will be (a) increased by the amount, if any, by which the Current Accounts Receivable (as defined in the Sale Agreement), as reflected on the Debtor's books and records 2 business days prior to the Closing Date exceed $900,000; and (b) decreased by the amount, if any, by which the Current Accounts Receivable, as reflected on the Debtor's books and records 2 business days prior to the Closing Date are less than $800,000.

[3] Simultaneously with the Petition Date, the Debtor filed a motion seeking, among other things, approval of a $4 million senior secured debtor-in-possession financing facility from Kravet (the "DIP Facility").

[4] As discussed herein, pursuant to the pre-fixed order scheduling hearing, the Debtor requests that the Court fix a bar date for the assertion of any Cure Costs by the counterparty to any Assigned Contracts and Leases.

Conditions to Closing: The Sale Agreement provides that the conditions to closing include, among other things, (a) entry of a final non-appealable order by the Bankruptcy Court authorizing the sale of the Assets to Purchaser, in accordance with the terms of the Sale Agreement; (b) a closing occurring no later than March 21, 2011; (c) representations and warranties are true and correct; (d) no breach of the Sale Agreement; and (e) an active inventory level of not less than $5 million.

Record Retention: The Purchaser has agreed to provide the Debtor with access to its books and records as may be necessary to conclude the administration of the estate.

Transition Services: The Purchaser and the Seller have agreed to enter into a transition services agreement, pursuant to which, at Purchaser's sole cost and expense, Seller will provide Purchaser with access to premises, and the benefits of any executory contract not being assumed and assigned, for a period of time post-Closing so as to permit Purchaser to conduct an orderly transition with respect to the Acquired Assets.

Record Retention: The Purchaser has agreed to provide the Debtor with access to its books and records as may be necessary to conclude the administration of the estate.

**PLEASE TAKE FURTHER NOTICE,** that any of the hearings scheduled by the Bankruptcy Court may be adjourned from time to time withoutprior notice to creditors or other parties of interest, other than by announcement in Bankruptcy Court of such adjournment on the date of the hearing.

**PLEASE TAKE FURTHER NOTICE,** that copies of the entire sale package are available for inspection at the Bankruptcy Court's website (www.nysb.uscourts.gov); or during regular business hours at the office of the Clerk of the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601-4140; and you may request a copy by contacting Halperin Battaglia Raicht, LLP, 555 Madison Avenue, 9th Floor, New York, New York 10022, Attn: Ligee Gu, Esq., telephone number (212) 765-9100 or lgu@halperinlaw.net.

**PLEASE TAKE FURTHER NOTICE,** that objections, if any, to the Sale shall be filed electronically with the Clerk of the Bankruptcy Court (with a copy to chambers), and served upon Halperin Battaglia Raicht, LLP, proposed attorneys for the Debtor, 555 Madison Avenue, 9th Floor, New York, New York 10022, Attn: Alan D. Halperin, Esq. and Robert D. Raicht, Esq. and Schulte Roth & Zabel LLP, attorneys for Purchaser, 919 Third Avenue, New York, New York  10022, Attn: Adam C. Harris, Esq., so as to be received no later than **_____, 2011 at __:__ _.m. (ET).**

Dated: New York, New York
January __, 2011

**HALPERIN BATTAGLIA RAICHT, LLP**
Proposed Bankruptcy Counsel to
**BRUNSCHWIG & FILS, INC.**
Alan D. Halperin, Esq.
Robert D. Raicht, Esq.
Jocelyn Keynes, Esq.
555 Madison Avenue, 9th Floor
New York, New York 10022
Telephone (212) 765-9100
Facsimile (212) 765-0964

**EXHIBIT A**

**BIDDING PROCEDURES ORDER**

## **Exhibit D**

Form of Notice of Cure Claims Bar Date

UNITED STATES BANKRUPTCY COURT                    **Cure Claim Bar Date:**
SOUTHERN DISTRICT OF NEW YORK                      **2/[18]/2011, 4:00 p.m.**
-----------------------------------------------------------x
In re:

**BRUNSCHWIG & FILS, INC.,**                        Chapter 11

                                                    Case No. 11-22036 (RDD)

                                  Debtor.
-----------------------------------------------------------x

## NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND ESTABLISHMENT OF CURE CLAIMS BAR DATE FOR NON-DEBTOR <u>COUNTERPARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>

**TO ALL NON-DEBTOR COUNTERPARTIES TO**
**EXECUTORY CONTRACTS OR LEASES WITH THE DEBTOR:**

   **PLEASE TAKE NOTICE** that on January 12, 2011 (the "<u>Petition Date</u>"), Brunschwig & Fils, Inc., the debtor and debtor-in-possession herein ("<u>Brunschwig</u>" or the "<u>Debtor</u>"), filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York.

   **PLEASE TAKE FURTHER NOTICE** that the Debtor has filed a motion (the "<u>Motion</u>") seeking approval of a certain asset purchase and agreement and all ancillary transaction documents (collectively, the "<u>Sale Agreement</u>") by and between the Debtor, T. Olivier Peardon and Thomas P. Peardon, Jr., as sellers, and Kravet Inc. ("<u>Kravet</u>" or the "<u>Purchaser</u>"), pursuant to which, among other things, the Debtor proposes to sell substantially all of its assets (the "<u>Assets</u>") to Purchaser, free and clear of all liens, claims and encumbrances, subject to higher or better offers (the "<u>Sale</u>").

   **PLEASE TAKE FURTHER NOTICE** that in connection with the Sale, the Debtor has filed a schedule of all of the Debtor's executory contracts and unexpired leases that may potentially be assumed and assigned to the Purchaser in accordance with the Sale Agreement (the "<u>Cure Claims List</u>"); further, the Debtor has filed (among other things) the cure costs associated with each executory contract and unexpired lease on the Cure Claims List, calculated in accordance with the Debtor's books and records. The Cure Claims List is attached hereto as **<u>Exhibit A</u>**.

   **PLEASE TAKE FURTHER NOTICE** that the Bankruptcy Court has established **<u>February [18], 2011 at 4:00 p.m.</u>** (the "<u>Cure Claims Bar Date</u>") as the date by which all non-debtor counterparties parties to the executory contracts and unexpired leases must electronically file with the Clerk of the Bankruptcy Court a cure claim, setting forth all claims and arrearages against the Debtor due under such executory contract or unexpired lease (the

"<u>Cure Claims</u>"), and serve a copy of the Cure Claim upon Halperin Battaglia Raicht, LLP, proposed attorneys for the Debtor, 555 Madison Avenue, 9th Floor, New York, New York 10022, Attn: Alan D. Halperin, Esq. and Robert D. Raicht, Esq.

**PLEASE TAKE FURTHER NOTICE** that any party that is required to file a Cure Claim, but fails to do so, shall be bound by the cure amount as set forth on the Cure Claim List, and shall be forever barred from asserting any other Cure Claim against the Debtor, its estate, the Purchaser, or its designee, and/or any Successful Bidder arising under such executory contract.

Dated: New York, New York
        February __, 2011

> **HALPERIN BATTAGLIA RAICHT, LLP**
> Proposed Bankruptcy Counsel to
> **BRUNSCHWIG & FILS, INC.**
> Alan D. Halperin, Esq.
> Robert D. Raicht, Esq.
> Jocelyn Keynes, Esq.
> 555 Madison Avenue, 9th Floor
> New York, New York 10022
> Telephone (212) 765-9100
> Facsimile (212) 765-0964

**EXHIBIT A**

**Cure Claims List**

Exhibit G

Form of Bill of Sale

**Exhibit G**

**FORM OF**

**BILL OF SALE**

BY THIS BILL OF SALE (this "Bill of Sale") made on _____, 2009 by and between Brunschwig & Fils, Inc., a New York corporation ("Seller") and Kravet, Inc. a Delaware corporation ("Buyer"), for good and valuable consideration paid by Buyer, the receipt and sufficiency of which consideration are acknowledged by Seller, pursuant to the terms and provisions of that certain Asset Purchase Agreement dated as of January 28, 2011 by and among Buyer, Seller, T. Olivier Peardon and Thomas P. Peardon, Jr. (the "Agreement"), Seller does hereby, effective as of the date hereof, irrevocably bargain, grant, sell, convey, assign, transfer and deliver to Buyer and its successors and assigns, all right, title and interest of Seller in, to and under the Acquired Assets, including, without limitation, the Acquired Assets listed on the attached Exhibit A, free and clear of all Encumbrances (other than Permitted Encumbrances), and Buyer does hereby purchase, acquire and accept from Seller, effective as of the date hereof, all right, title and interest of Seller in, to and under the Acquired Assets.

Notwithstanding the foregoing, the provisions of this Bill of Sale are subject, in all respects, to the terms and conditions of the Agreement and all the representations and warranties, covenants and agreements contained therein, all of which shall survive the execution and delivery of this Bill of Sale as provided in the Agreement. In the event of any inconsistency between the terms and conditions of this Bill of Sale and those of the Agreement, the terms and conditions of the Agreement will govern and control.

All capitalized terms used but not otherwise defined in this Bill of Sale shall have the respective meanings ascribed to such terms in the Agreement.

This Bill of Sale shall be governed by, and construed in accordance with, the Laws of the State of New York applicable to Contracts executed in and to be performed in that State, and, to the extent applicable, the Bankruptcy Code.

This Agreement may be signed in any number of counterparts (including by facsimile or PDF), each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

IN WITNESS WHEREOF, Seller has caused this Bill of Sale to be executed by its duly authorized representative as of the date first written above,

BRUNSCHWIG & FILS, INC.

By:_____
Name:
Title:

ACKNOWLEDGED AND ACCEPTED AS OF
THE DATE FIRST WRITTEN ABOVE:

KRAVET INC.

By:_____
Name:
Title:

# EXHIBIT A

# ACQUIRED ASSETS

**Exhibit J**

**TRANSITION SERVICES AGREEMENT**

This Transition Services Agreement (together with the Exhibit hereto, this "<u>Agreement</u>"), is made as of March __, 2011, by and between Brunschwig & Fils, Inc., a New York corporation ("<u>B&F</u>") and Kravet Inc., a Delaware corporation ("<u>Buyer</u>"). B&F and Buyer are sometimes referred to herein as a "<u>Party</u>" or collectively as the "<u>Parties</u>."

<u>W I T N E S S E T H</u>:

WHEREAS, B&F, Buyer, T. Olivier Peardon and Thomas P. Peardon, Jr. are parties to an Asset Purchase Agreement dated as of January 28, 2011 (as may be amended from time to time, the "<u>Purchase Agreement</u>"), pursuant to which, among other things, B&F has agreed to transfer, sell, convey, assign and deliver to Buyer certain of the assets held, owned or used by B&F to conduct the Business and to assign certain Liabilities associated with the Business to Buyer, and Buyer has agreed to acquire such assets and assume such Liabilities;

WHEREAS, B&F has agreed to provide, and to cause certain of its Affiliates to provide, to the Buyer during the term of this Agreement access to certain properties and services utilized by B&F and its Affiliates in connection with the operation of the Business prior to the Closing (and which are not the subject of any Assigned Contracts or Assigned Leases); and

WHEREAS, B&F and Buyer desire to enter into this Agreement simultaneously with the Closing of the transactions contemplated by the Purchase Agreement.

NOW THEREFORE, in consideration of the foregoing and of the representations, warranties, covenants and agreements of the Parties contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS**

Section 1.01    <u>Definitions</u>. Capitalized terms used in this Agreement but not defined herein shall have the meanings given to them in the Purchase Agreement. Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| <u>Term</u> | <u>Section</u> |
| Agreement | Preamble |
| B&F | Preamble |
| B&F Location | Exhibit A |
| B&F Location Assets | Exhibit A |
| Buyer | Preamble |
| Disputed Amount | 3.01 |
| Expenses | 3.01 |

Funded Amount ..................................................................3.01
Indemnified Party .........................................................6.01(c)
Indemnifying Party .......................................................6.01(c)
Indemnitee ...................................................................6.01(c)
Indemnitor.....................................................................6.01(c)
Losses ..........................................................................6.01(a)
Monthly Cost Budget..........................................................3.01
Parties ......................................................................Preamble
Party.........................................................................Preamble
Services.........................................................................2.01(a)
Purchase Agreement .............................................................Recitals
Required Consents ...............................................................2.05
Service Fees...........................................................................3.01
Transition Period ..................................................................4.01

## ARTICLE II
## SERVICES PROVIDED

Section 2.01    The Services.

(a)    Provision of Services.  On the terms and subject to the conditions set forth in this Agreement, during the Transition Period, B&F agrees to provide, or cause to be provided, to Buyer or its designated Affiliates those services identified on Exhibit A (the "Services"). Subject to Section 2.01(c), B&F may provide the Services itself or may cause one or more of its Affiliates to provide the Services.

(b)    Independent Contractor.  The relationship of B&F and Buyer pursuant to this Agreement is that of an independent contractor.  This Agreement is not intended to create and shall not be construed as created between B&F and its employees and personnel, on the one hand, and Buyer, and its employees and personnel, on the other hand, any relationship other than as independent contractor and purchaser of contract services, it being specifically acknowledged that there is no relationship between the Parties or their respective employees and personnel of affiliate, employer-employee, principal and agent, joint venture, partnership, or similar relationship.  Each Party retains control over its personnel, and the employees of one Party shall not be considered employees of the other Party.  Neither Party will be bound by any representation, act or omission of the other Party.  Neither Party has any right, power or authority to create any obligation, express or implied on behalf of the other Party.

(c)    Standard of Performance.  B&F shall use its commercially reasonable efforts to provide, or cause to be provided, the Services with the same timeliness, service, quality and standard of care as such Services were performed by or for the Business immediately prior to the Closing that are consistent with past practice.  B&F shall be responsible for obtaining any third party licenses, consents, waivers or other rights necessary for the provision of the Services in accordance with this Agreement; provided that Buyer hereby acknowledges that, following the Closing of the transactions contemplated by the Purchase Agreement, B&F will have transferred substantially all of its assets and will commence liquidation.

(d) <u>Transitional Nature; Orderly Transfer</u>.  The Parties acknowledge and agree that the Services to be provided hereunder are transitional in nature and are intended to provide Buyer sufficient time to develop the internal resources and capacities (or to arrange for third party providers) for such Services.  Each of the Parties shall use commercially reasonable efforts to (i) assist and cooperate with one another in the orderly transfer of the provision of Services from B&F to Buyer or Buyer's substitute service providers and (ii) make available, or cause to be made available, the documentation, personnel and know-how reasonably needed to facilitate such orderly transfer (to the extent such personnel and know-how exist at B&F following Closing).  The Parties further agree to cooperate and provide each other reasonable access to each other's premises and personnel during normal business hours as may be reasonably necessary for purposes of this Agreement, the orderly transfer of Services hereunder, or to facilitate the Parties' performance of their obligations under this Agreement.

Section 2.02   <u>Audit of Services</u>.  Upon reasonable request during normal business hours, B&F shall permit Buyer or its representatives to examine and make copies and abstracts from the records of B&F related to the Services for the purpose of reviewing the Services provided by B&F and its Affiliates and the amounts invoiced or paid by Buyer.

Section 2.03   <u>Names; Trademarks</u>.  This Agreement does not confer upon B&F the right to use any registered name, trademark, service mark, trade name or assumed name of Buyer (including, without limitation, any such registered name, trademark, service mark, trade name or assumed name acquired by Buyer pursuant to the Purchase Agreement).

Section 2.04   <u>Required Consents</u>.  B&F shall obtain any and all consents, waivers, authorization, permits or notifications necessary to allow B&F to provide the Services (and, if applicable, effect the assignment and transfer to Buyer of any B&F Location Assets) and to allow Buyer to use and access the Services, including, but not limited to, all computer hardware and software used in connection with the Services (the "<u>Required Consents</u>"); provided that B&F shall not make any expenditure to obtain any Required Consents without the prior written consent of Buyer.  If a Required Consent is not obtained, then, unless and until such Required Consent is obtained, B&F shall determine and adopt, subject to Buyer's written approval, such alternative commercially reasonable approaches as are necessary and sufficient to provide the Services in accordance with <u>Section 2.01(c)</u> without such Required Consents and in a manner which does not increase the fees payable by Buyer hereunder and does not violate any applicable provision of the Bankruptcy Code or B&F's duties and obligations as a debtor-in-possession.

Section 2.05   <u>Compliance with Laws</u>.  Each Party shall comply with all applicable laws in connection with its provision of the Services.

**ARTICLE III**
**CONSIDERATION**

Section 3.01   <u>Payment of Service Fees and Expenses</u>.

(a)   B&F shall submit to Buyer, no later than the times set forth in clause (b) of this Section 3.01, a budget reasonably satisfactory to Buyer and in substantially the form

\\

attached hereto as <u>Exhibit B</u> (the "<u>Monthly Cost Budget</u>"), for all reasonably anticipated service fees (the "<u>Service Fees</u>") and expenses (the "<u>Expenses</u>") for providing the Services to Buyer during the subsequent calendar month; <u>provided</u> that with respect to access to and use of any Leased Real Property or Subsidiary Leased Real Property, the Service Fees shall be limited to amounts required to be paid by B&F under the applicable Lease for such month.

(b)     B&F shall submit the initial Monthly Cost Budget (the "<u>Initial Monthly Cost Budget</u>") to Buyer no later than five (5) days prior to the Closing Date, which Monthly Cost Budget shall cover the period from the Closing Date through the end of the calendar month immediately following the Closing Date. Thereafter, B&F shall, on or before the 15th day of each calendar month during the Transition Period a Monthly Cost Budget for the next succeeding calendar month (each such Monthly Cost Budget, a "<u>Subsequent Monthly Cost Budget</u>").

(c)     On the Closing Date (with respect to the Initial Monthly Cost Budget), and at or before 9:00 am New York City time on the first day of each calendar month (with respect to each Subsequent Monthly Cost Budget), Buyer shall transfer by wire transfer of immediately available funds to a segregated bank account the amount set forth in the applicable Monthly Cost Budget (the "<u>Funded Amounts</u>"). Except with the written consent of Buyer, B&F shall use the Funded Amounts solely to pay line-item expenditures expressly set forth in the Monthly Cost Budget. Upon the written request of Buyer, B&F shall make available to Buyer supporting documentation for all Service Fees and Expenses and shall certify in writing to Buyer that all expenditures for each such month have been made in accordance with the Monthly Cost Budget. Any Funded Amounts for any calendar month not spent shall remain in the segregated account and applied towards the payment of Service Fees and Expenses for the subsequent calendar month (as expressly set forth in the Monthly Cost Budget for such calendar month). For the avoidance of doubt, the Initial Monthly Cost Budget shall be annexed as <u>Exhibit B</u> hereto. Upon the termination of this Agreement and after payment of all Service Fees and Expenses, all remaining unused Funded Amounts, if any, shall be returned to Buyer by wire transfer to an account identified by Buyer to B&F in writing.

Section 3.02   <u>Reduction of Services</u>. In the event that any Services set forth on <u>Exhibit A</u> are terminated by Buyer in accordance with <u>Section 4.02</u>, the Monthly Cost Budget for the subsequent calendar month shall reflect the termination of such Services and Buyer shall have no obligation to fund Service Fees or Expenses in respect of such terminated Services for any subsequent calendar month.

**ARTICLE IV**
**TERM AND TERMINATION**

Section 4.01   <u>Term</u>. Unless earlier terminated in whole or in part pursuant to <u>Section 4.02</u>, the Services shall be made available by B&F to Buyer during the period from and including the date hereof until the end of business on the 210th day following the Petition Date (or, in the case of Contracts or Leases that are not Assigned Contracts or Assigned Leases under the Purchase Agreement, until the expiration of the term of such Contracts or Leases if such term expires prior to the end of business on the 210th day following the Petition Date) or otherwise

agreed to by the Parties in writing, unless extended or sooner terminated in accordance with the provisions of this Agreement (the "Transition Period").

Section 4.02    Termination.

(a)    Notwithstanding Section 4.01, Buyer shall have the right at any time during the Transition Period to terminate or reduce its right to receive any or all of the Services effective on the first day of the subsequent month, for any reason or no reason, by providing notice to B&F at least 30 days (or such shorter period as may be approved by order of the Bankruptcy Court) prior to the last day of the month.

(b)    If B&F materially breaches any of its obligations under this Agreement, and does not cure such default within 10 days after receiving written notice thereof from Buyer, then Buyer may, at its option, terminate any Service affected by such material breach or this Agreement in its entirety by providing written notice of termination to B&F, which termination shall be effective on the second business day following B&F's receipt of such notice of such termination.

Section 4.03    Effect of Termination.  Upon the expiration of the Transition Period or the termination of this Agreement in accordance with the terms hereof, all obligations of the Parties hereunder shall terminate and be of no further force and effect, except that the obligations set forth in Section 2.02, Section 2.03, Article III, Article V, Article VI and Article VII will survive such expiration or termination.

## ARTICLE V
## CONFIDENTIALITY

Section 5.01    Confidentiality.  The confidentiality provisions set forth in the Purchase Agreement apply to this Agreement as if fully set forth herein.

## ARTICLE VI
## LIABILITY AND INDEMNIFICATION

Section 6.01    Indemnification.  (a)  B&F agrees to indemnify and hold harmless the Buyer and its Affiliates and its and their respective stockholders, members, partners, directors, managers, officers, employees, consultants, agents and representatives, in their capacities as such, and the respective successors, assigns, heirs and personal representatives of the foregoing, from and against any and all losses, liabilities, damages, costs and expenses (including reasonable legal fees and expenses, court costs and reasonable costs of investigation, defense or settlement), related to or arising out of any matters contemplated by this Agreement (collectively, "Losses") to the extent that it shall be finally judicially determined that such Losses resulted from (i) any bodily injury or damage to property occasioned by the acts or omissions of B&F or its agents, employees or representatives in connection with the Services; (ii) fraud, gross negligence or willful misconduct with respect to the provision of the Services; (iii) any failure by B&F to obtain any Required Consent; and (iv) a claim that the Services, or any intellectual property or software used in connection with the Services, or Buyer's receipt of, access to, or use of any of the foregoing violates any intellectual property rights.

(b)    Buyer agrees to indemnify and hold harmless B&F and its Affiliates and their respective stockholders, members, partners, directors, managers, officers, employees, consultants, agents and representatives, in their capacities as such, and the respective successors, assigns, heirs and personal representatives of the foregoing, from and against any and all Losses to the extent that it shall be finally judicially determined that such Losses resulted from the gross negligence or willful misconduct of Buyer.

(c)    The party seeking indemnification pursuant to this Section 6.01 may be referred to as the "Indemnitee" or "Indemnified Party" and the party against whom an indemnification claim is made may be referred to as the "Indemnitor" or "Indemnifying Party".

Section 6.02    Indemnification Procedure.

(a)    Any claim for Losses shall be asserted by written notice given by the Indemnitee to the applicable Indemnitor.  The Indemnitee agrees that the Indemnitor will have the right to assume and control the defense or settlement of such claim, with counsel chosen by the Indemnitor; provided, however, that the Indemnitor shall not enter into any settlement or compromise of any such claim in the even such settlement or compromise imposes any liability or obligation on the Indemnitee, without the Indemnitee's prior written consent.  If the Indemnitor does not respond promptly or take control of such claim, the Indemnitee shall be permitted to assume and assume the defense or settlement of such claim, with counsel chosen by the Indemnitee and shall be free to pursue such other remedies as may be available to it under this Agreement.

(b)    In addition, if the amount of any third party claim for Losses shall, at any time subsequent to the payment required by this Agreement, be reduced by recovery, settlement with such third party or otherwise, the amount of such reduction, less any expenses incurred in connection therewith, shall promptly be repaid by the Indemnitee to the Indemnitor.

Section 6.03    Limitation of Remedies.  NEITHER PARTY SHALL HAVE ANY OBLIGATION OR LIABILITY TO THE OTHER WITH RESPECT TO THE MATTERS CONTEMPLATED BY THIS AGREEMENT, WHETHER ARISING IN CONTRACT (INCLUDING WARRANTY), TORT (INCLUDING ACTIVE, PASSIVE OR IMPUTED NEGLIGENCE) OR OTHERWISE, FOR ANY SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS AND OPPORTUNITY COSTS, WHETHER FORESEEABLE OR NOT.  NOTWITHSTANDING ANYTHING IN THIS AGREEMENT, THE LIMITATIONS ON AND EXCLUSIONS FROM LIABILITY DO NOT APPLY TO LIABILITY RESULTING FROM (I) A PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER OR (II) FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT BY A PARTY.

## ARTICLE VII
## MISCELLANEOUS

Section 7.01    Notices.  All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given: (a) on the same

Business Day if sent by email followed by facsimile (with written confirmation of receipt), (b) when delivered by hand (with written confirmation of receipt), (c) when sent by facsimile (with written confirmation of receipt), (d) when received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (e) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses, representative (if applicable) and facsimile numbers set forth below (or to such other addresses, representative and facsimile numbers as a party may designate by notice to the other Parties given in accordance with this <u>Section 7.01</u>):

      (a)      If to B&F, then to:

                c/o Brunschwig & Fils, Inc.
                75 Virginia Road
                N. White Plains, NY  10603-0905
                Attention:     T. Olivier Peardon, President & CEO
                Facsimile:     914-684-6140
                E-mail:     opeardon@brunschwig.com

                with a copy (which shall not constitute notice) to:
                Halperin Battaglia Raicht, LLP
                555 Madison Avenue
                9th Floor
                New York, NY 10022-3301
                Attention:     Alan D. Halperin, Esq.
                Facsimile:     212-765-0964
                E-mail:     ahalperin@halperinlaw.net

      (b)      If to Buyer, then to:

                Kravet Inc.
                225 Central Avenue South
                Bethpage, NY  11714
                Attention:     Cary Kravet, President & CEO
                Facsimile:     516-293-8675
                E-mail:     cary.kravet@kravet.com

                with a copy (which shall not constitute notice) to:
                Schulte Roth & Zabel LLP
                919 Third Avenue
                New York, NY  10022
                Attention:     Adam C. Harris, Esq.
                Facsimile:     212-593-5955
                E-mail:     adam.harris@srz.com

      Section 7.02   <u>Waivers</u>.  Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement

shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by applicable law, (a) no waiver that may be given by a party shall be applicable except in the specific instance for which it is given; and (b) no notice to or demand on one party shall be deemed to be a waiver of any right of the party giving such notice or demand to take further action without notice or demand.

Section 7.03    Transaction Costs.  Except as otherwise provided in this Agreement, all costs and expenses incurred in connection with the preparation and negotiation of this Agreement shall be paid by the Party incurring such cost and expense.

Section 7.04    Entire Agreement; Amendment.  This Agreement, the Purchase Agreement and the other Transaction Documents supersede all prior agreements (other than the Confidentiality Agreement, which shall remain in full force and effect) between the Parties with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between the Parties with respect to their subject matter (other than the Confidentiality Agreement, which shall remain in full force and effect).  This Agreement may not be amended except by a written agreement executed by the Parties.

Section 7.05    Successors and Assigns.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign, delegate or otherwise transfer, directly or indirectly, in whole or in part, any of its rights or obligations under this Agreement without the prior written consent of the other Party; provided, however, that Buyer shall be permitted, upon prior notice to B&F, to assign all or part of its rights or obligations hereunder to an Affiliate, whereupon, references to "Buyer" herein shall be deemed to refer to such Affiliate; provided further that any such assignment shall not relieve Buyer of any of its financial obligations to Sellers hereunder.  Any attempted assignment, delegation or transfer in violation of this Section 7.05 shall be null and void.

Section 7.06    Construction.  As used in this Agreement, any reference to the masculine, feminine or neuter gender shall include all genders, the plural shall include the singular, and singular shall include the plural.  References in this Agreement to a Party or other Person include their respective successors and assigns.  The words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation" unless such phrase otherwise appears. Unless the context otherwise requires, references in this Agreement to Articles, Sections and Exhibits shall be deemed references to Articles and Sections of, and Exhibits to, this Agreement.  Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision hereof.  With regard to each and every term and condition of this Agreement, the Parties understand and agree that the same have or has been mutually negotiated, prepared and drafted, and that if at any time the Parties desire or are required to interpret or construe any such term or condition or any agreement or instrument subject thereto, no consideration shall be given to the issue of which Party actually prepared, drafted or requested any term or condition of this Agreement.  All

\\

references in this Agreement to "dollars" or "$" shall mean United States dollars. Any period of time hereunder ending on a day that is not a Business Day shall be extended to the next Business Day.

Section 7.07 Governing Law. This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York (without giving effect to any choice of law or conflict of law provisions) applicable to Contracts executed in and to be performed in that State, and, to the extent applicable, the Bankruptcy Code.

Section 7.08 Counterparts; Effectiveness. This Agreement may be signed in any number of counterparts (including by facsimile or PDF), each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party.

Section 7.09 Jurisdiction. The Parties agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Agreement and the transactions contemplated hereby and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; *provided* that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party: (i) agrees that all such actions or proceedings shall be heard and determined in a New York state or federal court sitting in The City of New York, Borough of Manhattan; (ii) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (iv) agrees that service of process in any such action or proceeding may be effected by providing a copy thereof by any of the methods of delivery permitted by Section 7.01 to such party at its address as provided in Section 7.01 (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Law). EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.09.

Section 7.10 Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. The application of such invalid or unenforceable provision to Persons or circumstances other than

\\

those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by Applicable Law.  To the extent any provision of this Agreement is determined to be prohibited or unenforceable in any jurisdiction, B&F and Buyer agree to use reasonable commercial efforts to substitute one or more valid, legal and enforceable provisions that, insofar as practicable, implement the purposes and intent of the prohibited or unenforceable provision.

Section 7.11  <u>Captions</u>.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

Section 7.12  <u>Third Party Beneficiaries</u>.  Except as expressly provided herein, nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any Person other than the Parties, and their successors or permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such Person being deemed a third party beneficiary of this Agreement.

Section 7.13  <u>Specific Performance</u>.  Each Party acknowledges that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by such Party and that any such breach would cause the other Party irreparable harm.  Accordingly, each Party also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such Party, the other Party shall be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance, in addition to all other remedies available to such other Party at law or in equity.

Section 7.14  <u>Further Assurances</u>.  Subject to the terms and conditions herein provided, parties hereto agree to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including, without limitation, the provision of the Services in accordance with this Agreement and, to the extent applicable, the assignment and transfer of the B&F Location Assets to Buyer.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized representatives on the day and year first above written.

KRAVET INC.

By:_____
Name:
Title:

BRUNSCHWIG & FILS, INC.

By:_____
Name:
Title:

## SERVICES

1.      B&F shall provide to Buyer or its designated Affiliates access, hosting and support services for the software and applications known as "Net Suite".

2.      B&F shall support the transfer of existing or needed records used or useful in connection with the Business.

3.      B&F shall provide access to each showroom, warehouse, office or other location at which B&F conducted the Business (or any portion thereof) immediately prior to Closing (each a "B&F Location") and shall not cause the effective date of any rejection of any Lease thereafter to occur prior to the expiration of this Agreement absent the written consent of, or written direction of, Buyer.

4.      With respect to each B&F Location, B&F shall retain and provide Buyer access to all of the tangible personal property related to, or used or useful in or held for use in the conduct of the Business (or any portion thereof) immediately prior to the Closing, including, without limitation, archives, samples, wings, furniture, fixtures, furnishings, screens, artwork, equipment (including warehouse, office and computer equipment), machinery, tools, supplies, spare parts, molds, trucks, cars, other vehicles and rolling stock, office materials and supplies and other tangible personal property located in each B&F Location (the "B&F Location Assets"); provided that Buyer shall have the right, upon three Business Days' written notice to B&F to acquire, and, no later than the third Business Day following such notice, B&F shall assign and transfer or cause to be assigned and transferred to Buyer, the B&F Location Assets for any B&F Location identified by Buyer in such notice without any adjustment to the Purchase Price.

5.      B&F shall provide Buyer access, hosting and support services in connection with the use of B&F's leased computer system by Buyer.

6.      B&F shall provide Buyer with the benefits of any Contract or Lease to which B&F is a party that is not an Assigned Contract or Assigned Lease.

7.      B&F shall retain employees and other personnel necessary to provide the Services and shall provide Buyer with access to such employees and personnel.

\\

**MONTHLY COST BUDGET**